Exhibit 12

```
 1          IN THE UNITED STATES DISTRICT COURT

 2     FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4    LESLIE MCDERMOTT,     )

 5              Plaintiff, )  CIVIL ACTION

 6        vs.              )  BI, 17-cv-4511 (MAK)

 7    GREAT LAKES DREDGE    )

 8    AND DOCK CO.,         )

 9              Defendant. )

10

11

12

13    VIDEOTAPED DEPOSITION OF DARREN A. FRANK, M.D.,

14     taken pursuant to the Federal Rules of Civil

15     Procedure, before Mary Secot, Certified Court

16     Reporter-Notary Public in and for the

17     Commonwealth of Pennsylvania, on Wednesday,

18     July 18, 2018, at 1307 Federal Street,

19     Pittsburgh, Pennsylvania 15219, commencing at

20     4:30 o'clock p.m.

21                      - - -

22

23

24

25
```

```
 1                A P P E A R A N C E S

 2                        - - -

 3    On behalf of the Plaintiff:

 4          S. REED MORGAN, Esquire

 5          S. Reed Morgan, P.C.

 6          413 Eighth Street

 7          P.O. Box 38

 8          Comfort, Texas 78013

 9          (830) 995-2464

10          rmorgan@carlsonattorneys.com

11    On behalf of the Defendant:

12          Frank P. DeGiulio, Esquire

13          Palmer Biezup & Henderson, LLP

14          190 North Independence Mall West

15          Suite 401

16          Philadelphia, PA 19106

17          (215) 625-7809

18          fpd@pbh.com

19

20          Dax Parise, videographer

21          Veritas Legal Services

22                      - - -

23

24

25
```

```
 1                    I N D E X

 2    WITNESS                  EXAMINATION BY      PAGE

 3    DARREN A. FRANK, M.D.    Mr. Morgan         5/84/97

 4                             Mr. DeGiulio         45/96

 5

 6                                          MARKED FOR

 7    EXHIBITS                           IDENTIFICATION

 8    No. 1, Medical records                  4

 9    No. 2, Lower Limb diagram              4

10    No. 3, Lower Limb diagram              4

11    No. 4, Lower Limb diagram              4

12    No. 5, Lower Limb diagram              4

13    No. 6, Curriculum Vitae               44

14    No. 7, Dr. Frank's invoice

15          (to be marked later)

16    No. 8, Compendium of Dr. Frank's reports  46

17    No. 9, Causes of Meniscal Tears article   47

18          Diagnosing Meniscal Tears article

19    No. 10, Meniscus Tears article        48

20    No. 11, Abstract article              56

21                        - - -

22

23

24

25
```

1             P R O C E E D I N G S

2                  (4:31 o'clock p.m.)

3            (Frank Deposition Exhibit Nos. 1 through

4       5 were marked for identification.)

5            VIDEOGRAPHER:  This is the videotape

6    deposition of Dr. Darren Frank taken in the matter

7    of Leslie McDermott versus Great Lakes Dredge and

8    Dock Company filed in the United States District

9    Court, Eastern District of Pennsylvania, Case.

10   No. 17-cv-4511.

11            This deposition is being held at 1307

12   Federal Street, Pittsburgh, Pennsylvania 15219 on

13   Wednesday, July 18, 2018.  My name is Dax Parise,

14   video specialist.  The court reporter is

15   Mary Secot from Douget Court Reporting with

16   offices at 3207 Landfair, Lake Charles, Louisiana

17   70601.

18            We are going on the record.  The time is

19   approximately 4:31 p.m.  Counsel will please state

20   their appearance for the record.

21            MR. MORGAN:  Good afternoon.  My name is

22   Reed Morgan.  I represent Leslie McDermott.

23            MR. DeGIULIO:  Good afternoon.

24   Frank DeGiulio representing Great Lakes Dredge and

25   Dock Company.

1              VIDEOGRAPHER:  Thank you.  The court

2      reporter will now swear in the witness.

3              DARREN A. FRANK, M.D.,

4        the witness, having been first duly sworn, was

5        deposed and testified as follows:

6                      EXAMINATION

7      BY MR. MORGAN:

8          Q.   Good afternoon, Dr. Frank.

9          A.   Good afternoon.

10         Q.   As you know, we're here to take your

11     testimony in the case where Les McDermott has filed a

12     lawsuit against his employer, Great Lakes Dredge and

13     Dock Company.

14             I would like to start the deposition today by

15     having you tell us about your college, medical school

16     and residency training.

17         A.   I graduated from Duquesne University in 1995.

18     I went on to pursue a Master's degree in Philadelphia,

19     followed by medical school at Drexel University

20     College of Medicine.  It was then known as Medical

21     College of Pennsylvania and Hahnemann University.  It

22     since changed names.

23             I graduated with a Doctor of Medicine in

24     2001.  I went on to pursue further training.  After

25     the M.D. in orthopedic surgery I did five years of

1    orthopedic surgery post-graduate training at Allegheny

2    General Hospital in Pittsburgh, Pennsylvania.

3           I did an additional year of fellowship

4    training in arthroscopy and sports medicine at

5    New York University Hospital for joint diseases in

6    Manhattan.

7           I've been employed with the Allegheny Health

8    Network since August of 2007 as an orthopedic surgeon

9    specializing in sports medicine and arthroscopic

10   surgery.

11      Q.   All right.  Thank you.  Can you tell us

12   please in your practice of medicine here did you

13   become board certified after you had done the

14   requisite number of years of practice?

15      A.   I did.  I am board certified in orthopedic

16   surgery with subspecialty certification in sports

17   medicine.

18      Q.   And in order to become board certified in

19   orthopedics, what did you have to accomplish?

20      A.   Complete passage of a written examination, as

21   well as an oral examination, and then an additional

22   written examination for subspecialty certification.

23      Q.   And the subspecialty certification is in

24   what?

25      A.   Sports medicine.

1    Q.   Okay.  Thank you.  Is that the highest degree

2    of certification you can have in those two areas?

3    A.   That is.

4    Q.   Okay.  Thank you.  Now, tell us a little bit

5    about your practice here at Allegheny Health Network.

6    What type of patients, in what walk of life do you see

7    for what kinds of injuries?

8    A.   I see patients from a broad, a broad based

9    walk of life.  I see a demographic from approximately

10   a 12-year-old to 80-year-old patients in terms of age.

11        I see a variety of athletes.  I see people

12   who are injured at work.  I see people who are injured

13   doing all sorts of things, really any activity.

14   Primarily for knee and shoulder injuries.

15   Q.   Okay.  Tell us with respect to your surgical

16   practice and experience in doing operations on persons

17   that have torn meniscus approximately how many of

18   those patients do you treat a year, do you believe?

19   A.   Operatively?

20   Q.   Operatively, yes.

21   A.   Probably 200 to 250 patients.

22   Q.   All right.  So, in essence, that would mean

23   that of those 200 to 250, those people go to surgery

24   and you try to help them through a repair of the

25   meniscus?

1          A.    Repair or resection, yes.

2          Q.    Or resection.  I saw in the literature,

3     there's actually, and actually it was in your notes

4     when you discussed the case with your patient,

5     Mr. McDermott, there's two types of health options

6     that you give a patient with a torn meniscus; aren't

7     there?

8          A.    Yes.  Well, in terms of surgical treatment?

9          Q.    In terms of surgical, sure.

10         A.    Yes.  There are two types of surgeries done

11    for a meniscal tear, either a partial resection or a

12    repair, and the criteria depends upon, you know,

13    chronicity of tear, the location of the tear, how much

14    blood supply there is, and the quality of the tissue.

15         Q.    And when you say repair, what does that

16    involve?

17         A.    Repair would involve actually stitching the

18    tear edges together in an effort to get it to heal.

19         Q.    Okay.  What is the other option?

20         A.    Just removing the torn part.

21         Q.    All right.  We're going to get into the

22    details a bit here in a moment on what happened with

23    your surgery on Mr. McDermott, but just so we kind of

24    have a pre-story of what this is about, did you do a

25    repair or a resection on him?

1          A.    A partial resection.

2          Q.    Okay.  Which means what?

3          A.    Removing the torn part of the meniscus.   In

4     Mr. McDermott's case the tear was not amenable to a

5     repair.

6          Q.    Why is that?

7          A.    Due to its location in the central aspect of

8     the meniscus where there's less than optimal blood

9     supply to encourage healing and also due to the

10    quality of the tissue, it was not amenable to a suture

11    repair.

12         Q.    Okay.  And before we get into your actual

13    treatment sequelae of Mr. McDermott, I just want to

14    ask some general questions about a meniscus.

15         A.    Sure.

16         Q.    Can you please tell us what is the function

17    of the meniscus in the human knee?

18         A.    The meniscus consists of a type of tissue

19    called cartilage.   In the knee there are two types of

20    cartilage.

21              There is the articular cartilage which is the

22    joint lining cartilage that lines the end of the bone.

23    The two bones that come together to make the knee are

24    the femur or the thigh, the tibia or the shin.   So the

25    joint lining or articular cartilage is one type.

1           The other type is the meniscal cartilage.

2     The meniscal cartilage can be thought of as a type of

3     gasket or shock absorbing structure that sits in

4     between the two bones, and if I may, I can show you on

5     this (indicating).

6           Q.    Please, go ahead.

7           A.    All right.  You put there Exhibit No. 3.  Let

8     me get that lined up.

9           Q.    What do we see there?  Are we good?

10          A.    Yes, sir.  This is a cross section through a

11    knee.  The femur would be up above here (indicating)

12    and the tibia would be below (indicating).  So what

13    we're looking at here is the meniscal cartilage.

14          Those are depicted here (indicating) in these

15    blue, sort of semi circular rings and the lighter blue

16    would be the articular joint lining cartilage.

17          So you can see how they sit in a position to

18    help absorb shock, and the histologic makeup of the

19    cartilage is such that it helps to absorb shock and

20    resist an axial load, a load that goes down through

21    the long axis of the knee.

22          Q.    So without the meniscus at all, if it was

23    totally removed, unless you were to as a surgeon put

24    in some artificial cartilage or meniscus, you would

25    have bone on bone; is that right?

1        A.    You would have articular cartilage on

2    articular cartilage after which point that cartilage

3    can wear away, and then you can get to a bone on bone

4    situation.

5            There is very good literature that shows that

6    resection of a very small amount of the meniscus can

7    increase the forces that the articular cartilage sees.

8            The articular cartilage can be thought of

9    sort of like the rubber on the tire.  Okay.  Once it

10   wears away, however, you can't replace it.  It's gone.

11       Q.    Okay.  Let me ask you if you could do this.

12   If you take this pen and just draw an arrow to the

13   articular cartilage and just abbreviate like AC so we

14   know what it is?

15       A.    (Witness indicating.)

16       Q.    Thank you.  Of course, and then your, that's

17   the more soft material that's in the inner portion of

18   the knee, the articular cartilage?

19       A.    That's in the joint lining cartilage.

20       Q.    And articular means what?

21       A.    Joint.

22       Q.    Okay.  And then the outer cartilage that is

23   involved in this case is called what?

24       A.    The meniscus.  So you have one lateral and

25   one medial, the medial being the inside part of the

1   knee and the lateral being the outside of the knee.

2        Q.   Okay.  Great.  Thank you.  Now, with respect

3   to the mechanical forces that we as people are

4   subjected to, are those meniscus important to

5   cushioning the tibia and the femur?

6        A.   Yes.

7        Q.   And if they are damaged in some way and you

8   remove a portion of the medial and lateral cartilage,

9   does that reduce the amount of cushion that the person

10  has?

11       A.   Yes.  The torn cartilage no longer functions

12  normally.  Okay.  So the tear is what actually reduces

13  the amount of available meniscus.

14       Q.   Right.

15       A.   Okay.  The resection is aimed at decreasing

16  the symptoms due to the torn cartilage.

17       Q.   Why is it painful to have torn cartilage?

18       A.   Because the kinematics or motion of the

19  meniscus is abnormal.  So when you have a torn

20  cartilage, it doesn't react or act normally.  It

21  doesn't dissipate force the way it's supposed to, and

22  it will pull on other structures in the knee.

23            The cartilage itself has no nerves in it so

24  it doesn't cause pain.  However, it can cause abnormal

25  motion in these other structures which do have nerve

 1     tissue and therefore cause pain.

