# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

LESLIE MCDERMOTT : 
 : CIVIL ACTION
vs. : 
 : NO. 17-cv-4511 (MAK)
GREAT LAKES DREDGE AND DOCK CO. :

## Plaintiff's Statement of Material, Undisputed Facts

1. Great Lakes admitted that they were the bareboat charterer of the Barge 1003 at the time of Plaintiff's injury. Defendant's Answers to Plaintiff's Requests for Admission No. 2.

2. Great Lakes employed the Plaintiff. Defendant's Answers to Plaintiff's Requests for Admission No. 3.

3. Great Lakes admits that the Barge 1003 is a vessel under the general maritime law. Defendant's Answers to Plaintiff's Requests for Admission No. 13.

4. The winch did not provide sufficient lifting power for the purpose of lifting and extending fuel hoses to the dockside workers at fuel loading facilities. Dep. Smith 37:14-17; 64:15; 67:7-10; Dep. Harris 23:3-8; 25:23-24.

5. Mr. Richard Smith was the safety advisor on the barge 1003 when it was commissioned in 2014. (Depo Smith page 17, lines 11-22). Before McDermott's injury he oversaw maintenance and logistics for the barges and dredges. (Smith depo. page 26:22 thru 27:7).

6. He learned then the boom and crane was "really hard to use on the winch, and failed to tell the company management this at that time. (Depo Smith page 29, lines 15-24 and page 30, lines 1-9).

7. McDermott coworker Josh Harris testified the winch used to lift the boom to lift and extend the fuel hoses was rusty, inefficient, not functional, "it basically did not work," and that the "crank was rusty" because the gears were rusty. (Dep. Harris 23:3-8; 89:5-9).

8. The winch was not fit for the purpose for which it was intended. (Harris dep. 25:9-15).

9. The men needed the winch on the 3" hose to lift it up. (Harris dep. 108:10 to 109: 4)

10. The winch was to lift the hose regardless of it being a 3"or 6" hose to lift it into the air. (Harris dep. 111:20: to 112:8)

11. At least on one occasion, at the Kinder Morgan fuel terminal in Carteret, New Jersey, the Barge 1003 was turned away because of the inoperability of the winch and the crew's inability to facilitate the transfer of the fuel loading hoses from the vessel to the dock and vice versa. Dep. Smith 38:1.

12. For months Harris and McDermott warned their employer they were at risk of back injury from lifting the hose due to the boom not working. (Harris dep. 113:8-14)

13. Great Lakes maintenance manager Richard Smith was responsible for the maintenance on the winch during all relevant times. Dep. Richard Smith 24:7-24.

14. Great Lakes Maintenance Manager Richard Smith knew from when the winch was first installed on the barge that the winch was inoperable. Dep. Smith 29:15-22; 33:8; 37:9-14.

15. Mr. Richard Smith informed his superiors in Great Lakes' chain of management, that the result of the winch's inoperability was that the crew were forced to physically handle the hoses in order to complete fueling operations. Dep. Smith 29:15-22; 33:8; 37:9-14; Dep. Harris 113:15-114:5.

16. Richard Smith reported the winch needed to be replaced in September of 2016 and submitted a written request on September 22, 2018. Dep. Richard Smith 35:7.

17. It was Richard Smith's responsibility to ensure that this injury was prevented. Dep. Campbell 60:6-12.

18. Mr. Campbell, the Director of Safety and Risk for Great Lakes, testified for the corporation on May 23, 2018, stating that Mr. Smith had the most knowledge about the condition of the winch on barge 1003. Dep. Campbell 191:2-6.

19. Richard Smith had an obligation to report the difficulty of operating the boom, and he should have informed those commissioning the barge. Dep. Campbell 84:7-18.

20. On September 22, 2016, Richard Smith submitted a capital improvement request with remarks to Bill Bauman, Great Lakes' fleet maintenance manager, informing him of the difficulty of use of the winch. Dep. Smith 35:6-12.