 2         Q.   So as an orthopedic surgeon specializing in

 3     sports medicine and in knees, when you remove a

 4     portion of the medial and lateral meniscus, why does

 5     that make the patient more comfortable?

 6         A.   Because you stabilize the tissue and you

 7     leave what's called the meniscal remnant so you try to

 8     preserve as much meniscus as you possibly can, and the

 9     meniscal remnant having been stabilized can then

10     function more normally.

11         Q.   All right.  With respect to Mr. McDermott, we

12     have a copy here of a large portion of your file.

13         A.   Okay.

14         Q.   And I think the set there is marked as Frank

15     Exhibit No. 1, and feel free to refer to any of those

16     things.

17         A.   Okay.

18         Q.   I'm just going to go through some of these

19     pages here.  Okay?

20         A.   Sure.

21         Q.   The first page here reflects a date I believe

22     of an encounter of 11-18-2016, and it shows chief

23     complaint, left knee pain.

24             Can you just use this to refresh your

25     recollection and tell us if this is the first time

1    that you saw Mr. McDermott, and when you met with him

2    and took a history, what did you learn?

3         A.   Yes.  I believe the first day that we met was

4    November 18th, 2016.  You know, at that point, yes, he

5    was 54-years-old, and he gave me the history of an

6    injury to his knee.  The documented history is twisted

7    his knee while pulling hoses across a deck.

8              He had had imaging with an MRI done on

9    11-8-16 that he brought with him for review.  He was

10   complaining of a burning pain that was constant in

11   nature.  He was complaining of mechanical symptoms

12   including clicking and popping, and on a pain scale

13   rated zero to ten he rated it an eight out of ten.

14        Q.   All right.  So let me ask about this

15   mechanism of injury.

16        A.   Sure.

17        Q.   When a person is pulling on an object and

18   comes to you with a history of the pain, what have you

19   learned over the years about the mechanism of injury,

20   how a meniscus is torn doing a task where you're

21   standing, and I want you to assume he was standing on

22   a steel deck, that he had a hose in both hands, that

23   he was pulling on it, and that he twisted or turned

24   his torso somewhat.

25             And at the moment of injury does not recall

1   any extreme pain whatsoever, may recollect a twinge

2   and then after leaving work that evening at

3   approximately 6:00 to 6:30 p.m., awoke in the early

4   morning hours with knee pain.

5        Based upon that history and your education,

6   training and experience with patients, can you tell us

7   within reasonable medical probability what you believe

8   happened inside that knee?

9   A.   So, first of all, meniscal injuries are very,

10   very common injuries to the knee, probably the most

11   common diagnosis that I make as a knee surgeon in my

12   practice.

13        The classic mechanism of injury is a twisting

14   injury to the knee.  That can occur over a variety of

15   activities.  I see it in professional athletes.  I see

16   it in small kids.  I see it in -- there are all

17   different types of ways the knee can twist.

18        The meniscus, the way the collagen fibers are

19   organized in the meniscal tissue makes the tissue

20   very, very sound and hearty in compression.  Okay.  It

21   has collagen that's organized in a way that it can

22   develop hoop stresses and dissipate force in axial

23   load.

24   Q.   When you say hoop stresses, what do you mean?

25   A.   It's a term in physics and in engineering

1      that the axial load is dissipated throughout the

2      meniscus.

3          Q.   Sort of like in a spherical manner?

4          A.   Yes, circumferentially.  Circumferentially

5      organized collagen fibers.

6          Q.   Okay.

7          A.   Because of the organization of the collagen

8      fibers within the meniscal tissue, the tissue is also

9      very vulnerable to shear, so, you know, as opposed to

10     an axial compression, shear has some twisting

11     component to it.  All right.

12              So the classic mechanism is a twisting injury

13     to where the foot is planted and the rest of the body

14     twists.

15              Again, you can imagine you could see this in

16     a soccer or a football player, but you can also

17     imagine it in Mr. McDermott's case where he's carrying

18     a hose or something that I presume has some weight to

19     it or some mass.

20              His foot I would imagine to be fixed on a

21     ship deck and he is twisting so there's your shear

22     force across the knee.

23              So based upon his complaint of pulling a

24     hose, it's a reasonable mechanism for the type of

25     injury he had.

1    Q.    Okay.  So based on what he told you, was that

2    consistent or inconsistent with histories you had of

3    other people that had a report of a knee injury while

4    doing something with their knee twisted?

5    A.    I think it's consistent.

6    Q.    Okay.  And then at that time when you saw

7    him, you related to us he had an MRI run prior to

8    coming in, and do you remember from your treatment of

9    him what the MRI reflected?

10   A.    He did.  The MRI, the primary diagnoses from

11   the MRI were a tear involving the body and posterior

12   horn of the medial meniscus, the one on the inside of

13   the knee, a small tear involving the lateral meniscus

14   or the meniscus on the outside part of the knee, as

15   well as some minimal arthritic change.  Those were the

16   primary diagnoses obtained from the MRI imaging.

17   Q.    Okay.  When I read through the file, there's

18   something called the lateral meniscus horn.  Can you

19   show us on the diagram on the camera where that is at?

20   A.    So, you know, in general the meniscus is

21   broken up into several segments, so if we're looking

22   at the lateral meniscus, from about this (indicating)

23   point to this (indicating) point is called the body of

24   the meniscus.

25        In anatomy anterior means front and posterior

1    means back.  So the anterior horn would be from this

2    (indicating) junction of what we would consider the

3    body right here (indicating) to about right here

4    (indicating).  This is the body, and this would be the

5    anterior horn and the posterior horn.  Okay.  These

6    meniscus are also rooted.

7            I guess we have an anterior root and

8    posterior root.  So those are anatomically of what we

9    look at as the division of the meniscus.

10       Q.  Okay.  So in this stack of paper here, if you

11   turn to, it's probably the fifth or sixth sheet.  It's

12   marked page 19 at the bottom.

13       A.  Okay.

14       Q.  And if you look through here in the one, two,

15   third paragraph --

16            MR. DeGIULIO:  Mr. Morgan, do you have a

17       date of the report?

18            MR. MORGAN:  Yes, sir.  This one is

19       dated description of operative procedure, and at

20       the top it says opt note signed by Darren Frank,

21       M.D., 12-7 of '16.

22            MR. DeGIULIO:  Okay.

23   BY MR. MORGAN:

24       Q.  In that third paragraph you're basically

25   dictating I presume what you saw when you did surgery

1    on Mr. McDermott; is that right?

2        A.   Correct.

3        Q.   Okay.  And can you explain to the jury before

4    you're actually doing the surgery what happens to

5    Mr. McDermott to prep him, and is he under general

6    anesthesia?

7        A.   Sure.  So these procedures are done as an

8    outpatient.  I believe the surgery was done at

9    Allegheny General Hospital.  The patients are first

10   seen by a physician extender, either a nurse

11   practitioner or a physician's assistant.

12            They're prepped for surgery.  IVs are placed

13   to facilitate anesthesia.  They're seen by the

14   anesthesiologist who's working with me that day.

15            These surgeries are typically done under what

16   is called local sedation so they will be given a

17   sedative through an IV which essentially puts them

18   into a sleep, but they still control their own

19   breathing and respirations.

20            They are monitored by either an

21   anesthesiologist or a nurse anesthetist who monitors

22   their vital signs as well as their well-being

23   throughout the procedure.

24            The local part of local IV sedation is done

25   on my part by either anesthetizing them with a local

1    anesthetic.  It's done through an injection once

2    they're in the operating room.

3           So once they're prepped they come back to the

4    operating room.  They're given a little bit of

5    medication through the IV to relax them and to start

6    them off to what's essentially a twilight sleep.

7           Under sterile conditions we then inject

8    several milliliters of local anesthetic into the joint

9    to help anesthetize it and make it as pain free as

10   possible.

11          The extremity that we're operating on then is

12   prepped and draped and using the usual sterile

13   techniques to avoid any infection risk.

14          We do the surgery with tourniquet control

15   meaning that we limit the amount of blood flow into

16   the limb during the extremity.  These operations vary

17   in time.  The amount of safe tourniquet time is less

18   than two hours.  This tourniquet time is listed as 25

19   minutes.

20          So once everything is prepped and we're

21   sterile and ready to go, the surgery is done

22   arthroscopically which means the two small incisions

23   are made in the knee, and we use a camera to visualize

24   inside the knee.

25       Q.   With a tube?

1       A.    With a tube, yes.  So we insert a tube or a

2   trochar into the knee.

3       Q.    Okay.

4       A.    The camera is inserted through there.  We are

5   able to visualize the knee through very, very small

6   incisions.

7       Q.    Okay.  So obviously what you're saying it's

8   not an open knee surgery?

9       A.    No.

10      Q.    Where you cut the flesh and down to the area?

11      A.    No.  It's two small incisions.

12      Q.    Okay.  And then why don't you just walk us

13  through paragraph three --

14      A.    Sure.

15      Q.    Of what you did to try to help Mr. McDermott?

16      A.    So going through some of those operative

17  findings, we noted minimal chondromalacia.

18  Chondromalacia is another term for articular cartilage

19  damage or arthritis.  So minimal in the patellofemoral

20  joint.  That's underneath the kneecap.

21          We noted synovitis which is the synovium is

22  the lining of the joint.  Synovitis occurs for a

23  variety of reasons, either posttraumatic arthritis, so

24  it's just an inflammation of that tissue.

25          So we made a second portal or the first

1    portal or a small incision and put the scope of the

2    camera in.  We performed a synovectomy meaning we

3    resected some of that inflammatory tissue.

4           It says the ACL was grossly intact to

5    inspection, as well as probing.  The ACL stands for

6    anterior cruciate ligament, one of the four major

7    stabilizing ligaments in the knee.  There was no issue

8    with that.

9           The next point of inspection is the lateral

10   compartment.  That's the outside compartment, and I

11   did note there was a tear involving the anterior horn

12   of the lateral meniscus.

13      Q.   Let me slow you down here.  When you talk

14   about the anterior horn, is that -- you've already

15   shown us.

16      A.   Sure.

17      Q.   You said right here, the anterior horn

18   (indicating).

19      A.   That's correct.

20      Q.   And was the root of the lateral meniscus

21   involved?

22      A.   No.

23      Q.   Okay.  And what portion of that anterior

24   meniscus did you remove?

25      A.   A small amount.  So we noted that it was a

1    short radial tear, and I quantified that as about 15

2    percent of the anterior horn and body of the lateral

3    meniscus, so a small amount, meaning that 85 percent

4    of the meniscal substance remained after resection of

5    that tear.

6          We also noted some degenerative changes on

7    both sides of the joint in that compartment, in the

8    lateral compartment.

9    Q.   And what does that mean?

10   A.   It means that the cartilage was damaged.

11   Q.   Okay.  And so is there a way for you to tell

12   when you're doing your arthroscopic surgery looking at

13   the inside of the knee through the camera for how long

14   that cartilage had been damaged?

15   A.   It's difficult to say but this, the cartilage

16   damage, and now we're talking about the articular

17   cartilage, not the meniscus.

18   Q.   Okay.  So now the articular cartilage, you

19   got the AC right here (indicating), these two spots;

20   is that correct?

21   A.   Yes, and if we slide this (indicating) down a

22   little bit?

23   Q.   Uh-huh.

24   A.   All right.  Are we focused there?  So this is

25   now a coronal view of the knee looking at it from the

1    front.

2              So imagine if we took the other picture and

3    rotated it back about 90 degrees.  This (indicating)

4    blue here represents the articular cartilage, and you

5    can see the meniscal tissue that sits in between here

6    (indicating) as a shock absorber.  So this is what I'm

7    talking about when I describe Grade I through Grade IV

8    changes.

9         Q.   Uh-huh.

10        A.   Of the knee.  So when we document Grade II

11   and III changes, those are, that's a grading scale

12   that we use to quantify articular cartilage damage.

13             And in my opinion in Mr. McDermott those were

14   not acute injuries.  That was due to some arthritic

15   change that we knew he had, as well from MRI and

16   x-ray.

17        Q.   So it would be like wear and tear?

18        A.   Wear and tear.

19        Q.   And that's, what you're pointing at here is

20   the same thing as we see over on the other picture

21   that we showed earlier?

22        A.   That's correct.

23        Q.   Which is this stuff here (indicating), the

24   articulating part?

25        A.   That's correct.  You have it on both sides of

1    the joint.