21. Fleet Technical manager Bauman admitted when informed the winch was "extremely hard to operate," by Smith, he did not read the informative email telling him the details. (Bauman deposition at page 19 lines 20-25 thru 21/1-6).

22. Richard Smith was responsible for the maintenance on the winch during all relevant times. (Dep. Richard Smith 24:7-24; 26).

23. Smith admitted his operations manager did not fill out the proper form to report the deficiency in 2016. (Dep. at page 29, line19).

24. Smith does not fault McDermott for not using the winch, and said the boom and worm gear winch "was not reasonably fit for the purpose for which it was intended to move anything efficiently." (Depo. at page 67, lines 7-10).

25. Smith admitted the winch is such "it's not working correctly for us." (Depo. page 81, at lines 4-8), saying this was a "proper statement)."

26. Mr. Campbell testified that "reasonable care" required someone to address the issue of manhandling the hose. (Dep.195; 13-17). This falls under the Safety Management System.

27. No action was taken to render the conditions aboard the barge safe for the Plaintiff or crew and under Great Lakes' policy it was not required that the issue be addressed in any particular amount of time.   Dep. Campbell 65:12-23; 91:4-7.

28. Great Lakes knew that the crew physically moving the fuel hoses at fueling presented a dangerous situation, as Director of Safety and Risk Jason Campbell admitted that the force or "torque" experienced by the body at the time of an action like that that McDermott was experiencing causes injury and puts you at risk of injury. Dep. Campbell 175:22.

29. Campbell, speaking for Great Lakes stated that moving a heavy, six-inch fuel hose is hazardous to health. Dep. Campbell 211:10-17.

30. Great Lakes has admitted that reasonable care requires someone to address the issue of handling the hose under Great Lakes' Safety Management System. Dep. Campbell 195:13-17.

31. Great Lakes admitted that it had never made a determination of whether or not the crane was too difficult or impractical to use, or even investigated the Plaintiff's claims.  Dep. Campbell 52:17-23; 30:19-31:8.

32. Great Lakes project operations do a weekly report on the condition of barge 1003. Dep. Smith 27:20

33. There were no reports in writing on deficiency of the winches; Dep. Smith 29:12

34. Richard Smith wrote the report on the winch because the men would not use it to support their jobs. Dep. Smith 31:5

35. The report Richard Smith wrote went to Bill Bauman the fleet maintenance manager. Dep. Smith 31:13

36. In August of 2016 that boom operated the same as in Dec. of 2014. Dep. Smith 33:1

37. The Capital Expenditure Request with reports of the operational deficiencies of the winch went to Steve Becker who is senior corporate officer in charge of engineering. for Great Lakes. Dep. Smith 34:6

38. Steve Becker ensures that engineering functions are carried out. Dep. Smith 34:23

39. Richard Smith reported the winch to forestall men having to do something extremely hard to operate. Dep. Smith 35:17

40. Smith did not want the fuel line handled manually and dropped into the water. Dep. Smith 37:5.

41. Smith tried to provide a solution since men were not using the winch. Dep. Smith 39:20.

42. The winch and crane was not working properly and efficiently and safely. Dep. Smith 42:16.

43. Richard Smith was unprepared to testify to, and did not know the weight of the three-inch hose. Dep. Smith 51:15

44. The tankermen told Richard Smith they were manhandling the hose. Dep. Smith 52:23

45. Richard Smith testified: "I know they were moving the hoses by hand." Dep. Smith 53:7.

46. The reporting tankermen would not have distinguished what size hose was being used. Dep. Smith 54:4

47. Richard Smith testified that the six-inch hose was the only one that was in use on the Defendant's barges. Dep. Smith 54:18.

48. He knew it would take weeks to get the winch out there. Dep. Smith 59:5

49. Smith admitted that if equipment was not safe he had an obligation to report that fact to the safety department. Dep. Smith 61:8

50. At the time of his deposition, Richard Smith was unprepared to identify the hoses being used aboard the subject vessel. Dep. Smith 61:12.