2        Q.   And that's not the part you did surgery on?

3        A.   That's correct.

4        Q.   Okay.  Got it.  All right.  So when you

5    compare the amount of damage that was done to the

6    anterior meniscus to the damage done to the medial

7    meniscus, which was worse?

8        A.   The medial meniscus was more severely

9    affected.

10       Q.   Why don't you tell us what was the amount of

11   medial meniscus that you had to remove?

12       A.   So in the medial meniscus we noted a tear

13   involving the posterior horn and extending to the root

14   in those terms I described earlier.

15       Q.   Okay.

16       A.   There was some maceration which means that

17   the meniscus was sort of grinding down so there were

18   components there that, you know, when a meniscus is

19   torn and somebody walks on it, it gets macerated.

20       Q.   Okay.

21       A.   Or, you know, that's a term we use, or ground

22   down.  There was also what we documented a horizontal

23   cleavage tear which is a tear that goes almost through

24   the meniscus through the tissue.

25            We noted the tear extended to the root but

1    did not involve root detachment, and it was described

2    as a central tear meaning that it was not vascular.

3            So what we talked about earlier about the

4    types of surgery that are done on the meniscus,

5    whether it's partially resected or whether it's

6    repaired depends on these findings.

7            These are what I'm judging as a clinician and

8    as a surgeon as to what the most appropriate operation

9    is.

10           Based upon these criteria, I thought a

11   partial resection was more appropriate because putting

12   stitches in this type of tear would not work.

13      Q.   Okay.  And so, Doctor, in your training and

14   in your experience as a knee surgeon have you studied

15   and come to learn whether when you have damage to the

16   knee meniscus root as he had is this considered by you

17   to be a serious injury to the meniscus?

18           MR. DeGIULIO:  I'm going to object to

19     the form of the question.

20           MR. MORGAN:  I will rephrase it.

21      Q.   Tell us what is the significance, if any, to

22   the type of injury that Mr. McDermott had to the

23   medial meniscus.

24      A.   So it's a significant injury in that a

25   substantial portion of the meniscus had to be removed

1    in order to treat him.  So the meniscal roots were

2    stable, but he had a tear of the posterior horn, which

3    again we've gone over a little bit of that anatomy

4    already.

5            So it's substantial in that the meniscus was

6    torn and irreparable and therefore the only way to

7    treat it and alleviate the symptoms is to resect the

8    torn part.

9            Again, we know that biomechanically resection

10   of a very small amount of the meniscus can increase

11   the forces significantly, but that was the treatment

12   the injury required.

13   Q.    Okay.  I have this article that was published

14   in the Iowa Orthopedic Journal.  The title of it is

15   Medial Meniscus Root Tear in the Middle-Aged Patient.

16   I want to read something from this and ask you if you

17   have an opinion as to whether this is true.

18           It says, "Posterior root tears are also more

19   biomechanically significant, as they can disrupt the

20   essential shock absorbing ability of the meniscus and

21   render it unable to adequately transfer axial load

22   into hoop stresses."

23           MR. DeGIULIO:  I object to the question.

24    The doctor's testified that there was no

25    involvement of the root.  You're reading from an

1      article about root tears and a sentence about the

2      effect of a root tear.

3   BY MR. MORGAN:

4      Q.   Well, let me see.  Let me back up here and

5   lay a little bit of foundation.  In a medial meniscus

6   was there a tear there at the root or not?

7      A.   There was a tear that involved the root

8   without root detachment.

9      Q.   Okay.  So does that reduce Mr. McDermott's

10  ability as he walks to shock absorb the forces on the

11  knee joint?

12     A.   The resection of the meniscus that was

13  performed would result in increased forces and

14  decreased shock absorption.

15     Q.   All right.  So if he were to continue to

16  engage in work that he had chosen as his method of

17  earning a living, working in maritime positions where

18  he walks, he occasionally kneels, and he climbs

19  ladders during the day on steel decks, steel stairs

20  for anywhere from eight to say ten hours per day, is

21  he going to be in pain because of this injury?

22     A.   Well, all of his activities are activities

23  that would put a fair amount of force across the knee

24  as opposed to more sedentary activity.  Therefore,

25  given the fact that some of his meniscus were injured

1    in addition to the arthritic change that he already

2    had, I would say that those activities would be

3    aggravated.

4        Q.   Okay.  And within reasonable medical

5    probability when you say those activities would be

6    aggravated, what are the manifestations of doing it?

7    What does it do to him?

8        A.   Pain would be one.  Stiffness, swelling.

9    Those would be the type of symptoms that I would

10   expect him to have.

11       Q.   And over the period of time that you treated

12   him, if you refer to your records and prior to coming

13   in here today we had a meeting, did you refresh your

14   recollection about the treatment to Mr. McDermott?

15       A.   I did.

16       Q.   I believe one of the documents shows a visit

17   of 5-16 -- I'm sorry, of 5-6 of '18, in May of this

18   year.

19       A.   It was May of this year.  I don't recall the

20   exact date.

21       Q.   Okay.

22       A.   But, you know, from the time of his surgery I

23   followed him for approximately 18 months.

24       Q.   Okay.  Is it pretty typical for this type of

25   surgery?

1        A.    It's not entirely typical because he's had

2   some issues during his recovery.

3        Q.    Okay.  And have you had to inject him with

4   cortisone over the period of beginning February 17th,

5   '17 through May 6th of '18?

6        A.    I believe he's had treatment with cortisone

7   on three occasions since his surgery.

8        Q.    Roughly eight months apart?

9        A.    Roughly eight months apart.

10        Q.    And was that at your direction?

11        A.    It was.

12        Q.    And for what reason did you offer him and he

13   accepted injection of cortisone into the knee?

14        A.    Continued complaints of pain and the

15   diagnosis that for me postoperatively is now

16   osteoarthritis.

17        Q.    And what does that mean?

18        A.    Osteoarthritis is the wearing away of that

19   articular cartilage, the wear and tear.

20        Q.    Okay.  And the articular cartilage is the

21   more soft cartilage if we look at the diagram where

22   you marked?

23        A.    It's not actually softer.  It's the type of

24   cartilage that lines the joint.

25        Q.    Okay.

1       A.    Okay.  So it's -- it lines the end of the

2   bone.

3       Q.    Okay.  So if he were to continue, Doctor, to

4   perform work where he walks on steel decks, climbs

5   ladders occasionally, stoops and bends, kneels

6   occasionally in his work and does this day in and day

7   out, within a reasonable medical probability is he at

8   a risk of increasing his osteoarthritis?

9       A.    In my opinion those activities would be

10  aggravating and those types of activities could result

11  in worsening of the arthritic condition.

12      Q.    Okay.  And is that consistent with what your

13  medical practice has shown for people who do this and

14  have this kind of operation?

15      A.    Yes.

16      Q.    Okay.  Now, I don't want to go through every

17  page of your treatment of Mr. McDermott, but I do want

18  to cover some of the pictures that we have.

19            I did photocopies of the internal photographs

20  that you had of the meniscus, and I believe if we look

21  at those, it begins at Bates page number 64 at the

22  bottom which you should have there.  It looks like the

23  date that this scan was run was 12-6-16.

24            Was this done at the same time you did the

25  surgery?

```
1         A.   Yes.  Those are live photos of the
2    arthroscopic procedure.
3         Q.   All right.  And if you could just go through
4    those, pick the ones you believe fairly and accurately
5    depict the conditions that caused you to resect the
6    portion of the lateral and medial meniscus?
7         A.   All right.  So this is going to be
8    arthroscopy page two.
9         Q.   Okay.
10        A.   We're looking at the top left photo here.
11   This (indicating) one right here.
12        Q.   Okay.  What does that show?
13             MR. MORGAN:  You got it?  Towards you?
14    Come this way a little bit.  That's good?
15        A.   So this (indicating) is the lateral meniscus.
16   This depicts a tear.  It's a bit hard to see because
17   this is a photocopy.
18        Q.   Sure.
19        A.   Of an image generated out of our electronic
20   medical record, but this is the tissue right here and
21   this is the tear (indicating).
22        Q.   The dark spot's the tear?
23        A.   Right in here (indicating), yes.
24        Q.   Okay.
25        A.   And then this is the picture after the
```

1    resection.  You can see that portion of the meniscus

2    has been removed right along this resection line here

3    (indicating), and now it's smooth again.

4              So, you know, there's no longer an edge to

5    catch.  The meniscus has now been stabilized.  That's

6    the partial meniscectomy, the partial lateral

7    meniscectomy on the outside part of his knee.

8        Q.   Is that portion here that we see in the

9    bottom of this part, it seems wider than right here.

10   How did this become more closed like that

11   (indicating)?

12       A.   Which part are you looking at?

13       Q.   Right here after you resected it, it seems

14   like the darkened spot is not as wide as it was before

15   surgery.

16       A.   I mean that's a shadow from the light.

17       Q.   Oh, okay.  So basically would it be fair and

18   accurate to say what you're trying to do is remove any

19   frayed or jagged parts of the meniscus?

20       A.   That's correct.  That's correct.

21       Q.   Okay.  And the reason is because the meniscus

22   is a cushion between the tibia and the femur?

23       A.   Right.  As we talked about the portions that

24   are torn become unstable and so as the knee is placed

25   in a range of motion, the meniscus moves abnormally.

1     There's abnormal meniscal motion.

2         Q.   Okay.

3         A.   Which can result in pain.

4         Q.   Okay.  So now we've covered the lateral

5     meniscus which is on page 65 dated -- let's see if

6     there is a date on this.  Yes.  12-6-16 at 3:01 p.m.

7     And do we have one of the medial meniscus?

8         A.   On this set of records there's a page missing

9     from the arthroscopy.  I have one, two and four.  I

10    don't have page three.

11        Q.   Okay.  Sorry.

12        A.   But at any rate --

13        Q.   You know, in your chart -- you might have it

14    in your whole chart there.  Did you bring it in?

15        A.   I didn't bring the arthroscopic images in.

16    I'm sorry.

17        Q.   Okay.

18        A.   But this image right here I'm looking at,

19    this (indicating) one.

20        Q.   Yes, sir.  Are we okay?  Does that have to

21    come this (indicating) way?  Okay.

22        A.   So these are difficult to see.  I mean these

23    are not ideal images to do any sort of teaching from.

24    However, this is the torn meniscus right here

25    (indicating).

1      Q.   Okay.

2      A.   And this is the tear in the posterior horn

3   right there and this is the before and these are the

4   after pictures so you can see again stabilized

5   meniscus removed any loose edges or torn fragments

6   from the meniscus (indicating).

7      Q.   And that again is on the lateral side?

8      A.   That's the medial side.

9      Q.   Oh, that's the medial side.  Okay.  That one

10   is Bates stamped 67, the same date, 12-6-16.

11      A.   Yes.

12      Q.   All right.  Thank you.  Okay.  So if you go

13   to page 82 in these records, this shows a history he

14   came back about a week after knee surgery, and was

15   there anything remarkable about this visit?

16      A.   Yes.  He had had some issues immediately

17   postoperatively that necessitated a visit to the

18   emergency department.  I believe the surgery was 12-6.

19   Is that accurate?

20      Q.   I believe so.

21      A.   So three days later he had some pain and

22   unfortunately, the office was closed so he sought care

23   in the emergency department.  They tried to aspirate

24   his knee which is to draw some fluid out of it.  They

25   were not able to indicate any evidence of an

1    infection.

2            Despite that early episode of early

3    postoperative increase in pain, by the time he was a

4    week out when I saw him on the 14th, he was feeling

5    somewhat better.  I did note some pain and denied any

6    infection symptoms.

7        Q.   Okay.  So in the ensuing weeks just to put

8    this in perspective, what did you encounter as far as

9    his progress and any specific complaints he may have

10   made?

11       A.   Yes.  I mean we followed him as we would any

12   other postoperative patient.  He was advised to limit

13   his activity.  He was kept out of work for that

14   reason.

15           We started him in a course of physical

16   therapy and rehabilitation and joint mobilization,

17   just general rehab of the muscles around the knee.

18           He was treated initially with pain

19   medication.  I don't know the exact duration of time

20   that he took pain medication, but we followed him for

21   the usual postoperative course which for this type of

22   operation is roughly two months, give or take.

23       Q.   Okay.  During that period of time if we were

24   to go into the nuts and bolts of what you wrote, would

25   it be accurate to say that there were times where he

1    was pain free and doing well and there were times

2    where he had complaints of pain?