51. Richard Smith knew the fuel hose was awkward and heavy. Dep. Smith 62:18

52. Richard Smith knew it was impractical to use the winch at KMI. Dep. Smith 64:12

53. Richard Smith supervised men in Coast Guard using air tuggers. Dep. Smith 65:16

54. Richard Smith requested the winch for the other barges too. Dep. Smith 71:4

55. The installation of the electric winch on Barge 1003 was to be a prototype that, if successful, would be installed on the Barges 1001, and 1002. Dep. Smith 71:11.

56. Richard Smith sent an email reflecting the completion of the installation of the electric winch to Stefan Brogna, Staten Island yard manager. Dep. Smith 73:2.

57. The winch was not working properly for Great Lakes. Dep. Smith 81:4.

58. The video produced by the Defendant as GLDD_1010 showing the movement of the winch and boom was taped September 8, 2016. Dep. Smith 87:9

59. Stefen Brogna, yard manager at Staten Island facility, was the one that actually replaced the winch. Dep. Smith 91:2.

60. Great Lakes never made a determination of whether or not the crane was too difficult or impractical to use. (Dep. Campbell 52:17-23; 30:19-31:8).

61. Great Lakes did not investigate the Plaintiff's claims. (Dep. Campbell 52:17-23; 30:19-31:8).

62. Richard Smith recommended that the winches for barges 1001 and 1002 be replaced. Dep. Smith 97:19.

63. Great Lakes admitted that they have obligations under OSHA regulations to provide a workplace free from hazards, and replaced the winch in order to be incompliance with those regulations. Dep. Smith 98:1-99:10.

64. Richard Smith was the person within the company with the most knowledge concerning the crane and winch. Dep. Smith 101:19.

65. Great Lakes admitted that the winch was replaced was to make the workplace safer and so that injuries wouldn't occur. Dep. Smith 105:12.

66. Richard Smith did not know the weight of the hose at the time of his deposition. Dep. Smith 51:6-16.

67. Jason Campbell did not know the weight of the hose at the time of his deposition. 59:6-9; 101-102.

68. Campbell admitted the force or "torque" experienced by the body at the time of an action like that which McDermott was subjected to, causes injury and puts you at risk of injury. (Dep. Campbell 175:22).

69. Cameron Whitmore did not know the weight of the hose at the time of his deposition. Dep. Whitmore 33:21-25.

70. Bill Baumann did not know the weight of the hose at the time of his deposition. Dep. Baumann 23:18-20; 40:9-13.

71. The Plaintiff spent over 12 hours per day on average aboard the Barge 1003 in furtherance of its mission to transfer fuel. Dep. Harris 47:13-16. Dep. McDermott 47:17-24. Dep. Polly 21:1-2; declaration of Mr. Mcdermott at paragraph 6.

72. Great Lakes produced a video wherein Richard Smith is depicted as saying to Terry Polly, while Polly is cranking the winch aboard Barge 1003, "That'll wear you out, right?" Mr. Polly responds, "You're damn right." (GLDD_1010).

Dated: August 20, 2018

                                                      Respectfully submitted,

*/s/ S. Reed Morgan*
ATTORNEY

THE CARLSON LAW FIRM
Texas State Bar No: 14452300
100 E. Central Texas Expy
Killeen, TX 76541
Telephone: (800) 359-5690
Facsimile: (254) 526-8204

E-Mail: rmorgan@carlsonattorneys.com

*/s/ Gregory G. Paul*
Gregory G. Paul
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Telephone: (412) 259-8375
Facsimile: (888) 822-9421
Email: gregpaul@morgan-paul.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing instrument was served upon the following on the 20th day of August 2018.

Palmer Biezup & Henderson LLP
    Frank P. Deguilio
    190 N. Independence Mall West

Suite 401
Philadelphia, Pennsylvania 19106
Email: fpd@pbh.com

Charles P. Neely
190 N. Independence Mall West
Suite 401
Philadelphia, Pennsylvania 19106
Email: cneely@pbh.com

Attorneys for Defendant
Great Lakes Dredge and Dock Co., LLC

    /s/ *S. Reed Morgan*
    S. Reed Morgan