3        A.   I can't comment as to whether he was pain

4    free but your statement as to there were times when he

5    was doing what I would call well as opposed to times

6    when he was doing less is accurate.

7             He had sort of a vacillating course where

8    sometimes he would come back to the office saying he

9    was doing well in terms of his symptoms, and there

10   were other times he was still complaining of symptoms.

11   That's accurate.

12       Q.   Okay.  And what is the basis?  What's the

13   cause of the person that has this type of surgery to

14   have that sequence of events following surgery?

15       A.   Typically, it's the arthritic symptoms so the

16   efficacy of this type of surgery, the ability to do

17   what it's aimed to do is inversely proportionate to

18   the amount of arthritis that a patient has.

19            So a patient who has a very arthritic knee

20   which Mr. McDermott did not have a very arthritic knee

21   and has a meniscus tear would likely not be offered

22   surgery in my practice because my ability to effect a

23   change in that knee is minimal.

24       Q.   I see.  Okay.

25       A.   However, somebody who has mild to moderate

1     arthritis, some Grade II and III changes as we noted

2     at the time of arthroscopy, somebody who has pain due

3     to arthritis, as well as a meniscus tear, it's very

4     difficult to tell preoperatively what is causing his

5     symptoms because symptoms are very, very similar

6     sometimes.

7              So it is not uncommon for somebody with some

8     arthritic change to require further treatment of their

9     arthritic condition even beyond a successful treatment

10    of their meniscal tear.

11    Q.    Okay.  So let me ask you this, you know, if a

12    question is presented to you did he have some degree

13    of arthritis before the injury?

14    A.    I mean the answer to that question would have

15    to be probably almost certainly because those changes

16    don't develop in a very short period of time.  I did

17    not think the articular cartilage injury acute.  So

18    the answer to that would be yes, in my opinion.

19    Q.    Okay.  Is that typical of a man that's done

20    laboring type activities at age 54?

21    A.    Yes.

22    Q.    Okay.  And second to that is do you have an

23    opinion within a reasonable medical probability, the

24    incident of 10-29-16 where he's pulling on a hose and

25    twisted it, aggravated the underlying arthritis?

1          A.   In my opinion, yes.

2          Q.   Why is that?

3          A.   Arthritis exists and as we've mentioned, the

4     cartilage has very little nervous tissue in it so

5     arthritis hurts for a number of reasons.   There is

6     mechanical forces that affect the bone which is very

7     rich in innervation and can cause pain.

8          Q.   Right.

9          A.   Obviously, a broken bone hurts, right,

10    because there's nerves in it.   So arthritis doesn't

11    hurt like a broken bone but it does hurt because the

12    forces of the bone cease.

13              This can be exacerbated by meniscal injury

14    which as we've talked at length about has decreased

15    the amount of shock absorption that the meniscus is

16    normally designed to perform.

17              In addition to those mechanical forces on the

18    bone there's a biological phenomenon that causes pain.

19    There is inflammatory markers that are released within

20    a joint when there is arthritis that causes pain.

21              And that's why medical treatment such as

22    injecting cortisone can interrupt those cascades,

23    those biologic phenomenon and effect relief of

24    arthritic pain.

25          Q.   Okay.   So when you talk in terms of

 1    biological phenomenon or issues, is it important that

 2    either through cortisone or analgesics, to any

 3    inflammatory medications that you stop the

 4    inflammation?

 5         A.   I mean it depends.  I mean, you know, there

 6    is some degree of inflammation at all times in the

 7    body, but when it becomes symptomatic, yes, we try to

 8    arrest that.  Antiinflammatory medications are one way

 9    to do it.  Those are taken orally.  They're

10    nonsteroidal.  They're steroidal.

11         Q.   Right.

12         A.   There are different types of injections,

13    things that we can inject into the joint to affect

14    that local environment with less side effect on the

15    whole portion, and cortisone is one way that that's

16    done.

17         Q.   Okay.  And you already said you did three

18    separate cortisone injections into his knee over that

19    period of time we discussed.

20         A.   Uh-huh.

21         Q.   Within reasonable medical probability do you

22    have an opinion whether he will continue to need

23    steroidal injections from time to time?

24         A.   It would be my opinion based on his history

25    that yes, he probably would.

1     Q.   And is that for the purpose of removing or

2  trying to lessen the amount of inflammation?

3     A.   To control inflammation along with his

4  degenerative condition.

5     Q.   And the motivating force of that is to

6  relieve his pain?

7     A.   Yes.

8     Q.   Taking aside the necessity for everybody

9  that's not independently wealthy and we earn a living

10  and setting that over into say column B as not part of

11  the consideration, as far as a recommendation for what

12  is best for Mr. McDermott relative to his injured

13  knee, should he attempt to find employment other than

14  the craft of having to perform laboring tasks where he

15  climbs ladders on occasion, stoops and kneels on

16  occasion and walks on steel decks as he does in the

17  maritime industry?

18     A.   Well, in addition to the type of treatment

19  that I can provide as a physician and a medical

20  provider, and we alluded to many of those, many of the

21  things, many of the interventions that I can provide

22  to try to mitigate the symptoms of arthritis, in

23  addition to those, there's also activity modification.

24     So somebody with an arthritic knee, I usually

25  recommend they modify their activity, whether it be

1    exercise, activities of daily living or work.

2        Q.   Yes.

3        A.   So the conditions that you mentioned that

4    Mr. McDermott works in that require those activities

5    that you mentioned, it would be my recommendation that

6    he limit those activities because those activities

7    could be aggravating to his knee.

8        Q.   Okay.  And just to kind of finalize and to

9    kind of wrap things up here, you submitted I believe

10   two narrative reports, one November 15, 2017, and kind

11   of summarized what has happened to Mr. McDermott, and

12   I believe this was before the surgery which was done

13   December 6th of '16.  Oh, wait.  I'm wrong.  This is

14   November 15, 2017, so this is about 11 months post

15   surgery.

16       A.   Yes.

17       Q.   And then I believe you did another narrative

18   report in May of this year.

19       A.   Okay.

20       Q.   Okay.  So can you just verify that those were

21   your dictations and your reports pertaining to the

22   patient?

23       A.   They were.

24       Q.   Okay.  And other than that, I believe one of

25   the things I would love to do if we can is get a copy

1    of your bill and attach it as an exhibit to the

2    deposition.  We don't have to do it immediately but

3    sometime before I leave today, and I need to ask you

4    this question.

5          Are the billings that you do here in your

6    practice in conformity with and consistent with what

7    practicing physicians in your level of skill and

8    professional services charge in this community?

9      A.   Yes.

10          MR. MORGAN:  Okay.  Thank you very much.

11    I will pass the witness.

12          MR. DeGIULIO:  Did you mark a series of

13    exhibits already?  You hadn't referred to any

14    exhibit numbers.

15          MR. MORGAN:  Yes.  We marked the

16    exhibits that I was going to do my direct

17    examination from as Frank No. 1 in global which I

18    gave a copy to you.

19          MR. DeGIULIO:  I actually don't have a

20    copy.  This is different from those, but that's

21    okay.

22          MR. MORGAN:  You can take these.  I'm

23    through with them if you want to use them.

24          MR. DeGIULIO:  I'm just going to mark

25    those.

1                MR. MORGAN:  Okay.  And then we also

2       marked these exhibits as three, two, five, four

3       which are depictions.  He testified to all of

4       them.

5            And you're right.  We should mark the tears

6       that we referred to as exhibits, and I think there

7       was two of them.  I'm going to have to since we

8       didn't mark those, and we can go back into the

9       record.

10               MR. DeGIULIO:  Sure.

11               MR. MORGAN:  Get the court reporter to

12      help us.

13               MR. DeGIULIO:  I just want to know what

14      you marked.

15               MR. MORGAN:  No.  I agree.  We've got to

16      keep track of our stuff.

17               MR. DeGIULIO:  Okay.

18               MR. MORGAN:  Yes.  Let's go off the

19      record a second.  She's been typing.

20               VIDEOGRAPHER:  We're going off the

21      record.  The time is 5:19 p.m.

22           (Off the record.)

23               VIDEOGRAPHER:  We're going back on the

24      record.  The time is 5:23 p.m.

25           (Frank Deposition Exhibit No. 6 was

1        marked for identification.)

2                (Frank Deposition Exhibit No. 7 to be

3        marked at a later time.)

4                        EXAMINATION

5   BY MR. DeGIULIO:

6        Q.   Good afternoon, Dr. Frank.  Thanks for your

7   time today.  We put in front of you what we've marked

8   as Exhibit 8 which is a compendium of all the records

9   in the case.

10       A.   Yes.

11       Q.   Okay.  And I will be referring to various

12  documents.

13       A.   Okay.

14               (Discussion off the record.)

15               MR. DeGIULIO:  Let's just mark this.

16     What are we at?  Seven?

17               THE COURT REPORTER:  Seven is going to

18     be the bill we're going to mark so this will be --

19               MR. DeGIULIO:  Eight.

20               THE COURT REPORTER:  Eight.

21       Q.   Dr. Frank, I will just represent to you

22  that --

23               (Off video portion of record.)

24               THE COURT REPORTER:  Wait.

25               MR. DeGIULIO:  Oh, I'm sorry.

1              THE COURT REPORTER:  Wait.  Hold on a

2       second.

3                    (Frank Deposition Exhibit No. 8 was

4        marked for identification.)

5              MR. DeGIULIO:  I will tell you off the

6       record this is just a compendium of your reports

7       that I put together for this deposition.

8              VIDEOGRAPHER:  We are going back on the

9       record.  The time is 5:23 p.m.

10    BY MR. DeGIULIO:

11       Q.   Good afternoon, Dr. Frank.  Thanks for your

12    time today.

13       A.   Okay.

14       Q.   I put in front of you what we've marked as

15    Exhibit 8 which is a compendium of both of your

16    reports that I put together.

17       A.   Okay.

18       Q.   And I will be referring to those documents.

19       A.   Okay.

20       Q.   Have you read any witness testimony from the

21    lawsuit?

22       A.   Not to my knowledge.

23       Q.   Okay.  Have you been provided by Mr. Morgan

24    with any documents relating to the lawsuit itself

25    other than medical documents?

1      A.   Other than a conversation, no documents.

2      Q.   You had a conversation with Mr. Morgan?

3      A.   Yes.

4      Q.   When did that occur?

5      A.   Today.

6      Q.   How about prior to today?  Have you spoken to

7  Mr. Morgan?

8      A.   I believe we had either a telephone or

9  face-to-face conversation at some point.

10      Q.   Within the last year?

11      A.   Within the last two years.

12      Q.   Okay.  When did you first learn that

13  Mr. McDermott had an attorney?

14      A.   I can't say exactly.  I don't know exactly.

15      Q.   When did you first learn that Mr. McDermott

16  filed a lawsuit?

17      A.   I don't know that either.

18      Q.   I'm going to show you a couple of exhibits

19  just so the jury might be able to better understand

20  all of the medical terminology we're talking about.

21      A.   Okay.

22           MR. DeGIULIO:  And if you could mark

23   this one as nine?  What are we up to?  Nine?

24           THE COURT REPORTER:  Nine.

25           (Frank Deposition Exhibit No. 9 was

```
 1          marked for identification.)

 2                    MR. DeGIULIO:  And this one as ten.

 3                    (Frank Deposition Exhibit No. 10 was

 4          marked for identification.)

 5                    MR. DeGIULIO:  Did we get these marked

 6      yet?

 7   BY MR. DeGIULIO:

 8      Q.    So Exhibit 9 is just a discussion, an article

 9   I pulled off the internet.

10      A.    Okay.

11      Q.    What I want to ask you about on the first

12   page here is this seems to suggest that there's two

13   causes of meniscus tears, one related more to what I

14   would call trauma, sports injuries, that sort of

15   thing, and a second category of degenerative knee

16   causes.

17                    Am I correct based on my reading of the

18   literature that if there is osteoarthritis present in

19   the knee, that the risk of a meniscus tear goes up?

20      A.    I'm sorry.  Repeat that one more time.

21                    MR. DeGIULIO:  Could you read it back?

22                    (The pending question was read back.)

23      A.    That is correct.

24      Q.    Okay.  And could you tell, you made mention

25   of this in your testimony, degenerative osteoarthritis
```

1    is graded; is that correct?

2        A.   That's correct.

3        Q.   How many grades are there?

4        A.   I through IV.

5        Q.   Okay.

6        A.   Those are average.  The eponym for that

7    particular grading is I through IV.

8        Q.   And that's IV being the worst?

9        A.   The worst.  Exposed bone would be IV.

10       Q.   Okay.  Could you look at the second part of

11   what I marked again off the internet, and I'm not

12   asking anything more than some generalities here?

13       A.   Okay.  Sure.

14       Q.   Could you look at the top of the second page

15   of this document, Exhibit 10?  There are some drawings

16   of tears.  Do you see that?

17       A.   Yes.

18       Q.   Are you able to use these drawings to tell me

19   is any one of these an example of what you saw with

20   Mr. McDermott?

21       A.   So, sure.  The bottom left is an example of a

22   radial tear.  That's what he had laterally on the

23   outside part of his knee.

24       Q.   Right.

25       A.   The tear on the medial meniscus was more

1   complex meaning he had multiple types so it's more an

2   amalgam of these types.  I would say a combination of

3   the bottom right and the top right.

4          So there was a displaced flap and there was

5   also some -- you could see the one depicted, labeled

6   there as a degenerative tear.  There's some fraying or

7   abnormality of the central aspect of the meniscus.  So

8   I would say it's a combination of this.

9      Q.   Okay.  So that's what you saw on the medial?

10     A.   On medial.

11     Q.   Right.  So part of what you saw was a

12  degenerative tear?

13         MR. MORGAN:  I object to the form of the

14   question.

15     Q.   Go ahead.  I think that's what you just

16  testified to.

17     A.   This label, this is overly generalized, the

18  label, so.

19     Q.   But you did see fraying?

20     A.   I saw fraying, but that does not make it a

21  degenerative tear.

22     Q.   Okay.  Could you look under the word cause

23  here right down the middle of the page?

24     A.   Sure.

25     Q.   I'm going to read it, and I'm going to ask

1 you if you agree with it.

2   A. Sure.

3   Q. Older people are more likely to have

4 degenerative meniscus tears.  Do you agree with that

5 statement?

6   A. Yes.

7   Q. Cartilage weakens and wears thin over time.

8   A. Yes.

9   Q. Do you agree with that?

10   A. Yes.

11   Q. Aged, worn tissue is more prone to tears.  Do

12 you agree with that?

13   A. Yes.

14   Q. Finally, just an awkward twist when getting

15 up from a chair may be enough to cause a tear if the

16 menisci have weakened with age.

17     MR. MORGAN:  Object to form.

18   Q. Would you agree to that, with that statement?

19     THE WITNESS:  Can I answer?

20     MR. MORGAN:  Yes, please.

21   A. Yes.

22   Q. Throughout the time that you followed

23 Mr. McDermott, what has he told you about his return

24 to work in the dredging industry?

25   A. We talked about -- we talked about return to

1       work in the setting of the medical condition of his

2       knee.  So our visits are not aimed at discussing his

3       lawsuit.  They're really focused on his knee and the

4       quality of the health of the knee.

5           Q.   Uh huh.

6           A.   So we have returned Mr. McDermott on at least

7       one occasion that I am aware of back to full work

8       duty.

9           Q.   Uh-huh.

10          A.   And he has been able to go back to work but

11      has complained of pain doing the type of work that he

12      does.

13          Q.   Uh-huh.  Did he -- would it have been

14      important to you during this period of treatment to

15      know exactly how many times he went back to work and

16      what he did?

17          A.   We discussed what he did, and so that's part

18      of -- now I'm aware that he works offshore on a ship

19      and, you know, I'm going to be very general here

20      because my knowledge of his work is general.  I'm

21      aware that he does labor that requires him to lift,

22      squat and climb.

23          Q.   Uh-huh.

24          A.   And, you know, I could probably go back in

25      the medical record and note from the standpoint of his

1    medical visits how many times he went to, and went

2    back to work, but I don't know that off the top of my

3    head right now.

4        Q.  Well, let me ask it a different way.  I've

5    gone through all your reports and records.

6        A.  Sure.

7        Q.  And on one occasion after you returned him to

8    work in May of 2017, he came back to see you in August

9    after he worked, and he told you about the work.

10       A.  Yes.

11       Q.  Okay.  Now, that's the only reference I see

12    to any discussion about him having gone back to work

13    in the dredging industry.

14       A.  Okay.

15       Q.  So that's why I'm asking you the question.

16    Did he continue to tell you what he was doing, how he

17    was working, and where he was working?

18       A.  I don't think beyond that one discussion.

19    Not that I can recall.

20       Q.  Okay.  How much do you know about the

21    dredging industry?

22       A.  Very little.

23       Q.  Okay.  And I presume therefore that beyond

24    what Mr. McDermott might have told you, you don't have

25    any independent knowledge about the types of jobs that

1      are available in the dredging industry?

2          A.   That's correct.

3          Q.   And you don't have any particular independent

4      knowledge of the demands of those jobs or the forces

5      on the body?

6          A.   No.  No.

7          Q.   Did he ever tell you there is jobs in the

8      dredging industry that don't involve working on

9      vessels?

10         A.   He did not.

11         Q.   And he didn't tell you that actually he went

12     back to work and worked on one of those jobs?

13              MR. MORGAN:   I will object to the form

14      of the question.

15         A.   Not to my knowledge.

16         Q.   If you could look at tab one, this is your

17     report of your first encounter with Mr. McDermott,

18     November 18th, 2016, and Mr. Morgan I think already

19     asked you some questions about this.

20         A.   Okay.

21         Q.   If you could turn to the second page on the

22     report?

23         A.   Uh-huh.

24         Q.   At the bottom which is a description of what

25     Mr. McDermott told you?

1        A.    Uh-huh.

2        Q.    I just want to understand and make sure the

3   record's clear.  You have no independent knowledge of

4   anything having to do with how, when or where he was

5   injured other than what he told you; is that right?

6        A.    That's correct.

7        Q.    Here and elsewhere, here in this same

8   paragraph, you say pain is localized medial, but I

9   just want to ask you more generally about pain.

10            Do you agree with me that there is no

11   objective test to evaluate a patient's pain?

12        A.    There is no complete objective measure for

13   pain, correct.

14        Q.    Do you agree it's really subjective and based

15   on the reports of the patient?

16        A.    Yes.

17        Q.    So any time you're talking about pain in

18   these reports, just as with any other medical reports,

19   that's based on a description of what the patient is

20   reporting to you?

21        A.    That is correct.

22        Q.    Can you tell me again how did you grade the

23   extent of the osteoarthritis that you saw in his left

24   knee?

25        A.    Grade II and III.

1       Q.   And is that mild to moderate?

2       A.   It would be -- I mean I would call it

3  moderate.  Grade I, I could call mild.  Grade II and

4  III moderate and Grade IV severe.

5            MR. DeGIULIO:  Could you mark this,

6     please?  I don't have extra copies of this.

7     Sorry.

8               (Frank Deposition Exhibit No. 11 was

9      marked for identification.)

10      Q.   If you can just take a look at what I found

11  on the internet marked as Exhibit 11?

12      A.   Sure.

13      Q.   This seems to relate to this concept that

14  you've been describing about the grading.

15            MR. MORGAN:  Object.

16      Q.   To the extent of degradation of a knee.

17            MR. MORGAN:  Objection, form.

18      Q.   Am I correct about that?  Is this the scale

19  that you're talking about?

20      A.   It's similar.  Yes.

21      Q.   Okay.  Is this something different?  I just

22  want to make sure I understand.

23      A.   No.  It's similar.

24      Q.   Okay.  Could you read the descriptions of

25  the --

1      A.    Grade 0, normal.   Grade I, yellow

2   discoloration.   Grade II, softening and unevenness.

3   Grade III, fasciculation and attrition.   Grade IV, and

4   then they go on to subcategorize Grade IV as A, B, C,

5   but erosion, ulcer down the bone and eburnation of the

6   subchondral bone, and then they have Grade V, bone

7   destruction.

8      Q.    When you first evaluated Mr. McDermott --

9      A.    Let me just say this.   This article which

10   I've never read before, this sounds like they're

11   proposing a grading, a grading system which expands

12   upon the outer ridge.

13      Q.    Okay.

14      A.    Which is commonly used in orthopedics.   This

15   is from an article from Japan so this is something

16   I've never read before now.   It's also from 1993 which

17   is quite antiquated at this point.   So I will tell you

18   that this grading system created in 1993 is not part

19   of orthopedic practice today.

20      Q.    Where would I go to actually find in

21   writing this grading system?

22      A.    You can go to an orthopedic book.

23      Q.    Okay.   Now, you mentioned when you were

24   testifying in response to Mr. Morgan's question that

25   you observed during the procedure maceration of the

1      medial meniscus.

2          A.   Yes.

3          Q.   And I think you said, he didn't ask you many

4      questions about it, but as I understood your

5      testimony, you were saying that that is a symptom of

6      having walked on the knee?

7          A.   That's one thing that could cause it.  Sure.

8          Q.   Well, that's what I'm trying to understand.

9      What is your opinion about what caused this maceration

10     you saw?

11         A.   There are many things.  I can't offer an

12     opinion.

13         Q.   Okay.

14         A.   There are many things that could cause it.

15         Q.   Okay.  Now, during your initial treatment of

16     Mr. McDermott and up through and including your

17     surgery --

18         A.   Yes.

19         Q.   Is there any empirical evidence that you

20     could deduce that would tell you the timing of this

21     injury, when it occurred?

22         A.   No.  So there's no objective measure that

23     can, that can age a meniscus tear.

24         Q.   Okay.

25         A.   As clinicians, we base it on the history.

```
1       Q.   Which is what Mr. McDermott told you?

2       A.   Provided, yes.

3       Q.   That's all you can do; right?

4       A.   That's all you can do.

5            MR. MORGAN:   Frank, let me make sure you

6       don't still have the picture of the meniscus on

7       there.

8       Q.   Could you turn to tab three in this exhibit,

9       please?

10      A.   Sure.

11      Q.   This is your report of February 17th, 2017, a

12      couple months after the surgery.

13      A.   Okay.

14      Q.   And if you could turn to the fourth page

15      which describes a plan?  Do you see that?

16      A.   Okay.

17      Q.   So you say you're recommending additional

18      physical therapy.  You're focusing on work hardening.

19           Could you just tell the jury what that means,

20      work hardening?

21      A.   So in physical therapy and rehabilitation, in

22      full disclosure, I'm not a therapist.  However, my

23      understanding of the way that rehabilitation

24      functions, there's rehabilitation getting somebody

25      back to function to allow them to do ADLs or
```

1    activities of daily living.

2            So that generally involves joint

3    mobilization, range of motion, stretching and

4    strengthening to make a joint functional.

5            Beyond that for somebody who has to work, for

6    instance, somebody who has to work in an austere

7    environment, there is work hardening.  So what work

8    hardening does is a series of rehabilitation exercises

9    or stations, for lack of a better term, to try to

10   mimic what he would do in his job.

11           So he would provide, you know, information to

12   a therapist.  This is what I need to do, and he would

13   have him do it for an hour, that sort of thing, to try

14   to build up a tolerance to that type of work.

15       Q.   Okay.  Did you in fact recommend that he

16   undergo that kind of physical therapy after this

17   appointment?

18       A.   I believe I did.

19       Q.   Okay.

20       A.   Yes.  Will get him into work hardening.  Yes.

21       Q.   And then near the end of this paragraph, I

22   think it's the second to the last sentence, you say if

23   after another month he is not ready to return to full

24   work duty, I may consider a functional capacity

25   evaluation to get some object of -- I think you meant

1      objective measure.

2          A.    Correct.

3          Q.    Of what it is he can and cannot do so we can

4      provide that to his employer.

5          A.    That is correct.

6          Q.    What is a physical capacity evaluation?

7          A.    It's another rehabilitation exercise where

8      they put a subject or a patient through a battery of

9      tests and then try to come up with a U.S. Department

10     of Labor category that matches their ability in that

11     test.

12         Q.    Now, if you look at tab four, it looks like

13     he came back in about a month, March of 2017.

14         A.    Correct.

15         Q.    Is this your report from that visit?

16         A.    It is.

17         Q.    Okay.  And if you go to the second page under

18     plan again, again it says I'm recommending work

19     hardening and physical therapy.  They will focus on

20     squatting, climbing steps and ladders.  They will see

21     him back in another four months.  At that point if he

22     is not able to return, we'll get a functional capacity

23     evaluation.

24              So did you make a determination between

25     February and March that he should just continue for a

1    while in physical therapy?  It seems to be the same

2    plan.  That's why I'm asking.

3        A.   It's a very similar plan, so, yes, I'm trying

4    to give him -- I'm trying to give the patient some

5    time to recover.  So at this point he is three months

6    after his surgery which is still a very reasonable

7    amount of time in my mind to recover.

8             So I'm trying to balance getting him back to

9    work with treating the patient.  You know, that is a

10   little bit of an art in dealing with workers'

11   compensation, and that was -- I have no objectivity

12   behind that decision, but that was my opinion

13   medically.

14       Q.   That's fine.  Go to tab five now, and I think

15   this is a month later, April 14th, 2017.

16       A.   Okay.

17       Q.   Those are your notes of that visit; right?

18       A.   That's correct.

19       Q.   Okay.  If you go to the second page, and in

20   the second line there's a sentence that begins from.

21   It's from the standpoint of pain he is doing very

22   well.  He no longer has any pain in his knee.

23       A.   I'm sorry.  Which page are we on?

24       Q.   I'm sorry.  It's the second page of your

25   April 14th report.

1      A.   Second page.

2      Q.   Tab five at the bottom of the page.  Second

3  page.  I'm sorry.  Down here (indicating).

4      A.   Got it.  From the standpoint of pain.  Yes.

5      Q.   So in April of 2017 when he came to see you,

6  he told you he had no pain?

7      A.   That's correct.

8           MR. MORGAN:  Which tab is that?  Five?

9      Q.   Okay.  And then if we look at page three, at

10  this visit he said I recommended additional therapy,

11  work hardening.  I'm recommending a functional

12  capacity evaluation, as well to get some objective

13  measure of what it is he can and cannot do.

14           Do you remember after this visit whether you

15  actually put in that order for the FCE?

16      A.   We did.  He eventually had one.  I don't know

17  at what point exactly.

18      Q.   Well, you're going to see it on the next tab.

19      A.   Yes.

20      Q.   I think.

21      A.   Yes.

22      Q.   Is that your results of the functional --

23      A.   That is, and I've reviewed this in the past.

24  Yes.

25      Q.   Okay.  Now, was this performed by the

1    physical therapists that were working with him, or is

2    it a separate organization?

3        A.   I don't know the answer to that.

4        Q.   Well, you see NovaCare rehabilitation at the

5    top there?

6        A.   I do.

7        Q.   Is that an organization that you work with in

8    your work?

9        A.   In workers' compensation, sure, I've worked

10   with NovaCare before but in workers' compensation

11   typically the employer chooses not only the surgeon

12   but also the rehabilitation.  So the answer is I don't

13   know.  I don't know at this time.

14       Q.   All right.  But you've seen many of these FCE

15   reports, I take it --

16       A.   Sure.

17       Q.   I take it in your work?  I'm going to read

18   the summary on the first page.  It says the results of

19   this evaluation indicate that Leslie McDermott

20   demonstrates the material handling capabilities to

21   meet the physical demand requirements of a

22   hopper-chief engineer based upon the job description

23   provided by the employer.

24            Mr. McDermott demonstrates the abilities to

25   function within the heavy physical demand category

1       according to the U.S. Department of Labor on a

2       full-time basis for an eight hour workday.

3               Now, based on your experience with these

4       types of reports is this based on an objective

5       physical test given to Mr. McDermott?

6           A.   The answer is that he's given a physical

7       test.  The results of that test, however, as we

8       alluded to earlier, can be subjective based upon his

9       response to it.

10              So the test has some objectivity to it, and

11      it is designed to see how the patient tolerates.

12      However, as alluded to earlier, the tolerance is

13      somewhat subjective.

14          Q.   But these are geared to standards issued by

15      the Department of Labor; is that right?

16              MR. MORGAN:  Objection to form.

17          Q.   Take your time.

18          A.   To my knowledge, yes.

19          Q.   And in the paragraph right after that, I'm

20      not going to read the entire thing, but based on your

21      experience with these reports is this the very

22      specific findings of NovaCare as a result of the tests

23      in terms of how much he can lift, how much he can

24      pull, those sorts of things?

25          A.   They provided a report with that information,

1    yes.

2         Q.   Okay.  And that's not an evaluation.   That's

3    what he was actually able to do; right?

4         A.   That's what he did during the test.

5         Q.   Okay.  And down at the bottom of the page it

6    says physical demand level heavy.  Is that a category

7    that we talked about before?

8         A.   Yes, it is.

9         Q.   Now, you received this report?

10        A.   I did.

11        Q.   Which, by the way, was the date of the

12   evaluation was May 15, 2017?

13        A.   Yes.  I received it.

14        Q.   Okay.  If you could just before we leave this

15   report, if you could go to the second to the last

16   page?  I just asked you about the category heavy.

17             Have you seen this before?  You see all these

18   categories, physical demand categories, U.S.

19   Department of Labor?  I'm sorry.  Next to the last

20   page.  Well --

21        A.   Yes.

22        Q.   It looks like this (indicating).  I wonder if

23   you have an incomplete copy.

24        A.   No.  Here it is.

25        Q.   There we go.

1       A.   I see it.  Yes.

2       Q.   This is just for the record GLDD994 at the

3    bottom of the page.  You've seen these categories --

4       A.   I have.

5       Q.   In your practice.  Okay.  So Mr. McDermott

6    was classified as heavy in terms of what he was

7    capable of; right?

8       A.   Yes.

9       Q.   And that standard is exerting 50 pounds to

10   100 pounds of force occasionally and/or 25 pounds to

11   50 pounds of force frequently and/or 10 pounds to 20

12   pounds of force constantly to move objects.

13           Physical demand requirements are in excess of

14   those for medium work, and that's a U.S. Department of

15   Labor standard; right?

16      A.   That is.

17      Q.   Now, when you received this report, if you go

18   to the next tab, you saw Mr. McDermott about 15 days

19   later on May 31st, 2017.  Do you see that report?

20      A.   Yes.

21      Q.   Could you go to the second page under

22   history?

23      A.   Yes.

24      Q.   You say currently with activities of daily

25   living he is pain free.  He does have what he

1    describes as mild discomfort when he squats and kneels

2    but says that I can live with it, in quotes.

3         That's your record of Mr. McDermott's report

4    to you about his pain at that time; right?

5         A.   That's correct.

6         Q.   Now, if we turn to the next page in your

7    plan, at this point you have reviewed the FCE report;

8    correct?

9         A.   That's correct.

10        Q.   And what decisions did you make based on that

11   report?

12        A.   So I will comment quickly on the FCE report

13   since we've gone over it again here in detail.  The

14   U.S. Department of Labor heavy comments almost

15   exclusively on the ability to move force in terms of

16   pounds.  It does not comment on other activities.

17        If we go back to the first page, you will

18   notice in the third paragraph, and I will read from

19   it.

20        Deficits identified during testing include

21   left knee pain, decreased left knee range of motion

22   with flexion and left hip weakness.  Functioning to

23   claimant is limited in his ability to kneel.

24        So in light of that I did tell Mr. McDermott

25   based on his review of this report and his subjective

1    reports of no pain with activities of daily living,

2    mild discomfort when he squats and kneels and

3    complaints that he could live with it, in quotes, I

4    did say he could return to work.

5        Q.    Okay.  And that was May 31st, 2017; right?

6        A.    That is correct.

7        Q.    And more specifically, what you said in that

8    report, he feels ready to return.  Return to work date

9    will be June 12th.  Up until June 12th I am clearing

10   him to work with heavy work restrictions.  After

11   June 12th no restrictions.

12            So that was your determination of his fitness

13   to return to duty; correct?

14       A.    Yes.

15       Q.    Okay.  And if you go to the next page, there

16   is a separate form here.  We're going to see several

17   of these in your papers.  It says Work Capabilities

18   Report.  Is this a report that you filled out?

19       A.    Yes.

20       Q.    And this is dated May 31st, '17?

21       A.    Yes.

22       Q.    Same date as you saw him?

23       A.    Yes.

24       Q.    And here you say return to work full duty on

25   June 12th, and then you have heavy work checked off?

1        A.   That's right.

2        Q.   It says 100 pounds max lift, carry, push,

3    pull 50 pounds frequently.  Walks, stands frequently.

4        A.   Correct.

5        Q.   Is this a form that you're required to fill

6    out for workers' compensation?

7        A.   Yes.

8        Q.   Is it submitted to a government body?

9        A.   I do not know the answer to that.

10       Q.   Okay.  Is it submitted to the employer, do

11   you know?

12       A.   It is.

13       Q.   And if you could go to tab eight?

14       A.   Okay.

15       Q.   You may never have seen this before, but I

16   just want to ask you if you happen to know about it.

17       A.   Tab eight was the work comp.  So tab nine?

18       Q.   I'm sorry.  You're right.  Okay.  Tab nine?

19   I will represent to you that Mr. McDermott in

20   June of 2017 after you cleared him to go back to

21   work --

22       A.   Okay.

23       Q.   Underwent a physical for a job he applied for

24   with a company called Weeks Marine in the dredging

25   business.

1      A.    Uh-huh.

2      Q.    And I wondered if you've ever seen this

3   before?

4      A.    I've never seen that before.

5      Q.    Okay.  If you look at the last page in this

6   tab, the finding by the physician was physically

7   capable to meet the demands of the position offered

8   with no limitations.

9            The position that he was applying for was

10   something called an oiler.

11      A.    Okay.

12      Q.    Works on vessels.  And that wouldn't be

13   surprising to you that this physician reached that

14   conclusion, would it?

15      A.    No.  I'm looking at the date of the exam was

16   6-22-17.  I cleared him for full activity as of 6-12

17   so that would not be surprising to me.

18      Q.    Okay.  If you could go to tab ten?  This is

19   your report of a visit on August 9th, 2017.

20      A.    Yes.

21      Q.    Is that right?

22      A.    Yes.

23      Q.    Okay.  And this is after he had completed one

24   of the stints back in the dredging industry; correct?

25      A.    Yes.  He had been working for almost two

1    months at that point.

2        Q.    Okay.  And what he reported to you in the

3    history, third from the last line, his only complaint

4    is some pain when he kneels on the knee.  No other

5    complaints of pain, mechanical symptoms or swelling.

6    He's able to walk and lift without any issue.

7    Discomfort when he kneels directly onto the anterior

8    aspect of the knee.

9            What does that mean, the anterior aspect of

10   the knee?

11       A.    The front part of the knee.

12       Q.    So on the kneecap?

13       A.    Yes.

14       Q.    Okay.  Now, if we could go down to plan, you

15   say with regard to the knee itself he's doing very

16   well.  He does have some kneeling pain, which I

17   reassured him can be common after an arthroscopy.

18           So from that do I take it that anyone who

19   undergoes an arthroscopy for any ailment problem with

20   the knee might have kneeling pain?

21       A.    That's true.

22       Q.    You mentioned the possibility to him of using

23   a knee pad in that visit; right?

24       A.    Yes, correct.

25       Q.    Did he ever tell you if he ever did that?

1        A.   Not to my knowledge.

2        Q.   He reported according to this he does feel,

3   though, he can do his work without restrictions.  He

4   tells me he can live with the anterior pain he has

5   when kneeling, and that it is better than it was

6   before surgery.

7             That last part puzzles me from the standpoint

8   of this.  Did he tell you that he had pain performing

9   his job before you first saw him in November 2016?

10            MR. MORGAN:  Objection to form.

11       A.   No, but that's not what that says.

12       Q.   Okay.  Maybe I'm misunderstanding it.

13       A.    It says that his pain that he has now is

14  better than it was before surgery.  So that can be 15

15  minutes before surgery or a day before surgery.  He

16  had pain as a result of an injury for which we did

17  surgery.

18            In addition to the surgery that he had, in

19  the third line, we gave him an injection back in

20  February, the first injection that he had.

21            So this is a gentleman who's enjoying relief

22  from his pain from a number of modalities, the first

23  of which is the surgery that was performed, the second

24  of which is the non-operative treatment of his

25  arthritic condition, the cortisone injection, the

1    antiinflammatory medication administered in February.

2            Six months later still enjoying reasonable

3    relief with the exception of some knee pain when

4    kneeling which as we stated can be present in any

5    patient who undergoes an arthroscopy.

6        Q.   Okay.  Did he tell you anything about this

7    particular job that he had just finished actually on

8    August 3rd, just days before he saw you?  Did he tell

9    you what activities he was doing, what he had to do?

10       A.   I can't recall, and there's nothing

11   documented.

12           MR. DeGIULIO:  Go off the record a

13     minute.

14           VIDEOGRAPHER:  We're going off the

15     record.  The time is 5:58 p.m.

16           (Pause.)

17           VIDEOGRAPHER:  Back on the record.

18     We're going back on the record.  The time is 5:59

19     p.m.

20   BY MR. DeGIULIO:

21       Q.   Dr. Frank, thanks for your continued patience

22   here.  Could you go to tab 11 --

23       A.   Sure.

24       Q.   In this collection of documents?  Am I

25   correct this is your report from a visit on

1    October 25th, 2017?

2        A.    Correct.

3        Q.    Now, do you recall is that the first time you

4    had seen him since August, the visit we just looked

5    at?

6        A.    I believe so.

7        Q.    Did he tell you anything about an additional

8    job he had taken in the dredging industry between

9    August and the date of this visit?

10       A.    Nothing other than he was working.  To my

11   knowledge there were two jobs.  If there was another

12   one, I'm not aware.

13       Q.    Okay.  Let me see if this might refresh your

14   recollection.  This particular job he was working on a

15   beach.

16       A.    Okay.

17       Q.    Not on a ship or a barge.  Did he ever

18   mention that to you?

19       A.    I have no documentation of that, not that I

20   can recall.

21       Q.    Okay.  So if we just go down to the bottom of

22   the page, we're now nearly, we're approaching a year

23   out --

24       A.    Yes.

25       Q.    From the date that he claims he was injured.

1    Under plan, the third from the last line, he may

2    continue to work in a full duty capacity.

3            He made that determination on October 25th,

4    2017; right?

5    A.   That's right.

6    Q.   That reinforced your prior opinion?

7    A.   That's correct.

8    Q.   Quickly turn to the next page.  It's another

9    Work Capabilities Report.  This one's dated

10   October 25th, 2017.  This simply confirms what I

11   just read from your report.

12   A.   That is correct.

13   Q.   That he can return to full duty, no

14   restrictions; correct?

15   A.   That is correct.

16   Q.   And then tab 13 is a letter that you wrote to

17   Mr. Morgan dated November 15, 2017.  Do you recall

18   what the origin of this letter was?  I mean did you

19   know Mr. Morgan before this?

20   A.   No.  This was a request for a summary of care

21   rendered so --

22   Q.   Did Mr. Morgan call you sometime prior to

23   that date and ask you to do this?

24   A.   No.  The normal course of things is a letter

25   request.

1          Q.    Did you happen to see such a letter in your

2    file?

3          A.    I'm sure I saw it at some point.  I don't

4    have it in the file now.

5          Q.    You don't have it in the file now?

6          A.    No.

7          Q.    Okay.  I'm just asking because you reviewed

8    your file today before this deposition; right?

9          A.    Yes.

10         Q.    You didn't see it?

11         A.    I did not see the letter.

12         Q.    Okay.

13         A.    Those types of letters usually are not kept

14   as part of the medical record.

15         Q.    Okay.  So if we turn to the second page which

16   at the bottom is PLDISC 128, in the second

17   paragraph, we've already talked about this, third

18   sentence.

19                During the time of his diagnostic arthroscopy

20   we identified some Grade II and III degenerative

21   changes, particularly in the lateral compartment.

22                Just so the judge and jury understands, it's

23   pretty complicated stuff, that describes changes to

24   the articular cartilage; correct?

25         A.    Correct.

1                    MR. MORGAN:  Objection to form.

2          Q.    It does not in any manner refer to the

3     meniscus; correct?

4          A.    Correct.

5          Q.    Do you consider the surgery that you did on

6     Mr. McDermott successful?

7          A.    Yes.

8          Q.    It achieved what it was designed to achieve;

9     correct?

10         A.    It achieved what it was designed to achieve

11    within the limitations of what I could do given his

12    knee.

13         Q.    Fair enough.

14         A.    Yes.

15         Q.    Okay.  If you can turn to tab 14, this is a

16    particular tab.  I think it's a combination of

17    documents.  The first document is a Work Capabilities

18    Report.

19              Well, before I ask you a question,

20    Mr. McDermott came back to you in May of this year;

21    right?

22         A.    That is correct.

23         Q.    And you did not ask him to come back.  He

24    asked to come back; isn't that right?

25         A.    That's correct.

1    Q.    Okay.  What's the term PRN mean?

2    A.    As needed.

3    Q.    Okay.  So if I see in these reports that

4    further treatment contains that abbreviation which

5    must be Latin --

6    A.    Yes.

7    Q.    That means that he can come back if he needs

8    to come back?

9    A.    That's correct.

10    Q.    And he can seek treatment if he thinks he

11    needs it?

12    A.    That's correct.

13    Q.    So he came back to you, and we're going to

14    look at your actual visit report in a minute but --

15    A.    Okay.

16    Q.    What you ended up doing on 5-16-18, May 16th

17    of this year, is again reconfirming that he could work

18    full duty without restrictions; right?

19    A.    That is correct.

20    Q.    Now, when he came back in May, did he, and

21    you can obviously look at your notes which follow

22    this, did he tell you anything about having again

23    worked in the dredging industry since the last time he

24    had seen you in October?

25    A.    I don't know that he specifically addressed

1    that.   I believe it was assumed that was continuing

2    work in the same industry.

3        Q.   Okay.  At no time did he tell you he couldn't

4    do that; right?

5        A.   No.  He was doing so with discomfort.

6        Q.   Okay.

7        A.   Specifically, when he squats and climbs

8    steps.

9        Q.   Okay.  Now, if you could look at -- we're

10    still in tab 14.

11        A.   Yes.

12        Q.   It's the third page of the document.  At the

13    bottom of the page it says 2291.

14        A.   Okay.

15        Q.   Do you see that?

16        A.   Yes.

17        Q.   Again, going to the section on plan, do you

18    see that?

19        A.   Yes.

20        Q.   It says his company doctor has recommended a

21    repeat MRI.  Do you know what that refers to, the

22    company doctor?

23        A.   I assume this is somebody he's seeing.  I

24    don't know exactly, but I assume somebody he's seeing

25    at the request of his employer.

1      Q.   Did you ever speak with any doctor who

2   claimed to be representing the employer?

3      A.   No.

4      Q.   Okay.  Now, continuing on then, you refer to

5   this request for an MRI.  You say while I think that

6   is reasonable, I do believe that most of his symptoms

7   are coming from osteoarthritis.

8      A.   Yes.

9      Q.   And is that something that shows up on an

10  MRI?

11     A.   Yes.

12     Q.   Did you recommend that he have the MRI?

13     A.   I did.

14     Q.   Just at the end of the section on plan, you

15  reconfirmed once again that he could continue to work

16  full duty without restrictions?

17     A.   That's correct.

18     Q.   Now, he got a cortisone injection this time;

19  right?

20     A.   He did.

21     Q.   And each time that he got one during this

22  period of time he reported to you that it helped a

23  lot; right?

24     A.   He reported that it helped.

25     Q.   Let's go to tab 15, this report which is

1     dated May 30th, 2018, this year.

2         A.    Yes.

3         Q.    Had you received the results of the MRI that

4     you ordered prior to this visit?

5         A.    Not prior.  I reviewed them during the course

6     of the visit.

7         Q.    But you had the results at this time?

8         A.    Yes.

9         Q.    Okay.  And what did you see?

10        A.    We saw some degenerative changes.  We saw

11    post surgical changes of the medial meniscus, not

12    unexpected given his clinical course.

13            There was also some post surgical changes at

14    the junction of the posterior horn and body lateral

15    meniscus, again not unexpected given the surgery that

16    he had 18 months prior.

17            There was no definitive evidence of knee tear

18    and other than arthritic change I felt that these

19    represented post surgical changes, and I related those

20    findings to Mr. McDermott.

21        Q.    That terminology, post surgical changes, to a

22    layman like me sort of throws me off.

23        A.    Okay.

24        Q.    Is what you're really trying to convey is

25    that what you see in the knee is something that you

1    would expect from the procedure you had done back in

2    December of 2016?

3        A.    That, in addition to the arthritic condition

4    for which we've also been treating him, yes.  You

5    know, the purpose of the MRI for me as a clinician is

6    to determine is this a patient who could benefit

7    potentially from further surgery or not from further

8    surgery.

9            In my opinion I did not think he needed any

10   further surgery based on those findings.

11       Q.    We have one final document.

12       A.    Yes.

13       Q.    Well, in this collection.

14       A.    Okay.

15       Q.    And this is another Work Capabilities Report.

16   Did you prepare this?

17       A.    Yes.

18       Q.    And that was May 30th of this year?

19       A.    That's correct.

20       Q.    And, again, you reconfirmed that he could

21   work in a full duty capacity without any restrictions;

22   correct?

23       A.    Yes.

24       Q.    Have you been shown a report done by a

25   Dr. Robert Mannherz?

1        A.   Not to my recollection.

2        Q.   Have you ever heard of Dr. Mannherz?

3        A.   No.

4             MR. DeGIULIO:   Okay.   As a result of

5    that answer, I have no further questions.

6                          EXAMINATION

7    BY MR. MORGAN:

8        Q.   While Mr. DeGiulio was asking you questions,

9    I found some other slides.   Some of them seem to be

10   duplicates of what we already looked at, but if you

11   would look at those, Dr. Frank, you may find something

12   that would assist us in explaining where the tear was

13   that we couldn't find in the earlier slide of the

14   photograph you took during the arthroscopic surgery.

15            Is there anything in there that would assist

16   you in explaining the surgery to the court and jury?

17       A.   There is just some additional pictures of the

18   medial meniscus tear toward the bottom here.

19       Q.   Okay.   So we're looking at the Medial

20   Meniscus.   We're looking at page 66, which if

21   Mr. DeGiulio has no objection, I will just put that

22   in the package of Exhibit No. 1 which is the file

23   papers.

24            MR. DeGIULIO:   No problem.

25       A.   These are just some additional pictures

1    indicating instability.  That's an instrument or a

2    probe there, this flap of tissue --

3       Q.  Here you go.

4       A.  Is displaced.  There's a probe there.  This

5    is a displaced fragment of meniscus, and again we've

6    looked at the post surgical images.

7       Q.  Yes, sir.

8       A.  After resection so that just indicates the

9    tear further.

10      Q.  Thank you.

11      A.  Okay.

12      Q.  Now, I wanted to cover a couple points that

13   Mr. DeGiulio covered in his cross-examination.  One of

14   the questions that he asked you was whether there was

15   a way to objectively determine when a meniscus

16   actually tore.

17          And by objective, when you use the term in

18   this forensic area of medicine, what do you mean by

19   that?

20      A.  Objective is something that's not subject to

21   any opinion or input that could be subject to

22   question.  So, for instance, objective, if you use an

23   extreme example, an objective example in this case

24   would be if Mr. McDermott had an MRI on the deck of

25   the ship, went out and twisted it and that showed no

1    meniscal tear.

2        Q.   Right.

3        A.   Went out and twisted his knee and went right

4    back into the MRI and had a meniscus tear.  To me,

5    that would represent objective unequivocal evidence

6    that between point A and B --

7        Q.   Right.

8        A.   Or between point A and C with event B in the

9    middle.

10       Q.   Right.  Okay.

11       A.   So.

12       Q.   You have a photograph of no tear before he

13   goes on the deck.  You have a photograph of a tear

14   afterwards?

15       A.   So I would say in almost no situation in

16   medicine do we have that sort of data.

17       Q.   Right.

18       A.   In medicine we always start with a complaint

19   and a history.

20       Q.   Right.

21       A.   So, and we deduce probability of cause based

22   upon temporal relationships of a patient's subjective

23   complaint and history, combine that with objective

24   findings, physical exam findings, radiographic

25   findings, and come up with an opinion.

1                    So there's no absolute -- there are few

2      absolute objective measures in medicine.

3          Q.   Right.  When you use this word temporal, do

4      you mean over time?

5          A.   Over time, unrelated.

6          Q.   Okay.  So if we use a phraseology, which

7      believe it or not appears frequently in jury

8      instructions, common sense, we know from your

9      testimony that when you have a torn menisci, as did

10     Mr. McDermott, that you have what you would call

11     dysfunctional or somewhat jagged portions of the

12     meniscus in the knee; is that accurate?

13         A.   Yes.

14         Q.   And I believe your testimony has been because

15     they're abnormal they change the, for lack of a better

16     expression, what do you call it when the knee, when it

17     is not as --

18         A.   Kinematics.

19         Q.   Kinematics.  Meaning what?

20         A.   Normal function of the knee throughout a

21     range of motion.

22         Q.   All right.  So like if I had a chunk of heel

23     tore out of my shoe and tried to walk --

24         A.   Right.

25         Q.   Then my gait would be changed?

1          A.    Reasonable analogy.  Yes.

2          Q.    And what you're saying is if you have a piece

3     of cartilage that's jagged or somewhat frayed, then

4     you're going to have a change in gait?

5          A.    A change.  It will become symptomatic.

6     That's why meniscus tears are symptomatic.

7          Q.    All right.  So if we use common sense and say

8     here we have a 54-year-old gentleman that's engaged in

9     working in the maritime industry day in and day out.

10    He's walking on steel decks.  He's pulling on hoses,

11    on occasion has to hook up a hose or disconnect a

12    hose, which means he has to kneel or squat.

13          And he's never gone to the doctor.  He's

14    never complained of any pain to anyone in his life

15    that we know of, and he certainly hasn't stopped

16    working, and then he has this episode that I don't

17    need to repeat but related to you.

18          He's now in pain.  You do an MRI and see the

19    tears in the lateral meniscus and in the medial

20    meniscus.

21          Does that assist you in establishing whether

22    more likely than not the moment of the tear is

23    connected to the history that he gave you?

24          MR. DeGIULIO:  Objection to form.

25          MR. MORGAN:  Why?

1          MR. DeGIULIO:  It's mischaracterizing

2      what the doctor's already testified to.

3          MR. MORGAN:  Okay.  So I always run the

4      risk when these nice smart lawyers make

5      objections.  I mean it's sustained.

6  BY MR. MORGAN:

7      Q.  So I'm going to ask you, Doctor, in your

8  words can you tell us whether you have an opinion as

9  to whether Mr. McDermott sustained the tears to his

10  lateral meniscus and medial meniscus based on the

11  history he gave to you and the objective findings you

12  saw on the MRI and explain your answer?

13      A.  I mean based upon the information that I was

14  given, and to use your term, common sense reasoning, I

15  would say it is my opinion within a reasonable degree

16  of medical certainty that the injury to the knee was

17  caused by the event reported on this ship.

18      Q.  Okay.  Secondly, Mr. DeGiulio went through

19  tab after tab of documentation where you released

20  Mr. McDermott to go back to full duty based upon the

21  treatment that you had given to him and his reports

22  to you of how he was doing, and here's the question

23  that arises out of that information.

24          Given the instance of his returning to you

25  for treatment and his need for steroidal injections

1  because of pain, does the mere fact that you released

2  him to full duty change the internal, whatever you

3  want to call it, disease process, injury process of

4  the knee.  It's still there.  Isn't it?

5      A.   Hc has a chronic progressive disease in his

6  knee that at this point we are managing.  All right.

7  And testimony to the management is he has been able to

8  return to work.

9          The duration to which he will be able to

10 continue that type of work is unknown at this point in

11 time.

12     Q.   Okay.  And it would be irresponsible and

13 callous for an orthopedic surgeon such as yourself to

14 dictate to a person whether they can or cannot return

15 to heavy labor if they choose to do so, would it not?

16 That's not something you do?

17     A.   That's correct.  His desire to return to work

18 is his desire and, you know, he is managing this

19 disease in his knee and making an effort to make a

20 living.

21     Q.   Has he been a compliant patient that did what

22 you told him to do?

23     A.   In my opinion, yes.

24     Q.   Has he gone through the work strengthening

25 and work hardening so far as you read in the records

1   cooperatively and with the proper amount of effort?

2       A.   With the information that I have, yes.

3       Q.   The other thing was, I think it was in tab

4   six, NovaCare was a record that you all were talking

5   about here with Mr. DeGiulio.

6       A.   Yes.

7       Q.   And the fact he was able to lift, I think

8   they said, 100 pounds in that record; is that right?

9       A.   I'm seeing 80.

10      Q.   Or 80.

11      A.   Pushing up to 92.  Lifting up to 80.

12      Q.   Okay.  Can you tell if he's able to do that,

13  is that consistent or inconsistent with showing that

14  the large amount of debilitating osteoarthritis that

15  the defense may argue that he has isn't causing him

16  any pain right now when he does what's on that test

17  result?

18      A.   I think based upon this he could do what they

19  said he could do with limitations and again deficits

20  identified, knee pain.

21      Q.   Knee pain.  Okay.  So just that there's no

22  confusion on the testimony, it seems to me that the

23  osteoarthritis that you found in his knee was in the,

24  those inner menisci that we saw on this diagram here.

25           I believe you actually drew an arrow to one

1    of them.  What are those called?

2         A.   That's the articular cartilage.

3         Q.   Articular cartilage, and that's where the

4    osteoarthritis exists; is that correct?

5         A.   That's correct.  Mostly in the lateral

6    compartment which is the outside compartment.

7         Q.   All right.  Now, using your knowledge of

8    medicine, if you remove 50 percent of the medial

9    meniscus and 20 percent of the lateral meniscus, and

10   we look at one of the other depictions, perhaps this

11   one here which is marked as Frank No. 4, can you

12   explain to the jury when you take out these big,

13   portions of the big meniscus and then you have the

14   smaller articulating cartilages in there, is there

15   more pressure on them than there was before you

16   removed the 50 percent of the medial meniscus and the

17   20 percent of the lateral meniscus?

18             MR. DeGIULIO:  Objection to form.  Lack

19        of foundation.  He hasn't testified about how much

20        of the medial meniscus he removed.  He testified

21        it was 15 percent of the lateral.

22             And I think what you're pointing to in the

23        diagram are not the correct anatomical parts.

24             MR. MORGAN:  Okay.  Well, that's fine.

25        I appreciate it.

93

1      Q.   If you refer to the opt report that we looked

2    at earlier, can you find where you designated the

3    amount of medial meniscus removed?

4      A.   It's documented as 50 percent.

5      Q.   Fifty percent?

6      A.   Fifty percent.  Five-zero.

7      Q.   Thank you.  Now, as we look at Exhibit No. 4

8    and we look at what I'm talking about here, what is

9    this up here (indicating) trying to replicate?

10     A.   Femur.

11     Q.   And what is this (indicating)?

12     A.   The tibia.

13     Q.   The femur's at the top?

14     A.   That's correct.

15     Q.   That would be like a thigh bone?

16     A.   Thigh bone.

17     Q.   And this is like your shin bone?

18     A.   Shin bone.

19     Q.   Okay.  And this here (indicating)?  What is

20    this blue thing?

21     A.   I imagine that is supposed to depict the

22    meniscus.

23     Q.   And then the top?

24     A.   That's articular cartilage, the blue.

25     Q.   Okay.  So perhaps the best way for me to

1    phrase this question is if you remove 50 percent of

2    the medial meniscus and 20 percent of the lateral

3    meniscus, is it going to facilitate aggravation of

4    preexisting osteoarthritis in the articulating

5    cartilage?

6        A.   What it's going to do is increase the forces

7    seen by the articular cartilage which could therefore

8    lead to acceleration of arthritic change.

9        Q.   All right.  So for lack of more scientific

10   terminology, is it bad for Mr. McDermott's knee joint

11   so far as being pain free that he sustained the injury

12   for which you treated him?

13       A.   It was -- the meniscus tear adversely

14   affected his knee.

15       Q.   Okay.  And I don't know why I made a note of

16   this, but in tab 13 I made a note here on page two of

17   the November 17th report.  No degenerative changes

18   were noted.  Do you know what that refers to?

19       A.   I don't know what that note refers to.

20       Q.   Okay.  Oh!

21       A.   Is there something on that page that stated

22   that?

23       Q.   Yes.  I think in the center, it doesn't say

24   what I just said, but it says the procedure was

25   performed on December 6, '16 during the time of his

1   diagnostic arthroscopy.  We identified some Grade II

2   and III degenerative changes, particularly in the

3   lateral compartment.

4         I believe what I was referring to is the

5   degenerative changes were not in the medial meniscus

6   and lateral meniscus but were in the articulating

7   cartilage that you showed in the diagram?

8         A.   That's correct.  We diagnosed minimal

9   arthritic change in the medial compartment where the

10  larger tear was.

11        Q.   So before those meniscus tore, by those I

12  mean the medial meniscus and the lateral meniscus, is

13  it true you saw no evidence of preexisting

14  degenerative changes that would make them more easily

15  torn than a normal meniscus?

16        A.   There were degenerative changes in the knee

17  which can render those meniscus more prone to tear.

18        Q.   Okay.  And were those areas of degenerative

19  changes that you saw in the knee what you would expect

20  in any 54-year-old person?

21        A.   They were age appropriate.

22        Q.   Okay.  All right.  So would that be all the

23  more reason that as an employer you would not want to

24  subject that person to torsion forces if there was a

25  way to design the work place to alleviate that?

1       A.   I think an abnormal torsion force on the knee

2    in any line of work is not ideal.

3     .  Q.   Okay.

4            MR. MORGAN:   Thank you very much.   Those

5    are all the questions.

6            MR. DeGIULIO:   I have a couple.   I

7    promise.

8                        EXAMINATION

9    BY MR. DeGIULIO:

10      Q.   You treat, I think you said, 200.   Actually,

11   you perform surgery on 200 to 250 patients a year for

12   meniscus tears?

13      A.   Yes.

14      Q.   Okay.  Based on that experience, your great

15   experience in this area, is it possible for an

16   individual to go a very long time with a meniscus tear

17   without, before seeking treatment?

18      A.   That is possible.

19      Q.   Does that happen often?

20      A.   It happens.

21      Q.   What percentage of the time?

22      A.   I can't say.

23      Q.   Would you agree with me that the tear of a

24   meniscus, that a person can still function normal

25   daily activities without getting it repaired?

1      A.   Yes.

2      Q.   What's the percentage of the population with

3  osteoarthritis in the knee among 54-year-old male?

4      A.   I can't cite a number, but it's greater than

5  50 percent.

6      Q.   Greater than 75 percent?

7      A.   Probably.

8      Q.   That's all I have.  Oh, one more.  I did some

9  reading about what I think is a drug or a product

10  called Xarelto.  Are you familiar with it?

11      A.   I'm not.

12           MR. DeGIULIO:  Okay.

13                     EXAMINATION

14  BY MR. MORGAN:

15      Q.   Just to follow up on the last series of

16  questions, Mr. McDermott in doing work, climbing

17  ladders and kneeling, pulling on hoses and working

18  eight to ten hours or more on steel decks is not what

19  you as an orthopedic surgeon would expect a person

20  with the tears he has in his knee would do pain free,

21  would he?

22      A.   I wouldn't expect it.

23           MR. MORGAN:  Thank you very much.  I

24   will pass the witness.

25           MR. DeGIULIO:  All done.

```
1                    MR. MORGAN:  Well done.  Thank you.

2                    THE WITNESS:  Thank you.

3                    VIDEOGRAPHER:  This concludes our

4        deposition.  We're going off the record.  The time

5        is 6:29 p.m.

6                        (Witness excused.)

7                        (Deposition concluded at 6:29 p.m.)

8                             - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E
2
3    COMMONWEALTH OF PENNSYLVANIA )
4    COUNTY OF BEAVER             )
5
6         I, Mary Secot, a notary public in and for
     the Commonwealth of Pennsylvania, do hereby
7    certify that the witness, DARREN A. FRANK, M.D.,
     was first duly sworn to testify the truth, the
8    whole truth and nothing but the truth; that the
     foregoing deposition was taken at the time and
9    place stated herein; and the said deposition was
     recorded stenographically by me and then reduced
10   to typewriting under my direction, and
     constitutes a true record of the testimony
11   given by said witness, all to the best of my skill
     and ability.
12
13        I further certify that I am not a relative
     or employee of either counsel, and that I am in
14   no way interested, directly or indirectly, in
     this action.
15
16        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 23rd day
17   of July 2018.
18
19
20        ------------------------------------
21        Mary Secot
22
23
24
25