TABLE OF CONTENTS

1. Complaint
2. Answer
3. Defendant's Answer's to Requests for Admissions
4. Affidavit of Leslie McDermott
5. GLDD_913-943
6. Smith-2
7. Whitmore-1
8. Campbell Deposition Excerpts
9. Smith Deposition Excerpts
10. McDermott Deposition Excerpts
11. Harris Deposition Excerpts
12. Polly Deposition Excerpts
13. Whitmore Deposition Excerpts
14. Baumann Deposition Excerpts

# EXHIBIT-1

MSJ_0002

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LESLIE MCDERMOTT, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | |
| GREAT LAKES DREDGE AND | : | |
| DOCK COMPANY, | : | |
| Defendant. | : | |

## COMPLAINT

COMES NOW, Leslie McDermott, hereinafter referred to as "Plaintiff", complaining of

Great Lakes Dredge and Dock Company, hereinafter referred to as "Defendant," and respectfully

shows as follows:

### JURISDICTION

1.      This is an action within the maritime jurisdiction of this Court. This claim is

maintained under the Jones Act, 46 U.S.C. § 30104, and the General Maritime Law of the United

States; and, it is filed under 28 U.S.C. Sec. 1916, as an American Seaman, and he institutes and

prosecutes this suit without prepaying fees or costs or furnishing security therefor.

### PARTIES

2.      Plaintiff, Leslie McDermott, is a resident and citizen of Pittsburgh, Pennsylvania.

3.      Defendant Great Lakes Dredge and Dock Company is a Delaware corporation

doing business in the State of New Jersey. This Defendant may be served with due process by

serving its registered agent for service in Oakbrook, Illinois, at 2122 York Road, Oakbrook,

Illinois, 60523.

MSJ_0003

## VENUE AND SERVICE OF PROCESS

4.     Venue is proper in because both Defendants entered into an agreement with plaintiff whereby if he became injured in the service of their company, he was contractually bound to file suit in Federal Court in the Eastern District of Pa., if a resident of Pa. at the time of injury. (See attached Exhibit "A" incorporated herein as part of paragraph III, "Venue." Defendant is being served with a Notice of the lawsuit and a request for Waiver of Service of Summons, sent by certified mail to their business address at 2122 York Road, Oakbrook, Illinois, 60523.

## FACTS

5.     At all material times hereto, Plaintiff was a Jones Act seaman employed by Defendant Great Lakes Dredge and Dock Company. This lawsuit has become necessary as a result of personal injuries received on or about 10/29/16 in the Atlantic Ocean off the coast of Atlantic City, New Jersey. Plaintiff was assigned to Fuel Barge 1003 as a tankerman and engineer and worked on the fuel barge a minimum of twelve (12) hrs. per day, in the furtherance of the barge's mission. This barge supplied fuel to a hopper dredge owned by defendant that worked in the Atlantic Ocean, off the coast of Atlantic City, N.J.

6.     Plaintiff was caused to injure his right knee on or about October 29, 2016, while handling and pulling a fuel hose on this barge. Plaintiff was treated in Atlantic City, New Jersey, and had surgery in Philadelphia, Pa., where he is domiciled.

7.     At all material times, the vessel was owned, operated and/or controlled by Defendant Great Lakes Dredge and Dock Company. Said vessel was in navigable waters in the Atlantic Ocean.

8.      At the time of the occurrence, Plaintiff was performing his assigned task and working in the furtherance of the vessel, doing his work as instructed.

## FIRST CAUSE OF ACTION FOR NEGLIGENCE

9.      Plaintiff, Leslie McDermott, repeats and realleges each and every allegation in paragraphs numbered "1" through "8" of this complaint with the same force and effect as if fully set forth herein.

10.     On or about October 29, 2016, Defendant was negligent, and said negligence was a proximate cause of Plaintiff's injuries. At all relevant times, it was feasible for Defendant to provide to Plaintiff a safe place to work with proper tools and equipment, and Defendant owed this duty to Plaintiff, with the duty of care to provide, inter alia, a safe place to work, proper equipment and sufficient manpower to do the work without overstress and overexertion. Plaintiff further contends that on the occasion in question, Defendant, acting through their vessel management and staffing, or in the alternative, agents, servants and/or employees, were careless and negligent in the following respects:

1.      In failing to properly manage the barge with proper and sufficient men and equipment for handling of the fuel line;

2.      In failing to provide a crane, hoist, or air-tugger to mechanically move the fuel hose;

3.      In failing to adequately man the barge;

4.      In failing to provide proper training to the crew;

5.      In failing to maintain the crane on the barge;

6.      Other acts of negligence as proven at time of trial.

MSJ_0005

11.     On said date the injury was caused, in whole or in part, as a direct result of the negligent acts of the Defendant's officers, agents, servants and/or employees, all of whom were acting in the course and scope of their employment and agency.

## SECOND CAUSE OF ACTION FOR UNSEAWORTHINESS

12.     Plaintiff, Leslie McDermott, repeats and realleges each and every allegation in paragraphs numbered "1" through "11" of this complaint with the same force and effect as if fully set forth herein.

13.     At all times material hereto, owned, operated and/or controlled the vessels in question. At all relevant times it was feasible for Defendant to provide to Plaintiff a seaworthy vessel with proper equipment and method of operating the hoses, and said Defendant owed Plaintiff a seaworthy vessel with proper appurtenances, equipment, furnishings, fixtures, and it breached said duty of care. Defendant breached this duty as follows:

1.     The company set-up the operation without an adequate complement of seaman to do the work safely;

2.      The crane on the barge did not function properly and could not be used for the purpose for which it was intended at the time of injury;

3.     The vessel had a routine of tugging fuel hoses manually due to inadequate number of crew and the lack of an air tugger or power wench; and

4.     Other unseaworthy conditions as proven at time of trial.

14.     Said breaches of duty proximately contributed, in whole or in part, to cause Plaintiff's injury for which Great Lakes Dredge and Dock Company is liable to Plaintiff in damages.

MSJ_0006

## THIRD CAUSE OF ACTION FOR MAINTENANCE AND CURE

15.     Plaintiff, Leslie McDermott, repeats and realleges each and every allegation in paragraphs numbered "1" through "14" of this complaint with the same force and effect as if fully set forth herein.

16.     On or about October 29, 2016, and on other dates thereafter, and ever since, Defendant is liable to plaintiff for all medical care necessary for the injuries he sustained in the service of its Barge 1003. Plaintiff is entitled to recovery for damages and expenses incurred, including, but not limited to, damages for prolongation or aggravation of injuries; pain and suffering and additional expenses.

17.     By reason of the foregoing premises, and as a legal result thereof, Plaintiff has in the past and/or will in the future be caused to suffer the following described injuries and/or losses, for which Defendant Great Lakes Dredge and Dock Company is liable to Plaintiff:

1.     Cure benefits accrued to date of trial and for a reasonable time in the future, as may be found necessary;

2.     Mental anguish;

3.     Physical injury, pain and suffering;

4.     Loss of physical function to his right knee;

5.     Indebtedness for health care expenses;

6.     Indebtedness for daily living expenses;

7.     Prejudgment interest; and

8.     Attorneys' fees.

18.     All said injuries and damages in an extent, not now precisely known, are in excess of $950,000.00.

MSJ_0007

## DAMAGES

19.     Plaintiff, Leslie McDermott, repeats and realleges each and every allegation in paragraphs numbered "1" through "18" of this complaint with the same force and effect as if fully set forth herein.

20.     As a direct and proximate result of the occurrence alleged, Plaintiff sustained severe and painful injuries to his right knee with significant physical pain and discomfort to date. Plaintiff believes and alleges that said injuries will result in permanent disability, with a loss of function.

21.     Plaintiff has suffered a loss of earnings in the past, as well as a loss of future earning capacity. He has incurred and will incur future pharmaceutical, hospital, doctor, and medical expenses in connection with said injuries. By reason of the foregoing, Plaintiff has been damaged in a sum far in excess of the minimum jurisdictional limits of this Honorable Court, for which amount he comes now and sues.

22.     By reason of the foregoing premises and as a legal result thereof, Plaintiff has in the past and/or will in the future be caused to suffer the following described injuries and/or losses, for which Defendant Great Lakes Dredge and Dock Company is liable to Plaintiff:

    1.     Reasonable and necessary medical expenses in the past and in the future;

    2.     Physical pain and suffering in the past and in the future;

    3.     Mental anguish in the past and in the future;

    4.     Loss of earning capacity in the past and in the future;

    5.     Physical disfigurement in the past and in the future; and,

    6.     Physical impairment in the past and in the future.

23.     All said injuries and damages in an extent, not now precisely known, are in excess of $950,000.00.

MSJ_0008

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Leslie McDermott, prays that Defendant GREAT LAKES DREDGE AND DOCK COMPANY, be cited to appear and answer herein in a form and manner prescribed by law, and after jury trial of the merits of this cause, Plaintiff have judgment against Defendant in a total sum in excess of the minimum jurisdictional limits of this Court, not less than nine hundred and fifty thousand dollars, plus pre-judgment and post-judgment interest at the maximum legal rates, all costs of Court, and all such other and further relief, be it general or special, at law or in equity, to which Plaintiff may show himself justly entitled.

JURY TRIAL IS DEMANDED.

Respectfully submitted,

MORGAN & PAUL, PLLC

/s/ Gregory G. Paul
Gregory G. Paul (PA ID #83334)
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Telephone: (412) 259-8375
Facsimile: (888) 822-9421
gregpaul@morgan-paul.com


/s/ S. Reed Morgan
S. Reed Morgan
*(Applicant for Pro Hac Vice)*
The Carlson Law Firm
100 E. Central Texas Expressway
Killeen, TX 76541
Telephone: (254) 526-5688
Facsimile: (254) 526-8204
rmorgan@carlsonattorneys.com

ATTORNEYS FOR PLAINTIFF

Dated: October 5, 2017

MSJ_0009

*Leslie McDermott*

## APPENDIX "A"
## EMPLOYEE AGREEMENT OF FORUM SELECTION

1. The following terms are conditions of the **EMPLOYEE'S** employment with **GREAT LAKES DREDGE & DOCK COMPANY, LLC** and are in addition to, but do not supersede, modify, impair, or restrict in any manner whatsoever, the other terms and conditions, rights, and obligations of any Collective Bargaining Agreement under which the EMPLOYEE may be employed. By executing below, the EMPLOYEE acknowledges his/her acceptance of these conditions of employment.

2. EMPLOYEE acknowledges that he/she has been offered employment on the condition that he/she shall agree to the conditions set forth herein as they shall apply to the EMPLOYEE'S employment with Great Lakes Dredge & Dock Company, LLC, even in the event of any promotions and/or demotions and subsequent to the termination of the employment relationship between EMPLOYEE and Great Lakes Dredge & Dock Company, LLC.

3. EMPLOYEE and Great Lakes Dredge & Dock Company, LLC hereby agree and acknowledge that if the EMPLOYEE is working under and subject to a Collective Bargaining Agreement, nothing in this Agreement shall be construed or interpreted to impair, reduce, limit, waive, surrender, or restrict the EMPLOYEE'S rights under that Collective Bargaining Agreement. Specifically, nothing in this agreement shall impose on the EMPLOYEE the obligation to file any matter alleging a breach of the Collective Bargaining Agreement, which does not involve personal injury/death claims, in the jurisdictions listed in this agreement, or to impair the right to file such actions in the forum as set forth in the Collective Bargaining Agreement. Nothing in this Employee Agreement of Forum Selection shall affect the UNION's rights to enforce the Collective Bargaining Agreement and applicable labor laws, nor does the UNION waive any rights under any laws.

4. Notwithstanding the provisions of Paragraph 3, the EMPLOYEE agrees that as a condition of employment with Great Lakes Dredge & Dock Company, LLC, any claim for personal, emotional, physical, or economic injury [including death] pursuant to Federal law, general maritime law, the Jones Act, or the laws of any State shall, if ever made the basis of litigation initiated by EMPLOYEE, be filed, at the option of the EMPLOYEE, <u>only</u> in any one of the following jurisdictions:

   a) The Circuit Court of DuPage, State of Illinois;

   **OR**

   b) The Court designated below in the State of residence of the EMPLOYEE or in the State in which the accident made the basis of the lawsuit occurred, as follows:

   | STATE | STATE COURT |
   |---|---|
   | Alabama | Circuit Court of Mobile County, AL |
   | California | Superior Court for County of San Diego |
   | Connecticut | Superior Court of Fairfield County |
   | Delaware | Superior Court of Delaware, New Castle County |
   | Florida | Clay County |
   | Georgia | Superior County of Chatham County |
   | Illinois | Circuit Court of 18th Judicial Circuit, DuPage County |

1

EXHIBIT

A

tabbies



| | |
|---|---|
| **Louisiana** | 24th Judicial District Court for the Parish of Jefferson |
| **Maine** | Superior Court for Cumberlain County |
| **Maryland** | Circuit Court for Baltimore County |
| **Massachusetts** | Suffolk Superior Court, Boston |
| **Michigan** | 17th Circuit Court, Kent County |
| **Mississippi** | Circuit Court of Harrison County, Gulfport |
| **Missouri** | Cape Girardeau County |
| **New Hampshire** | New Hampshire Superior Court, Merrimack County |
| **New Jersey** | Burlington County Superior Court, Law Division |
| **New York** | Supreme Court, Richmond County |
| **North Carolina** | NC General Court of Justice, Superior Court Division for New Hanover County |
| **Oregon** | Multnomah County Circuit Court |
| **Pennsylvania** | Bucks County Court of Common Pleas |
| **Rhode Island** | Newport County Superior Court, Newport |
| **South Carolina** | Charleston County Court of Common Pleas (9th Judicial Circuit) |
| **Tennessee** | Circuit Court of Shelby County |
| **Texas** | District Courts of Harris County, Texas |
| **Washington** | Superior Court of King County |
| **Wisconsin** | Circuit Court of Waukesha County |

**OR**

c) The United States Federal District Court in the State of residence of the EMPLOYEE or in the State in which the accident made the basis of the lawsuit occurred, as follows:

| **STATE** | **FEDERAL COURT** |
|---|---|
| **Alabama** | Southern District of Alabama, Southern Division |
| **California** | Southern District of California |
| **Connecticut** | District of Connecticut |
| **Delaware** | District of Delaware |
| **Florida** | Middle District of Florida, Jacksonville Division |
| **Georgia** | Southern District of Georgia, Savannah Division |
| **Illinois** | Northern District of Illinois, Eastern Division |
| **Louisiana** | Eastern District of Louisiana |
| **Maine** | District of Maine |
| **Maryland** | District of Maryland, Northern Division |
| **Massachusetts** | District of Massachusetts, Boston |
| **Michigan** | Western District of Michigan, Grand Rapids |
| **Mississippi** | Southern District of Mississippi, Gulf Coast Division (Biloxi) |
| **Missouri** | Eastern District of Missouri, Southeastern Division |
| **New Hampshire** | District of New Hampshire |
| **New Jersey** | District of New Jersey, Camden Vicinage |
| **New York** | Eastern District of New York |
| **North Carolina** | Eastern District of North Carolina, Southern Division |
| **Oregon** | District of Oregon, Portland |
| **Pennsylvania** | Eastern District of Pennsylvania |
| **Rhode Island** | District of Rhode Island, Providence |
| **South Carolina** | District of South Carolina, Charleston Division |

2

MSJ_0011

| Tennessee | Western District of Tennessee, Memphis Division |
| Texas | Southern District of Texas, Houston Division |
| Washington | Western District of Washington, Seattle |
| Wisconsin | Eastern District of Wisconsin, Milwaukee |

5. Notwithstanding the provisions of Paragraph 3, the EMPLOYEE agrees that any litigation initiated by EMPLOYEE for personal, emotional, physical, or economic injury [including death] pursuant to Federal law, general maritime law, the Jones Act, or the laws of any State shall be filed only in one of the jurisdictions as set forth hereinabove, which shall be the sole and exclusive venues for resolving any such claims or disputes.

6. The EMPLOYEE acknowledges that these forum selection provisions shall govern and apply to the resolution of any claims and/or disputes for personal, emotional, physical, or economic injury [including death] pursuant to Federal law, general maritime law, the Jones Act, the laws of any State, or otherwise which may arise between the EMPLOYEE and Great Lakes Dredge & Dock Company, LLC or contractors, sub-contractors, clients, vendors, facility owners, or others for whom or with whom Great Lakes Dredge & Dock Company, LLC is performing services at the time of any incident giving rise to a claim or dispute asserted by the employee.

7. EMPLOYEE understands that these forum selection provisions shall apply whether the litigation initiated by EMPLOYEE is initiated during the period of EMPLOYEE'S employment with Great Lakes Dredge & Dock Company, LLC or after the termination of EMPLOYEE'S employment relationship with Great Lakes Dredge & Dock Company, LLC.

8. The term "Great Lakes Dredge & Dock Company, LLC" as used hereinabove includes its officers, directors, agents, shareholders, partners, insurers, benefit plan, benefit plan sponsors, fiduciaries, administrators, affiliates, and any vessels owned and/or operated by Great Lakes Dredge & Dock Company, LLC and all successors and assigns of any of the above. The term "EMPLOYEE" includes, not only the individual whose signature is affixed hereto, but also his or her heirs, spouse, representatives, successors, executors, administrators, or assigns, but shall not include any Union.

9. Execution of this Employee Agreement of Forum Selection does not constitute a contract of employment for any specific length of time.

10. Any dispute regarding the enforceability of the terms and provisions of this Employee Agreement of Forum Selection shall be resolved through litigation initiated only in a United States District Court listed in Paragraph 4(c) above.

These terms and conditions of employment shall become effective immediately upon execution by the EMPLOYEE.

3

MSJ_0012

EXECUTED AND ACCEPTED this the _8b_ day of ___September___, 2010.

By: _Leslie McDermott_
      Signature of Employee

_Leslie McDermott_
Printed Name of Employee

**GREAT LAKES DREDGE & DOCK COMPANY, LLC**

By: _____
      Authorized Representative

_Jennifer Argentine_
Printed Name of Authorized Representative

4

MSJ_0013

# EXHIBIT-2

MSJ_0014

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LESLIE MCDERMOTT  :
                   :     CIVIL ACTION
     vs.  :
                   :     NO.  17-cv-4511 (MAK)
GREAT LAKES DREDGE AND DOCK CO.  :

## ANSWER TO COMPLAINT OF DEFENDANTS
## <u>GREAT LAKES DREDGE AND DOCK CO., LLC</u>

Defendant Great Lakes Dredge and Dock Co., LLC, (incorrectly identified as Great

Lakes Dredge and Dock Co., in the Complaint), by and through its undersigned attorneys,

answers the Plaintiff's Complaint as follows:

### JURISDICTION

1.     Denied. The averments contained in paragraph 1 of the Complaint are conclusions

of law and are, therefore, denied.

### PARTIES

2.     Denied as stated. Defendant Great Lakes Dredge and Dock Co., LLC, (hereinafter

"Defendant") is without knowledge or information sufficient to form a belief as to the truth of

the averments contained in paragraph 2 of the Complaint and, therefore, denies same and

demands strict proof thereof.

3.     Denied as stated. It is admitted that Defendant is a Delaware corporation duly

licensed to do business in the State of New Jersey. The remaining averments contained in

paragraph 3 of the Complaint are conclusions of law and are, therefore, denied.

### VENUE AND SERVICE OF PROCESS

4.     Admitted in part; denied in part. Defendant admits only that a document called

Employee Agreement of Forum Selection was executed by Plaintiff on September 6, 2010. By

PBH522354.1

MSJ_0015

way of further answer, the Employee Agreement of Forum Selection attached to the Complaint as Exhibit "A" is a document that speaks for itself. The remaining averments contained in paragraph 4 of the Complaint are conclusions of law and are, therefore, denied.

## FACTS

5.     Admitted in part; denied in part. It is admitted only that Plaintiff was employed by Defendant as an engineer in October of 2016. Except as admitted herein, the averments contained in paragraph 5 of the Complaint are denied.  By way of further response, but not in derogation of the foregoing, it is denied that any alleged accident or injury occurred on October 29, 2016, or on any other date in October, 2016, as alleged.

6.     Denied. Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 6 of the Complaint and, therefore, denies the same and demands strict proof thereof.

7.     Admitted in part; denied in part. Defendant admits only that on October 29, 2016, it was a lessee of Barge 1003. It is denied that Defendant owned Barge 1003. The remaining averments contained in paragraph 7 of the Complaint are conclusions of law and are, therefore, denied.

8.     Denied. Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 8 of the Complaint and, therefore, denies the same and demands strict proof thereof.

## FIRST CAUSE OF ACTION FOR NEGLIGENCE

9.     The averments, denials and separate defenses in this Answer to the Complaint are incorporated herein as if fully set forth.

2

10. Denied. The factual averments contained in paragraph 10 of the Complaint and all sub-paragraphs thereof are denied. The remaining averments contained in paragraph 10 of the Complaint are conclusions of law and are, therefore, denied. By way of further response, it is specifically denied that Defendant was negligent or careless or breached any duty owed to plaintiff, or that the vessel was unseaworthy.

11. Denied. It is denied that any alleged accident or injury occurred on October 29, 2016, or on any other date in October, 2016, as alleged, and it is denied that Defendant was negligent or careless or breached any duty owed to Plaintiff, or that the vessel was unseaworthy at any time material hereto.

WHEREFORE, Defendant demands judgment in its favor and against Plaintiff, dismissing Plaintiff's Complaint with prejudice at Plaintiff's cost, together with costs of suit, counsel fees, and such further relief as this Honorable Court deems appropriate under the circumstances.

### SECOND CAUSE OF ACTION FOR UNSEAWORTHINESS

12. The averments, denials and separate defenses in this Answer to the Complaint are incorporated herein as if fully set forth.

13. Admitted in part; denied in part. Defendant admits only that on October 29, 2016, it was a lessee of Barge 1003. The remaining factual averments contained in paragraph 13 of the Complaint and all sub-paragraphs thereof are denied. The remaining averments contained in paragraph 13 of the Complaint are conclusions of law and are, therefore, denied. By way of further response, it is specifically denied that the vessel was unseaworthy.

14. Denied.

3

WHEREFORE, Defendant demands judgment in its favor and against Plaintiff, dismissing Plaintiff's Complaint with prejudice at Plaintiff's cost, together with costs of suit, counsel fees, and such further relief as this Honorable Court deems appropriate under the circumstances.

## THIRD CAUSE OF ACTION FOR MAINTENANCE AND CURE

15.     The averments, denials and separate defenses in this Answer to the Complaint are incorporated herein as if fully set forth.

16.     Denied.  The averments contained in paragraph 16 of the Complaint relating to duties allegedly owed or liability for alleged maintenance and cure are conclusions of law and are, therefore, denied. All remaining averments contained in paragraph 16 of the Complaint are denied.

17.     Denied.  The averments contained in paragraph 17 of the Complaint and all sub-paragraphs thereof relating to duties allegedly owed or liability for alleged maintenance and cure are conclusions of law and are, therefore, denied. All remaining averments contained in paragraph 17 of the Complaint are denied.

18.     Denied.

WHEREFORE, Defendant demands judgment in its favor and against Plaintiff, dismissing Plaintiff's Complaint with prejudice at Plaintiff's cost, together with costs of suit, counsel fees, and such further relief as this Honorable Court deems appropriate under the circumstances.

MSJ_0018

## DAMAGES

19.     The averments, denials and separate defenses in this Answer to the Complaint are incorporated herein as if fully set forth.

20.     Denied. Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 20 of the Complaint and, therefore, denies the same and demands strict proof thereof.

21.     Denied. Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 21 of the Complaint and, therefore, denies the same and demands strict proof thereof.

22.     Denied. Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 22 of the Complaint and all sub-paragraphs thereof and, therefore, denies the same and demands strict proof thereof. The remaining averments contained in paragraph 22 of the Complaint are conclusions of law and are, therefore, denied.

23.     Denied.

WHEREFORE, Defendant demands judgment in its favor and against Plaintiff, dismissing Plaintiff's Complaint with prejudice at Plaintiff's cost, together with costs of suit, counsel fees, and such further relief as this Honorable Court deems appropriate under the circumstances.

## **FIRST SEPARATE DEFENSE**

Plaintiff has failed to state a claim against Defendant for which relief can be granted.

MSJ_0019

## SECOND SEPARATE DEFENSE

All claims asserted by Plaintiff against Defendant, said claims being denied by Defendant, may be barred, in whole or in part, by the applicable statute of limitations and/or the equitable doctrine of laches.

## THIRD SEPARATE DEFENSE

Any claims or rights asserted by Plaintiff against Defendant, which are denied, are barred, in whole or in part, by the doctrines of estoppel and/or waiver.

## FOURTH SEPARATE DEFENSE

Plaintiff has failed to mitigate his alleged damages.

## FIFTH SEPARATE DEFENSE

Plaintiff was contributorily negligent and, therefore, any recovery to which Plaintiff would otherwise be entitled against Defendant, said recovery being specifically denied, is either barred or must be reduced by the application of the doctrine of comparative negligence.

## SIXTH SEPARATE DEFENSE

The alleged accident, losses, and damages alleged by Plaintiff, which alleged accident, losses and damages are denied by Defendant, were the result of the actions of parties or persons for whom Defendant has no responsibility.

## SEVENTH SEPARATE DEFENSE

The alleged accident, losses and damages alleged by Plaintiff, which alleged accident, losses and damages are denied by Defendant, were the result of the sole negligence of the Plaintiff and, therefore, the Complaint must be dismissed.

6

MSJ_0020

### EIGHTH SEPARATE DEFENSE

No conduct on the part of Defendant contributed in any way to Plaintiff's alleged injuries and/or alleged damages, said alleged injuries and damages being specifically denied by Defendant.

### NINTH SEPARATE DEFENSE

Defendant was not negligent in any manner whatsoever.

### TENTH SEPARATE DEFENSE

Plaintiff's Complaint is barred by the doctrine of assumption of risk in that Plaintiff was aware of the alleged risks of personal injury as the result of engaging in the activities leading to his alleged injuries and, nevertheless, voluntarily exposed himself to the alleged risks.

### ELEVENTH SEPARATE DEFENSE

Plaintiff's Complaint is barred by the doctrine of accord and satisfaction as Defendant has paid Plaintiff's medical expenses and maintenance on a without prejudice basis.

### TWELFTH SEPARATE DEFENSE

Plaintiff did not sustain the injuries alleged in the Complaint, said injuries being specifically denied, while employed by Defendant or while in the service of the Barge 1003.

### THIRTEENTH SEPARATE DEFENSE

Defendant raises as an affirmative defense each and every term, condition, clause, forum selection clause, arbitration clause, limitation period for filing claims, notice provisions, defenses, maintenance rates, protection, and insulation from liability which is or may be contained within any and all pertinent employment and/or union contracts, agreements, or undertakings, specifically including the Employee Agreement of Forum Selection executed by

7

Plaintiff on September 6, 2010, whether written or verbal, which pertain to the activity which is the subject matter of the Plaintiff's Complaint.

## FOURTEENTH SEPARATE DEFENSE

Any injuries alleged by Plaintiff, which injuries are denied, pre-existed the alleged accident or came into existence subsequent to the time of the alleged injury which is the subject of the Complaint.

## FIFTEENTH SEPARATE DEFENSE

Any alleged accident, if it occurred, which is denied, was caused by an act of God and/or a peril of the sea for which Defendant has no responsibility.

## SIXTEENTH SEPARATE DEFENSE

At all times material hereto, the Barge 1003 was properly manned and equipped, and was tight, staunch, and seaworthy in all respects.

## SEVENTEENTH SEPARATE DEFENSE

At all times material hereto, Defendant was not the owner of the Barge 1003.

## EIGHTEENTH SEPARATE DEFENSE

Defendant avers upon information and belief that, as a result of the injuries alleged in this suit, said alleged injuries being denied by Defendant, that Plaintiff has received maintenance, wages, and cure and advance payments for wages on a without prejudice basis and, therefore, Plaintiff's claims for the same must be dismissed.

## NINETEENTH SEPARATE DEFENSE

Defendant has paid Plaintiff wages, maintenance and cure and advance payment of wages on a without prejudice basis and, therefore, it entitled to a set-off against any award in favor of Plaintiff, Plaintiff's entitlement to such an award being denied.

8

### TWENTIETH SEPARATE DEFENSE

Defendant claims benefit of all rights and defenses of the Limitation Statutes of the United States, particularly the Limitation of Liability Act, 46 U.S.C. § 30501 through 30512 (previously codified at 46 U.S.C. § 183 et seq.).

### TWENTY-FIRST SEPARATE DEFENSE

Defendant avers upon information and belief that, with respect to the injuries alleged in this suit, said alleged injuries being denied by Defendant, Plaintiff has reached maximum medical improvement and, therefore Defendant cannot be found responsible for owing maintenance and cure as alleged.

### TWENTY-SECOND SEPARATE DEFENSE

All losses and damages alleged by Plaintiff, said losses and damages being denied by Defendant, must be reduced to account for Plaintiff's pre-existing medical conditions that would have inevitably worsened notwithstanding the alleged incident which is the subject matter of the Plaintiff's Complaint.

### TWENTY-THIRD SEPARATE DEFENSE

Defendant claims all of the defenses available to it under state, federal or maritime law.

### TWENTY-FOURTH SEPARATE DEFENSE

Any losses sustained by Plaintiff as set forth in the Complaint were not sustained as a result of any act or failure to act on the part of Defendant or the crew of Barge 1003.

### TWENTY-FIFTH SEPARATE DEFENSE

Plaintiff's Complaint should be dismissed due to insufficient service of process.

MSJ_0023

WHEREFORE, Defendant prays that judgment be entered in its favor and against Plaintiff, dismissing Plaintiff's Complaint with prejudice at Plaintiff's cost, together with costs of suit, counsel fees, and such further relief as this Honorable Court deems appropriate under the circumstances.

Respectfully submitted,

**PALMER BIEZUP & HENDERSON LLP**

By:   /s/ Frank P. DeGiulio
       Frank P. DeGiulio (ID 41577)
       190 N. Independence Mall West
       Suite 401
       Philadelphia, PA 19106
       (215) 625 9900

       Attorneys for Defendant
       Great Lakes Dredge and
       Dock Co, LLC

Dated: January 17, 2018

10

MSJ_0024

## CERTIFICATE OF SERVICE

I hereby certify that on this the 17th day of January, 2018, a true and correct copy of the foregoing Answer to Complaint with Separate Defenses was served on the below listed counsel via electronic filing:

Gregory G. Paul, Esquire
Morgan & Paul, PLLC
First & Market Buildings
100 First Avenue, Ste. 1010
Pittsburgh, PA 15222
Attorney for Plaintiff
*via electronic filing*

**PALMER BIEZUP & HENDERSON, LLP**

By:   /s/ Frank P. DeGiulio
        Frank P. DeGiulio (ID 41577)

11

# EXHIBIT-3

MSJ_0026

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LESLIE MCDERMOTT | : | |
| | : | CIVIL ACTION |
| vs. | : | |
| | : | NO. 17-cv-4511 (MAK) |
| GREAT LAKES DREDGE AND DOCK CO. | : | |

### ANSWERS AND OBJECTIONS OF DEFENDANT, GREAT LAKES DREDGE AND DOCK CO., LLC TO REQUESTS FOR ADMISSION OF PLAINTIFF, LESLIE MCDERMOTT

Defendant Great Lakes Dredge and Dock Co., LLC, (hereinafter referred to as "Defendant" or "GLDD"),  by and through its undersigned attorneys, Palmer Biezup & Henderson LLP, hereby responds to Plaintiff Leslie McDermott's Requests for Admission Addressed to Defendant. Defendant's responses and objections are based upon information now known. Defendant has not completed its investigation of the facts pertaining to this action and has not completed discovery or preparation for trial in this action. Defendant therefore reserves the right to amend, modify and/or supplement the objections and responses stated herein in accordance with the Federal Rules of Civil Procedure, the orders of the Court and/or any order subsequently entered in this matter.

Defendant states the following General Objections:

1. Defendant objects to the Requests for Admission to the extent that they request information that is protected by the attorney-client privilege, the attorney work-product doctrine and other rules and privileges provided by law.

2. Defendant objects to the individual Requests for Admission to the extent that they seek information and/or documents that are not within Defendant's possession, custody or control and are, therefore, unduly burdensome, oppressive, harassing and vexatious and go beyond the limits permitted by the Federal Rules of Civil Procedure.

3. Defendant objects to each Requests for Admission to the extent that it seeks disclosure of work product, opinions, mental impressions, conclusions or legal theories of Defendant and/or their counsel and other representatives.

4. Defendant objects to each Requests for Admission to the extent it seeks information beyond that permitted by the Federal Rules of Civil Procedure.

5. Defendant objects to Plaintiff's Instructions to the extent that they set forth obligations greater than those required under Federal Rules of Civil Procedure and under Pennsylvania law.

**Answers are in Bold**

## REQUESTS FOR ADMISSION

1. Admit or deny that, on the date of the incident made the basis of this suit, Defendant owned the vessel in question, the FUEL BARGE 1003 (The Barge). **It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and it is further denied that Defendant owned Fuel Barge 1003 on that date.**

2. Admit or deny that, on the date of the incident made the basis of this suit, Defendant was the operator of The Barge. **Objection – the term "operator" is ambiguous and undefined. Without waiver of the foregoing, it is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and it is further denied that Defendant was "the operator" of Fuel Barge 1003 on that date.**

3. Admit or deny that, on the date of the incident made the basis of this suit, Defendant was the bare boat charterer of The Barge. **Denied as stated. It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and it is only admitted that Defendant was a bareboat charterer of Fuel Barge 1003 on that date.**

4. Admit or deny that, on the date of the incident made the basis of this suit, Defendant employed Plaintiff. **Denied as stated. It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and it is only admitted that the Plaintiff Leslie McDermott was employed by the Defendant on that date.**

5. Admit or deny that, on the date of the incident made the basis of this suit, Defendant provided Plaintiff with hose equipment to use to fuel other working Barges while he was aboard The Fuel Barge. **Denied as stated. It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and, by way of further Answer, this Request for Admission is denied.**

6. Admit or deny that, on the date of the incident made the basis of this suit, Plaintiff was a member of the crew of The Barge and/or fleet of defendant's vessels in question. **Denied as stated. It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and, by way of further Answer, this Request for Admission is denied as stated.**

7. Admit or deny that, on the date of the incident made the basis of this suit, Plaintiff was assigned to The Barge. **Denied as stated. It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and, by way of further Answer, this Request for Admission is denied as stated.**

8. Admit or deny that, on the date of the incident made the basis of this suit, Plaintiff was a seaman as that term is understood by the Jones Act (46 U.S.C. § 30104 et seq.) and general maritime law. **Defendant objects to this Request for Admission on the ground that it calls for legal analysis and a legal conclusion. Without waiver of the foregoing, it is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016.**

2

9.    Admit or deny that, on the date of the incident made the basis of this suit, you were the Jones Act employer of Plaintiff. **Defendant objects to this Request for Admission on the ground that it calls for a legal analysis and legal conclusion. Without waiver of the foregoing it is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016.**

10.   Admit or deny that on or about October 29, 2016, Plaintiff was injured during the course and scope of his employment. **Denied.**

11.   Admit or deny that on or about October 29, 2016, Plaintiff was injured aboard The Barge. **Denied.**

12.   Admit or deny that, prior to the incident made the basis of this suit, Plaintiff's conduct in his employment was satisfactory. **It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and by way of further Answer, denied.**

13.   Admit or deny that, on the date of the incident made the basis of this suit, The Barge was a vessel as that term is defined under the general maritime law of the United States. **Denied as stated. It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016. By way of further Answer, it is admitted only that Fuel Barge 1003 was and is a vessel as that term is defined under the general maritime law of the United States.**

14.   Admit or deny that, on the date and time of the incident made the basis of this suit, The Barge was in navigable waters as that term is defined under maritime law. **Defendant objects to this Request for Admission on the ground that it calls for a legal analysis and a legal conclusion regarding the meaning of "navigable waters." Without waiver of the foregoing it is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016.**

15.   Admit or deny that Plaintiff was entitled to maintenance commencing on the day his injuries rendered him unfit for duty and through the date he became fit for duty or reached maximum medical improvement. **Defendant objects to this Request for Admission on the ground it calls for a legal analysis and legal conclusions. It is denied that Plaintiff sustained an injury on the Fuel Barge 1003 on October 29, 2016, that entitled him to maintenance. To the extent not objectionable, it is admitted that Plaintiff was paid maintenance, cure and advanced wages following the alleged incident until he was declared fit for duty to return to work.**

16.   Admit or deny that Plaintiff was ordered to do the job he was performing by the GLD&D person in charge at the time in question. **Denied as stated. It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and, by way of further Answer, this Request for Admission is denied in its entirety.**

17.   Admit or deny that Plaintiff has reached maximum medical improvement. **Defendant objects to this Request for Admission on the ground it calls for a legal analysis and legal conclusion with respect to the term "maximum medical improvement". Without waiver of the foregoing it is denied that Plaintiff sustained an injury on the Fuel Barge 1003 on October 29, 2016, that entitled him to maintenance. To the extent not objectionable, it is**

MSJ_0029

admitted that Plaintiff was declared fit for duty without restrictions subsequent to October 29, 2016.

18.    Admit or deny that, on the date of the incident made the basis of this suit, The Barge was in navigation.  **Defendant objects to this Request for Admission on the ground that it calls for a legal analysis and legal conclusion with respect to the term "in navigation" which is also ambiguous and undefined.  Without waiver of the foregoing it is denied that Plaintiff sustained an injury on the Fuel Barge 1003 on October 29, 2016. Investigation is continuing into the location of the Fuel Barge on October 29, 2016.**

19.    Admit or deny that, at the time in question, the work being performed by Plaintiff was part of his job duty as expected to be performed by Defendant.  **Defendant objects to this Request for Admission on the grounds that the phrase "at the time in question" is ambiguous and undefined.  Without waiver of the foregoing, by way of further Answer, it is admitted that in October, 2016, Plaintiff at various times worked on the Fuel Barge 1003 performing his job functions in the manner he chose as an experienced Tankerman.**

20.    Admit or deny that, on the date of the incident made the basis of this suit, the company knew that the hand-operated hoist on The Barge was not working properly.  **Denied. It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016 and this Request for Admission is otherwise denied in its entirety.**

21.    Admit or deny that Richard Smith had been told the hand-operated hoist was not operating correctly more than 30 days before Plaintiff was injured. **Denied.  It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and this Request for Admission is otherwise denied in its entirety.**

22.    Admit or deny that on or about October 30th, 2016, in the morning hours, Plaintiff notified Defendant at the Long Beach, New Jersey office "Cameron" that Plaintiff claimed to have sustained an injury while working on board The Barge.  **Denied as stated.  It is admitted only that in the morning of October 30, 2016, Plaintiff claimed that he had sustained an injury while working.**

23.    Admit or deny that on or about October 30th, 2016, the company "safety officer" took Plaintiff to the Emergency Clinic in Long Beach, New Jersey.  **It is admitted that a Great Lakes Dredge and Dock Co., LLC, Site Safety & Health Officer accompanied Plaintiff to a clinic on October 30, 2016.**

24.    Admit or deny that the safety officer was present when the doctor at the Emergency Clinic told Plaintiff that he had a torn meniscus in his left knee.  **Denied. It is denied that the Site Safety & Health Officer that accompanied Plaintiff to a clinic on October 30, 2016, was present when Plaintiff was told he had a torn meniscus in his left knee.**

25.    Admit or deny that, on or about the date of the incident made the basis of this suit, an injury report was made at the Long Beach office in New Jersey regarding the injuries allegedly sustained by Plaintiff on The Barge.  **Denied as stated.  It is denied that there was an incident**

4

on the Fuel Barge 1003 on October 29, 2016.  By way of further Answer, it is admitted only that a Great Lakes Dredge & Dock Company LLC, First Notice of Employee Injury or Illness Report regarding Plaintiff's alleged injury was prepared on October 30, 2016.

26.     Admit or deny that, following the incident made the basis of this suit, Defendant failed to file with the United States Coast Guard or Shipping Commissioner a Coast Guard Form CG-2692 in connection with Plaintiff's injury aboard The Barge.  **Defendant objects to this Request for Admission on the ground it calls for legal analysis and conclusion in that it suggests that a Coast Guard Form CG-2692 was required to be filed in connection with Plaintiff's alleged injury aboard Fuel Barge 1003, which it was not.  Without wavier of the foregoing it is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016.**

27.     Admit or deny that Plaintiff did not misrepresent or conceal any medical facts from Defendant prior to, or during the hiring process, his employment with Defendant. **Unknown at this time, investigation is continuing and therefore this Request for Admission is denied.**

28.     Admit or deny that Plaintiff was acting as an ordinary, reasonable, prudent seaman at the time of the incident made the basis of this suit.  **Denied.  It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and this Request for Admission is otherwise denied in its entirety.**

29.     Admit or deny that nothing Plaintiff did, or failed to do, was a proximate cause of the incident made the basis of this suit.  **Denied.  It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and this Request for Admission is otherwise denied in its entirety.**

30.     Admit or deny that, at the time of the incident made the basis of this suit, The Barge's maintenance head man was Richard Smith.  **Denied as stated.   It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016, and, by way of further Answer, it is only admitted that GLDD employee Richard Smith's job responsibilities included maintenance of Fuel Barge 1003.**

31.     Admit or deny that, following the incident made the basis of this suit, defendant put a motorized winch on The Barge.  **Denied as stated.  It is denied that there was an incident on the Fuel Barge 1003 on October 29, 2016. By way of further Answer, is it admitted only that as part of routine upgrades to Fuel Barge 1003, a motorized winch was installed on Fuel Barge 1003 on November 30, 2016.**

32.     Admit or deny that, before the injury to Plaintiff, Defendant was aware that Plaintiff and his co-workers had to move fuel hoses by hand because the hand operated hoist was not functioning correctly.  **Denied.**

33.     Admit or deny that, before the injury in question, Defendant knew that, to safely move the fuel hoses on The Barge, two men were inadequate to safely perform this job.  **Denied.**

MSJ_0031

34.     Admit or deny that a report of the malfunctioning hoist on The Barge was written and located in the offices of Defendant. **Defendant objects to this Request for Admission as ambiguous inasmuch as it fails to define any time frame. Without waiver of the foregoing, this Request for Admission is denied.**

35.     Admit or deny that the hoist on The Barge was not working in the manner for which it was designed to work on October 29, 2016. **Denied.**

36.     Admit or deny that after Plaintiff was injured, the hoist on The Barge was removed and replaced with a fully functioning hoist. **Denied as stated. Defendant objects to this Request for Admission on the ground that it implies that a "hoist" on Fuel Barge 1003 was not fully functioning on or about October 29, 2016, which is denied. By way of further Answer, is it admitted only that as part of routine upgrades to Fuel Barge 1003, a motorized winch was installed on Fuel Barge 1003 on November 30, 2016.**

Respectfully submitted,

PALMER BIEZUP & HENDERSON LLP

By:    /s/ Charles P. Neely
       Charles P. Neely (#69981)
       190 North Independence Mall West, Ste 401
       Philadelphia, PA 19106
       (215) 625-9900
       Attorneys for Defendant

       Great Lakes Dredge and
       Dock Co, LLC

Dated: March 26, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Answers to Plaintiffs' Requests for Admissions were served on March 26, 2018, via Federal Express and e-mail, upon the following counsel:

S. Reed Morgan, Esquire
Gregory G. Paul, Esquire
The Carlson Law Firm, P.C.
100 E. Central Texas Expressway
Killeen, TX 76541
*Attorney for Plaintiff*

PALMER BIEZUP & HENDERSON LLP

By:   /s/ Charles P. Neely
Charles P. Neely (#69981)

7

# EXHIBIT-4

MSJ_0034

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LESLIE MCDERMOTT** | : | |
| | : | **CIVIL ACTION** |
| **vs.** | : | |
| | : | **NO.  17-cv-4511 (MAK)** |
| **GREAT LAKES DREDGE AND DOCK CO.** | : | |

<u>**AFFIDAVIT OF LESLIE MCDERMOTT**</u>

I, Leslie McDermott, hereby declare:

1. I am over the age of majority, of sound mind and am not under the influence of medication or drugs. I offer the statements I make in this declaration on personal knowledge.

2. I live at 1242 Ingham Street, Pitts., Pa., 15212.

3. I work out of International Union of Operating Engineers Local 333, which is the seaman's union for tankerman.

4. At the time of my injury I was out of the aforesaid Union Local 25.

5. I hold a United States issued Coast Guard tankerman's license, bearing my name and Serial no. 000404159 and Reference no. 2276486, and a copy of the same is attached.

   a. I have worked on and off for various maritime companies since 1986, and one of the companies that I work for is Great Lakes Dredge and Dock Co. During the year 2016, I worked for this company as a licensed lead tankerman.

   b. I frequently worked 7 days per week, and took off only 3 weeks time between 1/03/16 and 7/10/16. I usually worked 4 weeks on or 6-7 weeks on, and then 1 week off.

   c.  By the time I was injured on 10/29/16, I had earned $144, 175.79. Attached is a letter from the company regarding my work status (GLDD 00595, and a pay

1

record showing my weeks of work for the company through 7/10/16. (GLDD 00600)

6. My work required that I be at the dock ready to go to work on barge 1003, each morning at approximately 6:00 a.m. When the barge was to fuel the offshore dredging barges, we manned the barge 1003, and our working hours were 12 hours per day on the barge. We would perform traditional seaman's work, that is painting, chipping rust, handling the mooring lines, connecting the lines to and from the tugboats that pushed the barge, and connecting the lines between barge 1003 and the dredge barge.

7. My duties included full responsibility to oversee that the pumps on the barge 1003 were working correctly, that the fuel lines made of metal with flanges were in proper order, and that the fuel hoses that we used were of the correct size, with the proper fittings, and that they were not damaged or potentially going to leak when in use. These tasks required that I inspect the equipment described here, and this work would consume the majority of the hours of work per day. When pumping fuel out of the barge into the dredge, it would consume on average 8-18 hours at a minimum. When fueling the barge at the dock, it would take 8 hours on average.

8. My routine required me to work on the barge to which I was assigned for two weeks on, 12 hours per day, and then I would have one (1) week off. However, I did not always take the week off.

9. I do not work on the dock or on the shore, my work is on the barge.

10. I was assigned to the barge 1003, and was a member of the crew of the barge, contributing to its mission, and worked the tasks described herein aboard her while she was in navigation.

2

11. To my knowledge, I was pulling a three-inch hose with a six-inch flange reduced to a

three inch flange, and the fuel hose weighed over 100 pounds, on October 29, 2016.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on:

August 20th, 2018

In Pittsburgh, Pennsylvania

Leslie McDermott

3

MSJ_0037

# EXHIBIT-5

MSJ_0038



GLDD 000913

GLDD 000914





GLDD 000915

MSJ_0041



GLDD_000916
MSJ_0042



GLDD-000017
MS0_0043

GLDD 000918



GLDD 000919

GLDD 000920



GLDD 000921



GLDD 000922
MSJ_0048



GLDD 000923
MSJ_0049



GLDD 000924
MSJ_0050



GLDD 000925
MSJ_0051



GLDD 000927



GLDD 000926



GLDD 000928





GLDD 000930

MSJ_0056





GLDD 000932



GLDD 000933
MSJ_0059



GLDD 000934
MSJ_0060



GLDD 000935

GLDD 000936



MSJ_0062



GLDD 000937



GLDD 000938
MSJ_0064



GLDD 000939

GLDD 000940





MSJ_0067

GLDD 000941





GLDD 000942






GLDD 000943

# EXHIBIT-6

MSJ_0070



**GLDD**

**AFCE JUSTIFICATION**

| VESSEL INFORMATION |
|---|

| | |
|---|---|
| Vessel: | **Fuel Barge 1003** |
| Vessel System: | **Winch/Boom** |
| Capital Improvement: | **Upgrade mechanical winch to electrical controls** |
| Requestor: | **Rich Smith** |
| Date: | **9/22/16** |

| INSTRUCTIONS |
|---|

1. **Description.** Briefly describe each Capital Improvement/objective and when the Capital Improvement/objective should be met or accomplished.

2. **Justification.** How will the Capital Improvement/objective be evaluated? (Use quantitative measures such as % or dollar increase in revenue or market share and/or use qualitative measures which are descriptive of criteria.)

3. **Importance.** Rank the Capital Improvement as Essential, Important, or Desirable as follows:
   *Essential* – required for job performance
   *Important* – helpful for job performance
   *Desirable* – asset for job performance

| 1ˢᵀ CAPITAL IMPROVEMENT/OBJECTIVE |
|---|

**Equipment: Fuel Barge Crane Modification**
**Description:**
Upgrade hand crank operated boom to install electrical motors to control boom functions. Upon completion of modifications, we will require a weight test to certify the boom. (Two winches would be required for a complete modification of the boom).

**Justification:**
The original boom has a hand crank operation that is geared to a 1:1 ratio (worm gear hand powered winch) and is extremely difficult to operate due to the weight of the 30' boom. Because of the effort required to operate and the length of time it takes to pass a fuel hose, the tankermen do not use this piece of equipment. They have been man-handling/passing the 6" fuel hose (with heavy flanged fittings) across the barge to the fuel depot when taking-on fuel. We have been turned away from a certain fueling depot in the northeast (KMI) because they consider this process unsafe. This depot provides a sliding discount for fuel purchased from .03 - .10 per gallon below the other fueling depot price that we utilize. By making the boom usable to personnel, we would be offered the opportunity to continue to fuel at this facility in the northeast which could yield a median cost savings of $4.5 - $15K on a single fueling of the barge taking on 150K gals of fuel. The barge has a record of requiring approx. 200K gallons every 3 – 5 weeks which over a period of one year can yield a cost pay-back of a possible $150K per year (assuming .07 per gallon on 200K gallons -11 fueling). The Fuel Barge 1003 has a capable capacity of 261,500 gallons at 95%. We have completed the research with the boom manufacturer who provided us with a suitable electrical winch "bolt-in" replacement to the hand powered winch. There are two winches one to control the boom angle, the second to raise and lower the hook. OB engineers have reviewed the modification.

**Cost:   $15,000.00**

Importance:      ☒ Essential      ☐ Important      ☐ Desirable      GLDD 000912



# EXHIBIT-7

MSJ_0072



GREAT LAKES DREDGE & DOCK COMPANY, LLC
# SAFETY MANAGEMENT SYSTEM

| Section: | Revision Number: | Page: | Title: |
|---|---|---|---|
| IN-A-PO-010 | 3 | 1 of 2 | Introduction, Purpose, and Scope |
| Date Issued: | Approved By: | | |
| March 31, 2014 | *Glenn D. Thomas* | | |

## 1.0 Introduction

1.1    Great Lakes Dredge & Dock Company, LLC, manages and operates dredging vessels and support equipment in U.S. and International markets.

1.2    The Company is headquartered in Oak Brook, Illinois, USA

1.3    In an effort to continually improve upon its safety and environmental protection record, Great Lakes has developed a Safety Management System, which complies with the requirements of the International Safety Management Code (ISM Code), and the American Waterways Operators, Responsible Carrier Program (RCP).

## 2.0 Purpose

2.1    The purpose of this manual is to provide an overview of the Company's Safety Management System.  This manual accomplishes the following:
- Defines and outlines the structure of the safety management system;
- Contains the management system policies and associated objectives;
- Defines the scope of application of the management system;
- Describes the management system organization and provides descriptions of the responsibility and authority of key management personnel within the organization.

## 3.0 Scope

3.1    The requirements of the Safety Management System, which include adherence to all regulations, laws and conventions promulgated, as applicable, extend to all vessels managed and operated by Great Lakes which must comply with the ISM Code, the Company's and Responsible Carrier Programs.

3.2    The Safety Management System is implemented at all levels of the Company, both ashore and aboard vessels.

3.3    The common language of Great Lakes Dredge & Dock Company, LLC, is English. When operating vessels overseas, the official language of the vessel shall remain English, and shall be manned by personnel with a working knowledge of the official language.

3.4    The Document of Compliance issued to Great Lakes Dredge & Dock Company, LLC for complying with the requirements of the International Safety Management Code (ISM), shall be posted in the Corporate Offices located in Oak Brook, IL.  .The Certificate of successful completion of External Audit for the Responsible Carrier Program (RCP) shall

# EXHIBIT-8

Excerpts from Deposition of Jason Campbell

MSJ_0074

Page 30

```
 1          Q.     Did you realize that he
 2    testified the equipment was not
 3    reasonably fit for the purpose for which
 4    it was intended?  Did you see that in the
 5    deposition?
 6               MR. DeGUILIO:  It is
 7          impossible that he's read the
 8          deposition.  We don't even have
 9          it.
10               THE WITNESS:  I didn't read
11          that.
12               MR. MORGAN:  Well, I have
13          it.  She didn't send it to you?
14               MR. DeGUILIO:  No.
15    BY MR. MORGAN:
16          Q.     Have you talked to Mr. Smith
17    since he gave his testimony?
18          A.     No.
19          Q.     Assume it's true that he
20    testified that the Nabrico winch and boom
21    comprised in this barge crane was not
22    reasonably fit for the purpose for which
23    it was intended.  Is that new news to you
24    that the equipment was not working
```



1  properly as of August of 2016 on Barge

2  1003?

3          A.     Yes.

4          Q.     When did you first become

5  aware that there was any alleged problem

6  with the way the Nabrico barge worked?

7          A.     When McDermott filed a

8  lawsuit.

9          Q.     So before Les filed the

10  lawsuit you were not informed by anybody

11  within the corporation that there was a

12  safety problem on Barge 1003 with respect

13  to the boom or the winch out there?

14              MR. DeGUILIO:   Objection to

15          form.

16              THE WITNESS:   No, I was not

17          informed of any safety issue.

18  BY MR. MORGAN:

19          Q.     So we go back here, Mr.

20  Campbell, if we look at the notice of

21  deposition.  I think you have a copy

22  there in front of you.  The first topic

23  that is outlined it gets into the issue

24  of the safety management system.



Page 52

1    are not using it, what would you have

2    done about that?

3            A.     I would have asked, can they

4    still operate it and are they choosing

5    not to use it.

6            Q.     And why would you have done

7    that?

8            A.     I just want to get all the

9    information.

10           Q.     You want to get the facts,

11   right?  You want to drill down and find

12   out are they being knuckleheaded about it

13   and refusing to use something just

14   because it's problematic to them, or is

15   it, in fact, a realistic problem?

16           A.     Yes.

17           Q.     Have you as you sit here

18   today ever made a determination of

19   whether or not the original Nabrico barge

20   and winch that was in use when Mr.

21   McDermott was injured was too difficult

22   to use and had become impractical to use?

23           A.     No.

24           Q.     Have you ever spoken to



Page 63

```
 1   broke on an end-of-shift form.  He could
 2   do it that way.
 3          Q.    On a shift form?
 4          A.    End-of-shift form.  Or he
 5   could reach out to his supervisor.
 6          Q.    Who is his supervisor?
 7          A.    I don't remember at that
 8   time.
 9          Q.    If he reached out to Richard
10   Smith and told him this crane is not
11   safe, it needs to be replaced, is he
12   complying with what he is supposed to do
13   as the PIC?
14          A.    Yes, if he would reach out
15   and say this crane is not safe.
16          Q.    Do you agree that when Mr.
17   Smith documented 9-22-16, and assume he
18   testified under oath that I reported this
19   to a vice president when I ordered this
20   equipment that it was extremely difficult
21   to operate and, therefore, the men
22   weren't using it, that at that point
23   someone within the company had an
24   obligation to take action immediately for
```



Page 65

1    the VP to order equipment?

2          A.    From what he wrote for the

3    justification that he more so needed to

4    change the winch to accommodate us being

5    able to use a different terminal to fuel.

6          Q.    So you agree he wrote in

7    this document, the AFCE justification

8    that it needed to be replaced, right?

9          A.    Yes, he wrote that he would

10   like to replace it with an electrical

11   winch.

12         Q.    So my question to you is.

13   Under the rules of the company what's

14   supposed to happen?

15         A.    They would have to go

16   through the process and if they see that

17   it deemed to be needed to be replaced, if

18   there was something wrong with the hand

19   crank, then they would move in replacing

20   it.

21         Q.    What's the timeframe in

22   which it would be replaced?

23         A.    I can't answer that.

24         Q.    What are the rules with



Page 70

1    BY MR. MORGAN:

2          Q.    Mr. Campbell, are you

3    familiar with the Great Lakes Safety

4    Management System?  Do you work with it?

5          A.    I do work with it.  I have

6    to review and dive into it.  It's not

7    memorized.

8          Q.    Of course, but you are in

9    charge of safety for Great Lakes Dredge

10   And Dock; are you not?

11         A.    Yes.

12         Q.    You're the head man over the

13   department?

14         A.    Over the department, yes.

15         Q.    So part of your absolute

16   responsibility is to supervise the

17   functioning of the safety management

18   system, true?

19         A.    To oversee, yes.

20         Q.    What is the purpose of the

21   safety management system?

22         A.    The purpose of the safety

23   management system is provide a systematic

24   way to look for hazards, to be able to



Page 79

1           Q.      You're aware from your

2    college education and your work in the

3    marine industry that the duty to provide

4    equipment which is reasonably fit for its

5    intended purpose is a non-delegate

6    responsibility of the corporation, right?

7           A.      Yes.

8           Q.      They can't delegate that to

9    a laborer or to a tankerman?  They can

10   require the tankerman to report it if

11   it's not working right; isn't that true?

12          A.      Yes.

13          Q.      But they can't tell Mr.

14   McDermott you have to provide yourself a

15   reasonably fit piece of equipment on our

16   barge; isn't that true?

17          A.      Yes.

18          Q.      So what does this document,

19   Campbell-9, require the corporation to do

20   when they are notified by their own

21   maintenance manager this winch is not

22   useable and the maintenance manager

23   concludes that he agrees it's not usable?

24          A.      They follow the process of



Page 84

1  extremely difficult to operate due to the

2  weight of the 30' boom.

3           I believe this vessel was

4  commissioned in January of '16; does that

5  sound right?

6      A.    I couldn't -- I don't know.

7      Q.    In any event, if he knew it

8  was extremely difficult to operate when

9  it was commissioned, did he have an

10 obligation to tell anybody within the

11 corporation that fact.

12     A.    Yes.

13     Q.    Who should he have told?

14     A.    He should have told if he

15 was involved with commissioning then it

16 would be a line item, he could have told

17 the people who had built the barge and

18 put the davit on there.

19     Q.    Common sense would tell us

20 if it's extremely difficult to operate,

21 that you don't want your men manually

22 turning a crank on a winch that's

23 extremely difficult to operate; do you?

24         MR. DeGUILIO:  Objection to



Page 91

```
 1  it?
 2              MR. DeGUILIO:  Objection to
 3          form.
 4              THE WITNESS:  Well, there's
 5          definitely not a timeframe, but we
 6          would start to take the steps to
 7          minimize that risk.
 8  BY MR. MORGAN:
 9          Q.   Are you acquainted with The
10  Doctrine of Unseaworthiness, what that
11  means?
12          A.   Could you tell me?
13          Q.   That an appurtenance is not
14  reasonably fit for which it's intended?
15              MR. DeGUILIO:  Objection to
16          form.
17  BY MR. MORGAN:
18          Q.   Or a piece of gear is not
19  fit for the purpose for which it's
20  intended?
21              MR. DeGUILIO:  Same
22          objection.  It's not the
23          definition of unseaworthiness.
24              MR. MORGAN:  Well, it is the
```



Page 128

1    the winch and the davit and determine do

2    these men need a mechanical assist device

3    or not?  What would be better?

4            A.    That would seem reasonable.

5            Q.    And would you believe that a

6    reasonably prudent site manager would

7    take action immediately if he was so

8    informed?

9            A.    If he was informed.

10           Q.    Would you believe that if

11   Mr. Richard Smith was acting as a

12   reasonably prudent maintenance manager,

13   that he would have made some phone calls

14   or written some e-mails or letters to the

15   site manager and said, we have a problem,

16   the davit and winch is not being used

17   because it's too hard to operate and

18   these guys are manhandling 6" hoses,

19   which are very heavy, I need you to go

20   out there and look and figure out to how

21   to make it safe; should he do that?

22           A.    Yes, he should do that.

23           Q.    If you look at paragraph 8.1

24   on Campbell-9, that's basically what the



Page 129

1  intent of this is, right?

2          A.    Right, that's what I read.

3          Q.    And then if we look at

4  CA-A-PR-010, corrective action system.

5                MR. DeGUILIO:  Have you

6          marked this, Reed?

7                MR. MORGAN:  It's

8          Campbell-12.

9  BY MR. MORGAN:

10         Q.    This is actually your

11  company's in writing position to

12  establish a corrective action system and

13  guidance in the administration, right?

14         A.    Yes.

15         Q.    And this says it's the

16  responsibility of the safety management

17  system program manager and RCP program

18  manager to implement this procedure.

19  What's RCP?

20         A.    Reasonable Carrier.

21         Q.    And then it has under 6.1,

22  Instant Investigation and Reporting,

23  right?

24         A.    Right.



Page 130

```
 1            Q.      And then you have paperwork
 2   for internal audits, correct?
 3            A.      Yes.
 4            Q.      Under 7.3, Incident.  Any
 5   unplanned or unexpected event causing
 6   personal injury, occupational illness,
 7   death, or material loss or damage or an
 8   explosion of any kind.
 9                    And so by definition when
10   Mr. McDermott reported dragging fuel hose
11   across deck to make connection, felt a
12   little pain.  Did not take it serious,
13   but in the morning I couldn't get out of
14   bed.  He is reporting an incident, right?
15            A.      Yes.
16            Q.      So under this corrective
17   action system it's a responsibility of
18   the SMS program manager and RCP program
19   manager to have trained Mr. Martin over
20   here, Jody Martin, as the person with
21   this information to report it to Mr.
22   McDermott's supervisor, right?
23                    Say, hey, I got the report,
24   I can't really understand what happened,
```



Page 131

1   but you're his supervisor, you need to

2   make a decision as to the significance of

3   this and the impact on safety, figure it

4   out, true?

5          A.     Yes.

6          Q.     And the site safety manager

7   for this barge at that time, what person

8   was that?  I can't remember his name.

9   Cameron Whitmore?  That's who is on

10  Campbell-13, the first report of injury?

11         A.     That's correct, Cameron

12  Whitmore.

13         Q.     So Martin should have

14  contacted Cameron Whitmore and said, your

15  man got injured on that barge, figure it

16  out, go out there and ask questions and

17  look at the equipment?

18         A.     They probably -- yeah, I

19  mean, with this at the time of the

20  incident report when he said it was on

21  board in Staten Island, New York, which

22  the job was located down in Long Beach

23  Island, New Jersey.

24         Q.     So what are you saying



Page 171

1    to be certified as a PIC on a fuel barge?

2    What is his responsibility?

3            A.    I can't answer that without

4    seeing what the course was.

5            Q.    Do you all now have weight

6    lifting restriction in your safety

7    materials?

8            A.    Yes.

9            Q.    When did that come into

10   being?

11           A.    It came into being February

12   1st of 2017.

13           Q.    Was part of the reason for

14   that because of Mr. McDermott's injury?

15           A.    No.

16           Q.    What was the genesis of

17   that?  Why February of '17?

18           A.    It was instituted by myself

19   from my past experience.

20           Q.    Were there reports of

21   overstress injuries that triggered you

22   to want to redraft the safety manual and

23   put a weight lifting restriction in?

24           A.    Yes, there's strains and



Page 172

1   sprains incidents.

2          Q.    Were some of those strains

3   and sprains to the back of workers?

4          A.    Yes.

5          Q.    And some of them to the

6   knees?

7          A.    Yes.

8          Q.    Shoulders?

9          A.    Yes.

10         Q.    Neck?

11         A.    Yes.

12         Q.    And so you became concerned

13  that too many people were having

14  overexertion injuries and did something

15  about it, like you should, right?  I

16  mean, that's why you did it?

17         A.    More so for the way the

18  employee themselves are physically

19  nowadays verus, and it's good practice.

20         Q.    What's the weight

21  restriction that you have implemented?

22         A.    I implemented 50 pounds, no

23  more than 50 pounds for a single.

24         Q.    For a single person?

MSJ_0089



Page 173

1        A.    Yes.

2        Q.    100 pounds if you have a

3  partner?

4        A.    We say normally to get a

5  mechanical lifting device.

6        Q.    Over 50 pounds?

7        A.    Uh-huh.

8        Q.    That's a yes?

9        A.    Yes.

10        Q.    And so with respect to

11  pulling an object like a hose, would the

12  same weight restriction apply, don't pull

13  over 50 pounds per person without

14  mechanical means?

15        A.    It's not stated in there

16  about push or pull.

17        Q.    Do you not have any

18  restriction on weight restrictions for

19  pushing and pulling?

20        A.    No.

21        Q.    Should you?

22        A.    I can't answer that

23  question.

24        Q.    Let me ask you this.  You've



Page 175

1          A.     It's a best practice.

2          Q.     What's the foundation for

3     saying it's the best practice?  What do

4     you rely on?

5          A.     Well, we rely on basically

6     what the stuff from the NIOSH aspect and

7     then understanding what the individual

8     themselves might be doing.  So you're

9     trying to weed that out as it relates to

10    any kind of physical labor.

11         Q.     And part of when you're

12    pulling an object as opposed to lifting

13    an object, part of what a safety engineer

14    would be looking at is the possibility of

15    a person slipping, right, loss of

16    traction with their feet?

17         A.     Yes.

18         Q.     And part of it is that you

19    have what's called torsion where you're

20    twisting, you're turning your back as you

21    pull?

22         A.     Yes, you could torque.

23         Q.     And isn't it known to you

24    and to the people that write these books



Page 195

1    We have been turned away from a fueling

2    depot in the Northeast KIM because they

3    consider this process unsafe, for him to

4    have said that is unacceptable, we need

5    to do something about that immediately.

6    I need to pick up the phone and call the

7    site manager and have a discussion about

8    how we're going to prevent these men from

9    manhandling a 6" hose and having our

10   customers turning away business?

11        A.    I can't answer that.  He has

12   people that work for him.

13        Q.    Wouldn't you agree that

14   somebody that read this within the

15   organization had an obligation using

16   reasonable care to do that?

17        A.    Yes.

18             MR. MORGAN:   Number 11.  How

19        were the crew of the Barge 1003

20        expected to move the fuel hose on

21        that barge?  What was the diameter

22        length and weight of the hose?

23        What's the name and manufacturer

24        and model or make of the hose?



Page 211

```
 1              the hose.
 2                   MR. MORGAN:  Frank, that's
 3              ridiculous.  He knows it's a 6"
 4              hose.  We've been talking about a
 5              6" hose for four hours.
 6                   MR. DeGUILIO:  Okay.  He's
 7              already testified he doesn't know
 8              anything about the 6" hose.
 9       BY MR. MORGAN:
10              Q.    Is there something magical
11       about your training that makes you think
12       for one minute that Mr. Becker and Mr.
13       Baumann and Richard Smith are so ignorant
14       of weights and safety that they would
15       understand that men moving a 6" fuel
16       house is dangerous to their health?
17              A.    It would be hazardous.
18              Q.    And they should know that,
19       right?
20              A.    I can't tell you what they
21       do and do not know.
22              Q.    You would hope they would
23       know that; wouldn't you?
24              A.    Yes.
```



Page 218

1  talking about proper lifting techniques

2  as relation to warmup for work and items

3  like that.

4          Q.    So this line item that I've

5  read, transferring hoses to transfer

6  facility and the two columns to the right

7  of that, does this indicate to you that

8  Mr. Harris or Mr. McDermott identified

9  the boom not working as a hazard before

10 they started the operation, a potential

11 hazard?

12         A.    Yes.

13         Q.    Going up to the top of the

14 page, or farther up on the top part of

15 the pages it says, required tool.  Do you

16 see that?

17         A.    Yes.

18         Q.    And Mr. McDermott testified

19 that he wrote in, winches and hose.  Do

20 you see that?

21         A.    Yes.

22         Q.    What is the intention of

23 requiring the employees to fill out that

24 part of this form?



Page 60

1    that whatever happened doesn't happen

2    again if it can be alleviated through

3    actions by the company?

4           A.     It would just depend on

5    whose division or team.

6           Q.     In this case, Barge 1003,

7    who is ultimately responsible to look at

8    the situation and determine if this type

9    of injury can be prevented?

10          A.     The maintenance group.

11          Q.     That would be Richard Smith?

12          A.     Yes.

13          Q.     So you're saying that

14   Richard Smith on his own without the

15   input of the safety department has the

16   obligation to determine, number one, if

17   the condition at the time was unsafe and,

18   number two, how to fix it?

19          A.     No, I'm not saying that.

20          Q.     Who has that ultimate

21   responsibility?

22          A.     It would depend on who he

23   works with within his maintenance group

24   and if they need assistance or



Page 101

1    he have done that?

2           A.    I guess he could have taken

3    that route.

4           Q.    Isn't a fair way to operate

5    a company when a vice president and the

6    maintenance knows that the men are

7    struggling and manhandling equipment

8    because the davit and the winch aren't

9    usable to put the burden of doing

10   something about it on the back of the

11   company and not on the worker?

12          A.    The witch was usable.

13          Q.    You say that, but what's the

14   foundation for that testimony that the

15   winch was usable, the video?

16          A.    Yes.

17          Q.    How long do you think it

18   would take to lift a 6" fuel hose with

19   that winch and put it over to the dock?

20   Do you have any idea?

21          A.    No.

22          Q.    How much does that hose

23   weigh?

24          A.    I don't know.



Page 102

1          Q.     The video didn't show

2    anything but the boom being lifted,

3    right?

4          A.     Yes.

5          Q.     A 30' boom, correct?

6          A.     Yes.

7          Q.     Do you know the length of

8    that 6" hose?

9          A.     No.

10         Q.     Do you know if it's 100 feet

11   long or 50 feet long?

12         A.     No.

13         Q.     Have you ever seen it in

14   use?

15         A.     No.

16         Q.     Do you know what the flanges

17   weigh?

18         A.     No.

19         Q.     Do you know if those

20   flanges, the two of them together, would

21   weigh over 100 pounds?

22         A.     No.

23         Q.     Do you know if that hose

24   weighs as much as 10 pounds a foot?

MSJ_0097



Page 191

1   BY MR. MORGAN:

2         Q.    Who would be in a better

3   position to say whether this equipment

4   was reasonably fit for the purpose for

5   which it was intended, you or Mr. Smith?

6         A.    Mr. Smith.

7         Q.    Let's assume it's true that

8   a 6" hose had a weight of at least 10

9   pounds per foot for the hose itself, and

10  then was at least 50 feet long.  That's

11  500 pounds and that it had a flange on

12  each end that weighed at least 50 pounds.

13  So that's another 100 pounds, 600 pounds.

14              Do you believe it would be

15  reasonable to expect Mr. McDermott and

16  Mr. Josh Harris to move that hose by

17  hand?  Would that be a reasonable job

18  assignment?

19        A.    Assuming?

20        Q.    Yes, sir.

21        A.    No.

22        Q.    And state the reason.

23        A.    With 600 pounds neither one

24  of them could move it.

MSJ_0098



Page 71

1   provide a policy, a procedure,

2   accountability within the company to be

3   able to resource.

4          Q.    To take care of unsafe

5   conditions and to try to make the

6   workplace safe; would that be a fair

7   statement?

8          A.    I would say to continue to

9   improve the safety of the workers.

10         Q.    To identify hazards?

11         A.    To identify hazards, yes.

12         Q.    And if there is, in fact, a

13  reported hazard, to take appropriate

14  action as expeditiously as reasonable?

15         A.    Yes.

16         Q.    If we look at these

17  principles, I think what you're saying is

18  you want to identify equipment that's

19  used in operations and if it's unsafe,

20  you want to have it removed and replaced?

21              MR. DeGUILIO:  As a general

22         rule?

23  BY MR. MORGAN:

24         Q.    As a general rule.  If you

164



Page 134

1                    So under this safety

2    management system isn't he supposed to

3    document in writing somewhere if he knows

4    that this is extremely difficult to

5    operate so that it doesn't stay out there

6    for months being extremely difficult to

7    operate without somebody that's trained

8    in safety, such as yourself, is made

9    aware?

10          A.    He would have documented it

11   since that's unmanned barge.  It doesn't

12   have a computer on it.  He probably would

13   have documented an NS5.  But that's

14   assuming.

15          Q.    What is an NS5?

16          A.    It's a system to track

17   standard work operations.

18          Q.    For the barges?

19          A.    For equipment.

20          Q.    So that's an electronic

21   software program in the Great Lakes

22   software server?

23          A.    Yeah, I'm not familiar with

24   the particulars of it.

165



# EXHIBIT-9

Excerpts from Deposition of Richard Smith

MSJ_0099

Page 17

1    A.      I'm not sure -- ask one more time,

2    please.

3    Q.      You know we have this incident

4    involving our client here, Les, and the 1003

5    barge?

6    A.      Yes, sir.

7    Q.      So what I'm trying to learn from you

8    is, were you ever a safety advisor over a barge

9    such as the 1003?

10   A.      Yes, sir.

11   Q.      Were you a safety advisor of the 1003

12   during the timeframe that Les worked on it?

13   A.      No, sir.

14   Q.      Okay.  When were you the safety advisor

15   over that barge?

16   A.      When it was in Miami.  I don't recall

17   the exact dates, but it was -- the barge was in

18   Miami when it was commissioned.  I believe it was

19   commissioned in 2014.

20   Q.      Right.  That was my recollection.

21           Was it a new barge?

22   A.      Yes, sir.

23   Q.      Where were you actually working when it

24   was commissioned down in Miami?

MSJ_0100



Page 24

1      Q.      Who is the chief?

2      A.      Well, the chief would have been in the

3  hydraulic divisions.  I don't believe at this

4  point we were dealing with a hydraulic job.  I

5  was giving you a general answer to the question

6  you asked.

7      Q.      Who was responsible to establish a

8  maintenance program for the winches on this 1003

9  barge back during the timeframe that Les was

10  there, which I believe was around January of '16

11  through October the 30th of '16?

12      A.      That would be me.

13      Q.      Did you have a written maintenance

14  program set up for that barge?

15      A.      I have the maintenance manual which you

16  provided and that is on the barge.

17      Q.      So taking this document that we've

18  referred to as the maintenance manual -- why

19  don't we go ahead and mark it.

20              (A document was marked as Exhibit

21  Smith-1 for identification.)

22  BY MR. MORGAN:

23      Q.      So Mr. Smith, if you could look at that

24  manual and find in the manual where it says what



Page 26

1   installed correctly and anchored securely to the

2   winch drums.  Also, check to make sure that the

3   wire rope is in good condition.

4              Periodic inspections.  Periodic

5   inspections should occur every six months,

6   whenever equipment is returned to service from

7   storage, if a frequent inspection discovers any

8   damage or poor operations in any case where the

9   equipment may have been overloaded or

10  operationally abused, visually inspect the

11  equipment checking the finish for wear, flaking

12  or other damage as listed in the frequent

13  inspection plan.  Disassembly is recommended in

14  order to properly inspect individual components.

15             Wire rope inspections should be

16  conducted as per manufacturer's recommendations

17  or accepted industry standards.  Inspect the

18  entire length of wire cable for bent or crushed

19  areas, broken or cut wires, corrosion or other

20  damage.  Inspect end connections and fittings for

21  corrosion, kinking, crushing or other damage."

22      Q.      That's enough for now.  We can come

23  back and finish in a moment.

24             What was your job title as of



1    January 1st of '16?

2       A.       Port engineer.

3       Q.       What were your duties and

4    responsibilities?

5       A.       My responsibilities are to oversee

6    maintenance and logistics for anchor barges, fuel

7    barges and dredge barges.

8       Q.       Tell us how you oversaw the maintenance

9    and logistics for the barge, 1003?

10      A.       Well, I paid visits to each piece of

11   equipment.  I walked the equipment and checked to

12   see that it's in good condition.  I get reports

13   on a weekly basis from the job sites.

14      Q.       Who would fill out the weekly reports?

15      A.       That all depends what job site it's

16   assigned to.

17      Q.       Let's say for the barge 1003 when it

18   was working there in the Long Beach Island area,

19   who would file a weekly report for that barge?

20      A.       That would be the project operations

21   people.

22      Q.       Who was the person in particular that

23   would do the weekly report?

24      A.       I don't know who was there at that



1   equipment prior to use, and if there was

2   something wrong with that equipment, it was his

3   responsibility to report it.

4        Q.        Was there a form that was given to you

5   weekly by the project operation person you're

6   referring to that would tell you the condition of

7   the winches and the barge?

8        A.        No, not unless there was a deficiency.

9        Q.        So have you seen anything in writing

10  that reported a deficiency on the winches and the

11  boom for the 1003?

12       A.        No, sir, I have not.

13       Q.        You have not?

14       A.        No, sir, I have not.

15       Q.        When did you first become aware that

16  the boom was extremely difficult to operate on

17  the 1003?

18                 MR. NEELY:  I'm going to object to

19  the term extremely difficult, but you can answer.

20                 THE WITNESS:  Well, when I tried to

21  operate it when it was first commissioned.

22  BY MR. MORGAN:

23       Q.        Tell us about what you found.

24       A.        I found that when you crank the winch,



Page 30

1    that it was -- it had to lift a 30-foot boom and

2    it was heavy.  That boom is steel.  Steel is

3    heavy.  And when you try to crank that winch,

4    you're lifting all of that steel with whatever

5    the gear ratio is between the winch and also the

6    block system that's established on that winch.

7        Q.      Did you report that to anyone as being

8    a problem for the men that would be using it?

9        A.      No, sir.

10       Q.      Why not?

11       A.      Because that's the manufacturer's

12   design.  There's nothing to report.  It operated

13   as the manufacturer intended it to operate.

14       Q.      Have you ever written a record or a

15   report of any type where you said that the boom

16   on that barge, 1003, was extremely difficult to

17   operate?

18               MR. NEELY:  Same objection.

19               You can answer.

20               THE WITNESS:  A report?

21   BY MR. MORGAN:

22       Q.      Or a memorandum, anything in writing

23   that to effect?

24       A.      I may have written something in an



1    e-mail that stated it was difficult to operate or

2    might have been hard to operate because of the

3    gear ratios and the boom.

4         Q.       And why did you do that?

5         A.       Because the tankermen would not use the

6    crane to support their jobs.

7         Q.       And so you would have reported that to

8    what person?

9         A.       I'm not sure.  Are you talking about on

10   a report?  An e-mail would have went to my

11   supervisor.

12        Q.       Who was that?

13        A.       Bill Baumann, the fleet manager, fleet

14   maintenance manager.

15        Q.       Spell his last name, please.

16        A.       B-a-u-m-a-n-n.

17        Q.       You said he's the fleet supervisor?

18        A.       More hydraulics and mechanical

19   dredging.  Fleet maintenance supervisor.

20        Q.       Maintenance supervisor?

21        A.       Yes, sir.

22        Q.       Is his office is Chicago?

23        A.       He has an office in Chicago, however,

24   he's not an office guy.  He's a field guy like



Page 33

1    August of 2016 the same as it operated in

2    December of 2014.

3        Q.      I understand, but my question is

4    different.

5               I'm asking you, would you use the

6    terminology that the boom is extremely difficult

7    to operate?

8        A.      I would say it's difficult.  It's hard.

9        Q.      You wouldn't use the word extreme?

10       A.      I'm not sure I would use extreme.

11       Q.      Would extreme be an accurate

12   description of the way it operated, extreme

13   difficulty to operate?

14       A.      No, I don't think so.  I think that it

15   is difficult to operate.

16       Q.      I've got here a document that's Bates

17   stamped 9112.  I'll go ahead and mark this as

18   Smith-2.

19               (A document was marked as Exhibit

20   Smith-2 for identification.)

21   BY MR. MORGAN:

22       Q.      I'm going to hand you this.  It's

23   marked Smith-2 and ask you what is that?

24       A.      This is a justification for capital



Page 34

1   improvements.

2       Q.      Who is it to?

3       A.      It's to my boss's boss.

4       Q.      Who is that?

5       A.      That's Steve Becker.

6       Q.      So Steve Becker.  Is he over Bill

7   Baumann?

8       A.      Yes, he is.

9       Q.      Is Mr. Baumann your boss?

10      A.      Yes, sir, he is.

11      Q.      What's Steve Becker's position as of

12  the date of that correspondence?

13      A.      I don't know his exact title.  I think

14  he's a senior vice president in charge of

15  engineering logistics for Great Lakes Dredge and

16  Dock.  That may not be his accurate title.

17      Q.      Do you know what his education is?

18      A.      No, sir, I don't.

19      Q.      Do you know what his job function is?

20      A.      Yes, sir, I do.

21      Q.      What is that?

22      A.      His job function is to ensure that the

23  engineering functions of Great Lakes, whether it

24  be dredge or barge or other things, are carried



1    out.  He manages our budgets and funding.

2         Q.      Let me ask you a question personally

3    about the way you like to see things done.

4              Do you have a commitment to excellence?

5         A.      I feel I try to, yes, sir.

6         Q.      Didn't you do your best to inform this

7    company as of August 22, '16, that the winches

8    and the boom on that barge were very hard to

9    operate?

10        A.      I did make notification as showed by

11   this capital improvement, trying to make an

12   improvement of the barge.

13        Q.      And you did that because you didn't

14   want your men to be exposed to something that was

15   extremely hard to operate when they're trying to

16   move heavy equipment, right?

17        A.      You can say that, yes, sir.

18        Q.      Because your education and training and

19   experience has been over the years that there are

20   a lot of things that can happen if somebody has

21   to overexert their muscles in their arms, back,

22   legs, knee, right?

23        A.      Yes, sir.

24        Q.      And those aren't good things, they can



1    into the water causing a spill, right?

2        A.       That is correct.

3        Q.       So one of the other risks that's

4    associated with poorly functioning winches and

5    booms on a fuel barge would be the risk that

6    somebody might cause a spill; that's a fair

7    statement, isn't it?

8        A.       Yes, sir.

9        Q.       So consequently, because of your

10   30 years experience and being the person you are,

11   you reported to your boss's boss, Mr. Becker.

12   And if you look there at the bottom there, read

13   what you told Mr. Becker.

14       A.       "The original boom has a hand crank

15   operation that is geared to a one to one ratio.

16   It's a worm gear hand-powered winch and it is

17   extremely difficult to operate due to the weight

18   of the 30-foot boom.  Because the effort required

19   to operate and the length of time it takes to

20   pass a fuel hose, the tankermen do not use this

21   piece of equipment.  They had been manhandling

22   passing the 6-inch fuel hose with heavy flange

23   fittings across the barge to the fuel depot when

24   taking on fuel.  We have been turned away from a



Page 38

1   certain fueling depot in the Northeast, KMI,

2   because they consider this process unsafe.  The

3   depot provides a sliding discount for fuel

4   purchased from three cents to 10 cents per gallon

5   below the other fueling depot price that we

6   utilize.  By making the boom usable to personnel,

7   we would be offered the opportunity to continue

8   to fuel at this facility in the Northeast, which

9   could yield a median cost savings of 4.5 to 15K

10  on a single fueling of the barge taking on

11  150,000 gallons of fuel.  The barge has a record

12  of requiring approximately 200,000 gallons every

13  three to five weeks, which over a period of

14  one year can yield a cost payback of a possible

15  $150,000 a year assuming 7 cents per gallon on

16  200,000 gallons and 11 fuelings.  The fuel barge,

17  1003, has a capable capacity of 261,500 gallons

18  at 95 percent.  We have completed the research

19  with the boom manufacturer who provided us with a

20  suitable electric winch bolt-in replacement to

21  the hand-powered winch.  There are two winches,

22  one to control the boom angle, the second to

23  raise and lower the hook.  Oak Brook engineers

24  have reviewed this modification."

MSJ_0111



```
 1    Q.      And Oak Brook, Illinois is the home
 2  base for --
 3    A.      I said Chicago earlier, but Oak Brook,
 4  yes.  Oak Brook is a bedroom community of
 5  Chicago.
 6    Q.      And that's where Great Lakes' home is?
 7    A.      Yes, sir.
 8    Q.      All right.  So you cover a lot of
 9  material there, but apparently, you looked at
10  this situation closely, correct?
11    A.      I have, yes, sir.
12    Q.      You analyzed what you thought was the
13  performance level of the equipment, right?
14    A.      Yes, sir.
15    Q.      And you found the performance level of
16  the winch and the boom unsatisfactory for the
17  men; isn't that true?
18    A.      I found that the men weren't using it
19  because the hand winches were difficult to
20  operate, so I tried to provide an easier
21  solution.
22    Q.      I understand.  You tried to do the
23  right thing basically is what you did?
24    A.      Yes, sir.
```



Page 42

```
 1     A.      I can't tell that.  I don't know.

 2     Q.      What would be your estimation?

 3     A.      I don't know what the ratio is.  I

 4  couldn't estimate that.  I don't know.

 5     Q.      Well, you wouldn't expect tankerman,

 6  Les McDermott, and his helper, Josh Harris, to be

 7  able to use the winch that was on that tanker

 8  barge back in August through October with the

 9  boom and raise that boom up into the air without

10  having to turn the crank hundreds of times;

11  wouldn't that be true?

12     A.      Again, I don't know.  I don't know what

13  -- I don't know how many times you have to crank

14  it to get the boom up.  I mean, I've never

15  counted that.

16     Q.      That's a fair answer, but if you

17  thought the deal was working properly and safely

18  and efficiently, you wouldn't have wrote what you

19  wrote, right, to Mr. Becker?

20     A.      That's a fair statement, yes, sir.

21     Q.      So something in your assessment of the

22  situation was basically we can do better than

23  this, right?

24     A.      That's a great statement, yes, sir.
```

MSJ_0113



Page 51

1    letter.  I'll send him a letter.

2                    I'm going to mark this as Smith-3.

3                    (Documents were marked as Exhibit

4    Smith-3, collectively, for identification.)

5    BY MR. MORGAN:

6        Q.      And this one is number stamped 914.

7    And it says on here 3-inch Eagle Tank Truck

8    Service, 150 PSI?

9        A.      That's the manufacturer of the hose.

10   That's not who we bought it from.

11                   MR. NEELY:  That's the 3-inch hose.

12   BY MR. MORGAN:

13       Q.      Right, that's the 3-inch hose.  Do you

14   know what that weighs?

15       A.      No, sir.  I'm sure I can find out if

16   you'll ask.  I don't have this information.

17       Q.      I'll put it in the letter.  Frankly,

18   I've looked for the weights on the internet and I

19   think probably pretty well gotten close, but I

20   don't have an exact.

21       A.      So you're aware, this Tank Truck

22   Service, it's not a name of a company that

23   fabricated the hose.  It's the name of a company

24   that made the hose, made the rubber part of the



Page 52

1  hose.  They didn't put the fittings on there and

2  assemble the hose and sell us the hose.

3     Q.     Okay.  Wouldn't you agree that somebody

4  within the company and the safety department

5  ought to know the weight of the hose that they

6  ask Mr. McDermott and his helper to use?

7     A.     No, sir, not off the top of their

8  heads.  I don't know why we would -- why would we

9  know the weights of the hoses.

10    Q.     Well, surely, when you saw that Mr.

11 McDermott and Josh Harris or whoever was working

12 with McDermott or Mr. Polly were, as you put in

13 your memo to Becker, manhandling the hose, you

14 had observed them do that, right?

15    A.     No, sir, I have not observed them doing

16 that.

17    Q.     How did you find out they were

18 manhandling the hose?

19    A.     By them notifying me.

20    Q.     By the men notifying you?

21    A.     Yes, sir.

22    Q.     Which men?

23    A.     It would have been tankermen.  I have

24 never observed a fueling at any of these depots.



Page 53

1   I have never been to any of these depots.

2       Q.      Did Mr. McDermott tell you we're having

3   to handle the 6-inch hose by hand?

4       A.      I don't recall.  Don't know.

5       Q.      Do you recall the names of anybody that

6   did so?

7       A.      No.  No.  I know that they were moving

8   hoses by hand.

9       Q.      And you know that a tankerman told you

10  that, but you just don't remember which one; is

11  that correct?

12      A.      That's correct.

13      Q.      Under what circumstances -- what else

14  did they tell you that they were handling the

15  6-inch hose by hand?

16      A.      There's only one 6-inch hose that

17  exists on all of my barges, so I don't know if it

18  was ever used.

19      Q.      No.  My question's different,

20  Mr. Smith.  Surely somebody that told you didn't

21  say, hey, we're just handling the 6-inch hose by

22  hand; they probably said we're having a hell of a

23  problem with the 6-inch hose, we're having to

24  move it by hand because the winch and the boom

MSJ_0116



Page 54

1    are not working correctly, right?

2        A.      No, sir.

3        Q.      Okay.  Well, tell us what you remember.

4        A.      I'll tell you what I -- I don't believe

5    that anybody would have came out and said --

6    distinguished 6-inch hose, 3-inch hose, 2-inch

7    hose, 1-inch hose.  What they would have said was

8    hose, period.  They wouldn't have said six.  They

9    wouldn't have said three.  So I wouldn't know

10   what hose that they were operating or handling.

11       Q.      Maybe so, Mr. Smith, but in your memo

12   to Mr. Becker, you specifically referred to the

13   6-inch hose, right?

14       A.      Apparently, I did.

15       Q.      Don't you have some experience with

16   that hose yourself in your work there at Great

17   Lakes; have you ever picked it up?

18       A.      Have I picked it up?  I don't recall

19   ever picking that hose up.  I may have picked up

20   the end of it.  I don't know.  That's the only

21   hose that exits on my barges.

22       Q.      Did you have, as the person in charge

23   of maintenance of the 1003 barge between January

24   and the time Mr. McDermott was injured,



Page 59

1      A.      No, sir, I did not.

2      Q.      Okay.  You made one phone call to

3  Nabrico; is that right?

4      A.      Yes, sir, I did.

5      Q.      And you knew that it was going to take

6  weeks to get it fabricated and installed?

7      A.      Yes, sir.

8      Q.      Did you report that to Mr. Becker?

9      A.      I'm sure that I mentioned lead times.

10  I don't know who I reported that to.

11      Q.      Well, let's back up a little bit.

12              When do you recall becoming aware that

13  the tankermen were not using the winch and the

14  boom on Barge 1003?

15      A.      I don't know.

16      Q.      I mean, were they using it in January,

17  for example, of 2016?

18      A.      I have no idea.  That is an operations

19  issue that I wouldn't know whether they're using

20  it or not.

21      Q.      When we first started this whole

22  discussion, you said that every week that the

23  project manager -- the operations person writes a

24  weekly report, right?



Page 61

1   do anything.

2   BY MR. MORGAN:

3       Q.      All right.  Let's take this step by

4   step.

5               Didn't you have an obligation to report

6   to the safety department if you felt that there

7   was an unsafe condition on that barge?

8       A.      Yes, sir.

9       Q.      And you have indicated that you knew

10  the men were manhandling the 6-inch hose; is that

11  correct?

12      A.      No, sir.  We went through that.  I

13  can't say six inch, three inch, four inch,

14  one inch.  I can't say that.  I wrote it.  I

15  know.

16      Q.      Yeah.  Let's see.  Here it is right

17  here.  I bet you in the Coast Guard that's one of

18  the things they required, put things in writing,

19  right?

20      A.      Absolutely.  If it wasn't in writing,

21  it didn't happen.

22      Q.      God knows if it's helpful because if

23  you don't have it in writing in a deposition like

24  this, you can't really get anywhere, true?



MAGNA
LEGAL SERVICES

1    A.    Yes, sir.

2    Q.    So let's go to the piece of paper that

3  you wrote.  And it says right here:  "They have

4  been manhandling passing the 6-inch fuel hose

5  with heavy flange fittings across the barge to

6  the fuel depot when taking on fuel"?

7    A.    Yes, sir.

8    Q.    Does that refresh your memory?

9    A.    It refreshes what I wrote, yes, sir.

10    Q.    That you did know it was a 6-inch fuel

11  hose, right, you wrote it?

12    A.    I can't say it was the 6-inch fuel

13  hose.  All I can say is that's what's reported to

14  me.

15    Q.    Fair enough.  But you believed it was

16  true when you wrote it?

17    A.    Okay.  Yes, sir.

18    Q.    And with your 30 years experience in

19  the United States Coast Guard, you knew that

20  these guys were handling something very awkward

21  and very heavy; isn't that true?

22    A.    Yes, sir.

23    Q.    And you knew that if when handling this

24  hose, for example, if it was coming back to the



Page 63

1    barge after having taken fuel in and somebody

2    slipped and fell in between the dock and the

3    barge, that would be a very unsafe situation,

4    true?

5        A.      Yes, sir, that's true.

6        Q.      And you knew that was a possibility any

7    time you have people manually handling heavy

8    equipment on the edge of a barge without a

9    handrail; isn't that true?

10       A.      Yes, sir.

11       Q.      And you also knew that you could have a

12   fuel spill on the deck of the barge because of

13   this very situation as well, right?

14       A.      Yes, sir.

15       Q.      And you knew somebody could strain

16   their back doing it, right?

17       A.      Yes, sir.

18       Q.      Or tear up a knee as Mr. McDermott did,

19   correct?

20       A.      Yes, sir.

21       Q.      All right.  So putting all that

22   together, you knew it was a dangerous situation,

23   right?

24       A.      I feel that the situation that was



Page 64

1    dangerous was what the choice was in the way to

2    handle the hoses, not necessarily the equipment

3    itself.  If the equipment was used, it would have

4    been a different outcome.

5        Q.      Yeah, but you've already testified you

6    didn't blame the workers for not using the

7    equipment?

8        A.      I'm human.  That's correct.  I don't

9    blame somebody for not wanting to put forth a

10   little hard labor.  That doesn't mean that the

11   equipment can't be used.

12       Q.      You knew that it was impractical to

13   expect these men to use the winch and the boom

14   there at KMI?

15       A.      Yes, sir.

16       Q.      All right.  So knowing the dangers of

17   fuel spills and personal injuries that were

18   created by the situation, didn't you expect

19   somebody in management to want to rectify this

20   situation before the expenditure of 90 days?

21       A.      That could be a fair statement, yes,

22   sir.

23       Q.      All right.  And isn't it true that an

24   air tugger and a block and the pad eyes and shivs



1    could have been rigged on that barge as an

2    alternate to moving this hose?

3        A.        No, sir.

4        Q.        Why not?

5        A.        There are not installed systems on that

6    barge.  There weren't air compressors, tuggers or

7    anything like that on that barge at the time.  We

8    just recently got an air tank on that barge.

9        Q.        Have you worked around air tuggers when

10   you were in the Coast Guard?

11       A.        Yes, sir.

12       Q.        And have you used air tuggers yourself?

13       A.        Yes, sir.

14       Q.        Have you supervised people using them?

15       A.        Yes, sir.

16       Q.        Have you supervised them using air

17   tuggers to pull heavy fuel lines, for example?

18       A.        Fuel lines, not necessarily, no.

19       Q.        Things equivalent to it?

20       A.        Yes, sir.

21       Q.        Did you inquire of any ship channelers,

22   surveyors, marine architects, hey, can't we get

23   some rigging out here with some air tuggers and

24   some pulleys and fix this thing so these guys



Page 67

1  engineers.  The design engineers are the ones

2  that put that together.

3  BY MR. MORGAN:

4      Q.      Yeah, but it's not an engineering

5  question.  It's an ability to perform the work

6  question.

7              Don't you agree that this boom that you

8  reported as 30 feet long and the worm gear and

9  the winch were not reasonably fit for the

10  intended purpose of efficiently moving anything?

11              MR. NEELY:  Same objection, but you

12  can answer.

13              THE WITNESS:  I would say yes, sir.

14  BY MR. MORGAN:

15      Q.      Did you know Mr. McDermott when you

16  worked there?

17      A.      Yes, sir.

18      Q.      Did you ever observe him do his work?

19      A.      Sometimes, yes, sir.

20      Q.      Did you ever report to anybody that he

21  wasn't doing a professional job in his work?

22      A.      I don't recall whether I have or not.

23      Q.      Would you have if you had seen him

24  doing something that you thought was improper or



Page 71

1   barges that are similar to the 1003?

2       A.      Order, no, sir.

3       Q.      Did you request it?

4       A.      Yes, sir.

5       Q.      Same thing as on this Becker exhibit

6   marked Smith-2?

7       A.      I'd have to go back and research what I

8   submitted, but can I see that?

9       Q.      Yeah.  Sure.

10      A.      It doesn't say it in here, it doesn't

11  look like.  I know we were going to prototype

12  this process on the 1003 and then if it was

13  successful, we were going to put it on the other

14  two barges, and I included that in my budget.

15      Q.      Do you know when the winches and the

16  electrical controls were actually installed on

17  this barge, 1003?

18      A.      I can't give you an exact date.  I

19  would have to go back and look.

20      Q.      Okay.  There would be a purchase order

21  for the equipment, right?

22      A.      Yes, sir.

23      Q.      Would there be a remove and replace

24  labor order?

MSJ_0125



Page 72

```
 1      A.      There would have been -- there would

 2  have been some requests from me, yes, sir.

 3      Q.      From you?

 4      A.      Yes, sir.

 5      Q.      Because you were in charge?

 6      A.      This was done in New York, so yes, sir.

 7      Q.      Okay.  So were you the person that had

 8  oversight to see that the new electrical winch

 9  was installed and worked properly?

10      A.      Yes, sir, overall.

11      Q.      So what I'm trying to find out is what

12  paperwork would reflect when this happened,

13  what's it called?

14              MR. NEELY:  When what happened?

15  BY MR. MORGAN:

16      Q.      When this upgrade to the mechanical

17  winch from mechanical to electrical with controls

18  was accomplished?

19      A.      That would have been my direction to

20  our yard manager.  I believe this was installed

21  in the Staten Island yard.

22      Q.      What paperwork would you have had

23  performed or filled out?

24      A.      I would have sent him an e-mail
```



Page 73

1   requesting it to be done.

2       Q.      Do you still have those e-mails?

3       A.      I don't know.  I would have to take a

4   look.

5       Q.      Well, I mean, do you know the retention

6   policy for your e-mails?

7       A.      No, sir.

8       Q.      Is it in a company computer?

9       A.      I don't know whether it's in a server,

10  a notebook or -- I'm not sure.

11      Q.      It happened after Mr. McDermott's

12  injury, right?

13      A.      I don't --

14      Q.      He was injured 10/29 of '16.

15      A.      10/29.  This form was submitted 9/22.

16  Is that what it says?

17      Q.      Correct.

18      A.      If that was submitted 9/22, then it

19  would not have happened prior to his injury.  The

20  installation would have happened after his

21  injury, that's correct.

22      Q.      Down here at the bottom you have

23  categories, importance and you checked essential,

24  right?

MSJ_0127



Page 81

```
 1   to be used on a barge with this design?

 2        A.       Yes, sir.  That's what the designers --

 3   that's what that company stated.

 4        Q.       And basically what you're saying is,

 5   I'm not a design engineer, but it's not working

 6   correctly for us?

 7        A.       Okay.  That's a proper statement, yes,

 8   sir.

 9        Q.       And you're saying it's not a

10   maintenance problem, it's not a failure to grease

11   it or lube it or take care of it?

12        A.       Absolutely, yes, sir.

13        Q.       Absolutely, I'm right?

14        A.       The statement you made is correct, yes,

15   sir.

16        Q.       Is this a sealed unit or can you take

17   the bolts out and look at it?

18        A.       I'd have to go back and look through

19   the thing here.  I know that you can disassemble

20   the winch, but it is a sealed unit.  It's put

21   together.  I mean, you know, there's things you

22   could take apart.  I could take that computer

23   apart.

24        Q.       Okay.  So it may be bolted, it may be
```



Page 87

1    BY MR. MORGAN:

2        Q.        No.  I looked.  I couldn't find the

3    date.

4        A.        Do you know how to click on properties

5    and then --

6                    MR. NEELY:  His date might be the

7    date we gave it to him, but I will tell you from

8    when I looked at it when we got it, it was

9    9/8/2016.

10                   MR. MORGAN:  So we have a 30(b)(6)

11   notice out.  I'm going to have to pull it up.

12                   THE WITNESS:  I don't know what a

13   30(b)(6) notice is.

14                   MR. MORGAN:  I'm really talking to

15   Chuck here.  Is he designated to answer any

16   topics in the 30(b)(6)?

17                   MR. NEELY:  Well, he has been to

18   the extent he's talking about the maintenance,

19   but none of the safety stuff.  That's going to be

20   the other guy.

21                   MR. MORGAN:  There's nothing in the

22   notice that he would have particular knowledge

23   about, other than what we've been talking about

24   here today?



Page 91

```
 1      Q.      How do you spell his last name?

 2      A.      I believe it's B-r-o-g-n-a.  I could be

 3   wrong.  That spelling may not be correct, but

 4   that's what I believe it to be.

 5      Q.      What is his job?

 6      A.      He is the yard manager, yard supervisor

 7   at Staten Island -- Great Lakes Staten Island

 8   yard.

 9      Q.      Did you ever talk to him about the old

10   mechanical winch?

11      A.      Yes, sir, because I had to get him to

12   take those off and put the new ones on.

13      Q.      Did you ever ask him what his opinion

14   of it was as a functioning piece of equipment?

15      A.      No, sir, I didn't ask his opinion.

16      Q.      Did you ever see for the new electric

17   winch motors a manual on what power it had?

18      A.      What?

19      Q.      How powerful it was?

20      A.      Are talking wattage of -- I'm not sure

21   what you're asking for.

22      Q.      No.  No.  I'm talking how much weight

23   it could pull, the winch?

24      A.      I'd have to look at the manual.  I'm
```



```
 1     Q.      So would the 18 include the cost of the
 2   two winches and the electrical controls?
 3     A.      Yes, sir.
 4     Q.      So are you saying that the company
 5   spent roughly the same amount of money times
 6   three because of this situation with the winch
 7   and the boom?
 8     A.      No, sir.  No, sir.
 9     Q.      No?
10     A.      I haven't installed 1002 and three.
11     Q.      Why not?
12     A.      I haven't purchased them.
13     Q.      Why not?
14     A.      I don't have the authority to get them.
15     Q.      But you recommended it, right?
16     A.      Yes, sir.
17     Q.      For the same reasons you've testified
18   here today?
19     A.      Yes, sir.
20     Q.      Have you been certified by OSHA with
21   regard to being a rigger for a barge like this?
22   I'm sorry.  A fuel barge like this?
23     A.      I do not have a rigger certification.
24     Q.      But you have the experience probably
```



1    from the Coast Guard?

2        A.       I have the experience from OSHA.

3        Q.       Okay.  You've been trained by OSHA?

4        A.       Yes, sir.

5        Q.       And OSHA has some very specific

6    requirements for safety, don't they?

7        A.       Yes, sir.

8        Q.       And one of those requirements is

9    recited right here in Smith Exhibit 1 where it

10   says:  "The Occupational Safety and Health Act of

11   1970 states that it is the employer's

12   responsibility to provide a workplace free of

13   hazards."

14              Do you agree with that?

15       A.       Yes, sir.

16       Q.       "To this end, all equipment should be

17   installed, operated and maintained in compliance

18   with applicable trade, industrial, federal, state

19   and local regulations."

20              Do you agree?

21       A.       Yes, sir.

22       Q.       "It is the equipment owner's

23   responsibility to obtain copies of these regs and

24   to determine the suitability of the equipment for



1    the equipment's owner's intended use," which you

2    did; you looked at the suitability for the

3    equipment owner, Great Lakes, intended use and

4    said replace it?

5        A.      Yes, sir.

6        Q.      One of the reasons you did it was to

7    comply with the OSHA regulations?

8        A.      Okay.

9        Q.      Right?

10       A.      Yes, sir.

11               MR. MORGAN:  I think that's

12   probably all the questions that I have, but let

13   me just -- can we go off for a second?

14               (Recess.)

15   BY MR. MORGAN:

16       Q.      So let me ask you this, Mr. Smith.  You

17   don't have any criticism of Mr. McDermott's

18   methods and performance for maintenance on the

19   barge?

20       A.      I didn't observe his performance on the

21   barge.  That would have been an operational

22   thing.  He worked for the local site manager, not

23   for me.

24       Q.      But as far as doing or failing to do



```
 1      Q.      Okay.  But do you believe he reported

 2   that to you in a timely fashion?

 3      A.      I don't know.

 4      Q.      Do you know of anybody who has any more

 5   information than you do about the performance

 6   level of the DF-126 and the mechanical winch?

 7      A.      Within Great Lakes?

 8      Q.      Right.

 9      A.      No, sir.

10      Q.      Did anybody at that dock or the broker

11   complain to you concerning anything that Mr.

12   McDermott did?

13              MR. NEELY:  I'm going to object

14   only because I don't know which dock you're

15   talking about.

16   BY MR. MORGAN:

17      Q.      KMI.  You talked about a broker.  I

18   don't remember the guy's name, but Barberese

19   (ph), did he complain about Mr. McDermott?

20      A.      I don't recall him making any specific

21   remarks about Mr. McDermott.

22      Q.      Did he make any specific remarks

23   derogatory about any of the tankermen?

24      A.      Derogatory remarks, I don't recall of
```



Page 105

1    replacing the winch with the electrical winch and

2    controls was a measure to do so?

3              MR. NEELY:  I'm going to object

4    only to make sure you're limiting it just to

5    winch because that was a broad question.

6    BY MR. MORGAN:

7       Q.      Yeah.  In other words, isn't it true

8    that one of the reasons the electrical winch was

9    recommended to be replaced by you was to make it

10   safer for the men so they wouldn't sustain

11   personal injuries?

12      A.      That is an accurate statement, yes,

13   sir.

14      Q.      To the extent that the barge is

15   operated, that is loads and unloads fuel, do you

16   agree that Great Lakes Dredge and Dock is the

17   operator of that barge?

18      A.      Yes, sir.

19      Q.      No question in your mind that Mr.

20   McDermott was one of the people that got on that

21   barge and would go offshore to dredges to bring

22   fuel to the bridge, you knew that, right?

23      A.      Yes, sir.

24      Q.      Did you know how many hours a day he



# EXHIBIT-10

MSJ_0136

Page 47

1    get on-board the 1003.

2         Q.      So during that time period, is that all

3    you were responsible for doing, being a licensed

4    person on that fuel barge, or did you have other

5    responsibilities for Great Lakes in connection

6    with the dredging project?

7         A.      No.

8         Q.      You did not?

9         A.      My main job is as a tankerman.

10        Q.      Okay.  Now, is it possible to live

11   aboard that fuel barge?

12        A.      No.

13        Q.      Okay.  So when you worked on the Long

14   Beach Island project for Great Lakes, where did

15   you actually live?

16        A.      In a motel.

17        Q.      Okay.  And you went to the barge when

18   you needed to?

19        A.      I spent 12 hours on the barge at times,

20   but during discharge when I'm loading the

21   hoppers, it took anywhere from 16 to 18 hours to

22   discharge that because I'm giving them between 60

23   and 70,000 gallons of fuel at a moderate pace,

24   you know.



Page 66

1    turn.

2        Q.        Okay.  And you worked on Barge 1003

3    approximately five months before your injury?

4        A.        Yes, sir.

5        Q.        Okay.  How many times did you use it?

6        A.        Never.  We tried to, but we just

7    couldn't lift it up.  The crank was frozen.  Even

8    Mr. Smith told us it was frozen.  I complained a

9    lot to him about it.

10       Q.        What was your understanding of the

11   purpose of having this crane?

12       A.        The main purpose for that crane is to

13   lift the hose up from one point, swing it over to

14   the dock, back and forth.  That's the main

15   purpose is to lift heavy stuff.

16       Q.        Did you have any training on the use of

17   this crane?

18       A.        No.  I never received any training on

19   that crane.

20       Q.        When you received your training to get

21   your tankerman and PIC credentials, did you have

22   any training on the use of this type of crane on

23   a fuel barge?

24       A.        Yes.



1      Q.      Okay.  Why?

2      A.      I cannot do it.  I have to get okay

3   from -- I told Mr. Rich Smith about it, yes, and

4   he told me he knew about it.

5      Q.      Did you ask him if you could try to fix

6   it?

7      A.      No.  I'm not in charge of the

8   maintenance.  He is.

9      Q.      Besides Mr. Smith, did you ever tell

10   anybody else, any other employee of Great Lakes,

11   that there was a problem with these winches as

12   far as you were concerned besides Rich Smith?

13      A.      The workers, the safety officer.

14      Q.      Do you remember the name of the safety

15   officer?

16      A.      Steve.

17      Q.      And that was before your accident you

18   told him that?

19      A.      A long time before that.

20      Q.      Okay.  Who else?  Anybody else besides

21   Steve?

22      A.      I don't remember, but I remember those

23   names, but I cannot override Mr. Smith and do

24   anything unless I get the okay.  He has to okay



# EXHIBIT-11

Excerpts from Deposition of Joshua Harris

MSJ_0140

1           A.    FOWT.  Yes.

2           Q.    All right.  So now I want to make it

3    clear on the record, when you went on the, the Barge

4    1003, they, they being Great Lakes Dredge and Dock,

5    refer to this as an unmanned barge.  Did you know that?

6           A.    Yes.

7           Q.    All right.  And during the daytime when

8    this barge is working, what is the purpose of the barge

9    if you and your engineer are, are assigned to be on the

10   barge; what are you all doing?

11          A.    During the daytime?

12          Q.    Yes, sir.

13          A.    We were either getting fuel or fueling

14   the hopper dredges off the shore, or we were making

15   sure we had enough fuel and the things that we needed

16   when we weren't doing that.

17          Q.    So it'd be basically three things.

18   Either, either you're fueling your barge, that is

19   taking on diesel fuel so that you can then take it

20   offshore to a hopper barge; is that correct?

21          A.    Yes.

22          Q.    Or if you're not doing that, I suppose

23   you would be doing routine clean-up and some minor

24   maintenance work on the barge.  Would that be accurate?

25          A.    Yeah.  And also we were preparing for

```
 1   next -- we were making preparations for our next load

 2   or discharge, yeah.

 3        Q.    Okay.  And when you prepare for the next

 4   load or discharge, did you personally have any duties

 5   or responsibilities with regard to the Nabrico winch

 6   and boom that is present on that 1003 barge?

 7        A.    Just to make sure that it kind of worked,

 8   but it really didn't.  It was old and rusty.

 9        Q.    Okay.

10        A.    We greased it, oiled it, all that stuff.

11        Q.    All right.  We have a videotape that was

12   made by Mr. Polly.  Do you know Mr. Polly?

13        A.    Oh, yeah.  Yes, I do.

14        Q.    Okay.  And who is Mr. Polly?

15        A.    He was another man that worked on the

16   barge with us.

17        Q.    Okay.  Do you remember what his job

18   position was?

19        A.    I wasn't -- not quite sure.  I never got

20   exactly what he did.  He was a -- I thought he was

21   another oiler like myself.

22        Q.    Okay.  Did you have more or less

23   experience than Mr. Jolly (sic) in the maritime field,

24   if you know?

25        A.    I, I couldn't say so for sure.
```



1    an understanding of why he was meeting your barge?

2          A.    Yes.

3          Q.    What was he doing?

4          A.    He was making sure everything was in

5    order.

6          Q.    Okay.  He was in charge of maintenance,

7    wasn't he?

8          A.    Yes.

9          Q.    He's given a deposition, and in his

10   deposition we asked him point-blank can you state

11   whether or not the, the winch and the boom on the 1003

12   was reasonably fit for the purpose for which it was

13   intended.  And he answered, no, it was not.  Do you

14   agree with that?

15         A.    Yes.

16         Q.    What was the -- what was the purpose of

17   having the winch and the boom on the 1003 as you knew

18   it?

19         A.    The purpose to have the winch, I believe,

20   was to just to hold the hose so it wouldn't scuff up

21   against the handrails inside of the barge.  I believe

22   it was just to hold the hose, not to actually move it.

23   Because it was almost impossible to like move the hose

24   with the winch.

25         Q.    All right.  And at some point in time one



1  out along the length of the barge on the end next to

2  the handrail.

3          A.    Yeah.

4          Q.    How long -- well, excuse me.  What's the

5  difference in the ability of you and Mr. McDermott to

6  do that manually?

7          A.    That would take a great more deal of

8  strength to use the six-inch hose versus the three-inch

9  hose.  It required at least two men, at least.  I would

10 say three men to be honest.  It was very heavy.

11         Q.    And when you men worked out there, you

12 worked with Mr. McDermott, didn't you?

13         A.    Yeah.

14         Q.    And he was the engineer?

15         A.    Yes.

16         Q.    Also sometimes referred to as a

17 tankerman, I believe?

18         A.    Yes.

19         Q.    He's the person in charge, right, PIC?

20         A.    Yes.

21         Q.    And on the other hand we've seen that you

22 did some paperwork, and one of the pieces of paper

23 we've seen was a job safety analysis sheet.  Do you

24 remember that?

25         A.    Right.



1   you-all had as far as staying there at the hotel and

2   going to bed so you could go to the next morning?

3          A.     We'd go to bed early so we can get up

4   early to get -- meet the barge, have plenty of time.

5          Q.     What time do you call early?

6          A.     4:00 or 5:00 in the morning.

7          Q.     And what time did you go to bed?

8          A.     Before 10:00.  Probably 8:00 or like 9:00

9   or 9:30, something like that.

10         Q.     All right.  So you could get something

11   like seven hours of sleep if you were consistent?

12         A.     Yeah, a decent amount of sleep.

13         Q.     All right.  And how many hours did you

14   work during the day when you worked there on the Barge

15   1003?

16         A.     Usually it was twelve.

17         Q.     All right.  So you were probably more

18   than a little bit tired by the time you went to bed.

19   Would that be fair?

20         A.     Yeah.  We were always tired.

21         Q.     Okay.  So did you have any doubt in your

22   mind that Mr. McDermott had come back from the Barge

23   1003 after work on 10/29 with you, and then did you

24   stay with him?  Did you-all go to dinner?

25         A.     No.  That was a late night.  We got -- we



1   the JSI (sic) of having a potential injury because the

2   boom was not working other than what you've already

3   testified to, which was to get an electric winch?

4        A.    Yeah.  That was the solution to the

5   problem was get the electric winch.

6        Q.    Who suggested that?

7        A.    Everybody.  Myself, Mr. McDermott, the

8   safety man and Mr. Rich Smith.

9        Q.    Did the site manager ever discuss this

10  with you men?

11       A.    I think, yeah, we talked about it with

12  him too.

13       Q.    Was he in agreement?

14       A.    I believe he was.  And I -- we were

15  waiting for it to come in, so that's what I remember.

16       Q.    To the best of your recollection for how

17  many days, weeks or months had you-all had under

18  request to get this electric winch to make the job more

19  safe?

20       A.    It was pretty much the whole time we were

21  on the barge.  I don't remember how long we were there.

22  We were on the barge, it was a good while.

23       Q.    When you say "a good while," was it a

24  matter of weeks or months?

25       A.    I'd say months.



```
 1   to free it up so it would work better.
 2          Q.    Okay.  Now, all of these pictures show
 3   the, the davit.  Some people call it a crane.
 4          A.    It's a davit.
 5          Q.    You, you testified earlier that it was
 6   old and rusty.  Do you remember that?
 7          A.    Yeah.  The win -- the crank was rusty,
 8   not the -- the davit itself is -- is in -- it's clean
 9   and in good shape.
10          Q.    Okay.
11          A.    I want to -- what I was talking about was
12   the winch.  The crank that you had to actually use to
13   move it, that's what was --
14          Q.    You mean the hand crank itself?
15          A.    Yes.
16          Q.    Okay.  So can you look at Great Lakes
17   939?
18          A.    All right.
19          Q.    Does this show the two winches that were
20   on the davit?
21          A.    Yes.
22          Q.    Okay.  And it -- one -- am I correct that
23   one of them moves the boom itself and the other moves
24   the object that you attach to the wire, right?
25          A.    Yes.
```



1          A.    All right.

2          Q.    Mr. Harris, I know that when I had asked

3    you questions earlier about the fact that the winch was

4    not working you indicated that this had gone on for a

5    period of, you thought, months.  Remember that

6    testimony?

7          A.    Uh-huh.

8          Q.    That's a yes?

9          A.    Yes.

10         Q.    Okay.  And so my question to you is, you

11   also said that the reason that you used the winch was

12   primarily -- I believe you said this -- for the

13   movement of the hose?

14         A.    To hold it up.  Hold it up.

15         Q.    Hold it up to the air, right.  And so

16   what we need to do is find out from you, going back to

17   being on the barge and saying to Mr. Smith the

18   maintenance man we need a winch that works, when you're

19   using the three-inch hose with a flange, why did you

20   need a winch that worked?

21         A.    To -- because it took forever to get --

22   you had to pick the boom up, swing it over, and then

23   pick the hose -- pick the cable up.  And it took so

24   many turns to get that boom up it would have took

25   forever.  I mean, it took hours almost.  Maybe not

ZAHN
COURT REPORTING

www.zahncourtreporting.com

1    hours.  Maybe like a half an hour or more just to get

2    the, the boom where you needed it, to get the davit to

3    where you needed it.  And if we had an electric one it

4    could have been done in a matter of moments.

5            Q.    Okay.  I understand.  So it's a matter of

6    quickness or expediency was one of the reasons.  And

7    for what purpose did you want to use the boom in the

8    first place?

9            A.    To move that big hose is what we needed

10   it for to begin with.

11           Q.    So if we take this JSA that you wrote,

12   and I think what you said was you and Mr. McDermott put

13   together your belief about the potential hazards and

14   consequences?

15           A.    Yeah.

16           Q.    And then maybe the safety department

17   tweaked it by putting the 40 pounds in there?

18           A.    Yeah.

19           Q.    Is that right?

20           A.    I believe so, yeah.

21           Q.    You hand wrote it and then they typed it?

22           A.    Yes.

23           Q.    Were you the one that wrote:  Back

24   injuries from lifting heavy hose due to boom not

25   working.  Do you remember that?



1   September 22nd.  And so when you had reported

2   originally to Mr. Smith that you need a winch and a

3   boom, that was before the, to your recollection, the

4   six-inch hose had ever come into being used; is that

5   right?

6              MR. MORGAN:  Objection to form.

7              THE WITNESS:  That was --

8   BY MR. MORGAN:

9        Q.    Or maybe you don't remember.  I'm just

10  trying to get the truth here.  Was the -- was the

11  moving force that wanted -- why you wanted to have this

12  hose ordered, was it because of a certain size of the

13  hose or was it for some other reason?

14       A.    Just to move the winch in general.  It

15  was hard to move the winch, so we wanted a winch to

16  move the -- we wanted an electric winch to move the

17  boom instead of the hand winch, because it was so

18  difficult just to turn the winch.  Without even a load

19  on winch it was difficult to use.

20       Q.    All right.  And is it your testimony that

21  you wanted to have a winch and a boom that worked

22  properly to move the hose regardless of whether it was

23  a three-inch hose or a six-inch hose?

24       A.    We needed a winch not to move -- you

25  can't really move the hose over.  You can pick the



1   hose -- you can only do one motion.  It can go up.  You

2   can't swing the boom over.  That's manually.  It would

3   be just as difficult.

4          Q.    I'm just trying to understand something.

5   If you wanted to have a winch that worked, was it

6   because you wanted to lift the hose mechanically up

7   into the air?

8          A.    Yes.

9          Q.    And was -- were you then going to take

10  your arms and your back and your strength and manually

11  move the boom to swing the hose over the dock?

12         A.    Yeah.  And it would have still been

13  easier to do it like that, yeah.

14         Q.    Okay.  And was the reason because, as you

15  stated on the JSA on October 29th, because you men felt

16  that you might suffer a back injury from lifting the

17  hose without the boom?

18         A.    Yes.

19         Q.    All right.  And did you-all fill out

20  JSAs, Mr. Harris, every time you did one of these jobs?

21         A.    Every time we fueled we had to fill out a

22  JSA, yes.

23         Q.    Do you remember if this was the one and

24  only time that you put on here, back injuries from

25  lifting heavy hose due to boom not working, or had you



1  done it before?

2         A.    No.  This was just a general copy.  So we

3  did this every time.  This is the exact same copy we

4  would have used for the most -- it would have been

5  the -- a copy just like this.  I did not type this.

6  All I did was read over this and sign it.  So we used

7  this copy more than once.

8         Q.    Okay.  And so is it your testimony that,

9  that for months your recollection is you and

10 Mr. McDermott were informing your employer that when

11 the major job step of transferring a hose to the

12 transfer facility was being done, you were at risk of a

13 back injury from lifting hose due to boom not working?

14        A.    Yes.

15        Q.    And when you first reported to

16 Mr. Richard Smith that the boom was not working, do you

17 recall what he responded?

18        A.    He said they were going to work on

19 getting us something that worked.  I'm pretty sure.

20        Q.    Okay.

21        A.    I think that's what he said.

22        Q.    Was he generally aware that the boom was

23 not working or do you know?

24        A.    Yeah.  He -- we went out there and we did

25 a demonstration to him.  We showed him how it didn't



1   work.   That's where a lot of these pictures come from.

2          Q.    All right.

3          A.    Rich took the pictures.

4          Q.    And did he agree it didn't work?

5          A.    Yes.

6          Q.    Did he agree you needed to have this

7   corrected?

8          A.    Yes.

9          Q.    Did he agree that he would try to do

10  something about it?

11         A.    Yes.

12         Q.    And did he mention whether he felt that

13  he needed to buy these winches so they had power,

14  electric power?

15         A.    Yes.

16         Q.    Did he mention whether he wanted to do it

17  on all three barges?

18         A.    No.  He said that if he did it on one, he

19  would have to do it on the others because of the

20  blueprints.  They had to change the blueprints or

21  something like that.

22         Q.    Okay.

23         A.    I'm not sure on that.  That's --

24               MR. MORGAN:  All right.  I found the, the

25  videotape that was produced to us in this case, and it



1          Q.     And I just want to follow up on your own

2    testimony where you said you can't -- no matter what

3    hose it is, you can't use this device to move the hose

4    around on the barge.  What you're doing is just lifting

5    it up once it gets to the edge, right?

6          A.     Right.

7          Q.     Okay.  So there's going to be manual

8    movement of whatever hose it is --

9          A.     Of course.

10          Q.     -- on the barge, right?

11          A.     Yes.

12          Q.     Okay.  You got to get it to the edge, got

13   to get -- afterwards, you got to get it back and coil

14   it up or flake it, whatever you're going to do?

15          A.     Right.

16          Q.     And this device is not going to help you

17   with that?

18          A.     Right.  I mean, it -- you could use it if

19   it worked correctly.  If it wasn't so hard to crank,

20   you could use it to lift the hose up maybe to the dock

21   or push it over to the dock, but it -- it was -- it was

22   broken.  It didn't work very well.

23          Q.     And in the video that we saw, you are in

24   the video --

25          A.     Right.



# EXHIBIT-12

MSJ_0155

```
1   want to make life easy for you, you know, you're

2   working long hours, 12-hour days, but definitely they

3   want you to use help.  They want you to make sure

4   you're not doing a project by yourself --

5                 MR. MORGAN:  (inaudible)

6                 THE WITNESS:  -- that you always got

7   someone around.

8                 MR. MORGAN:  (inaudible)

9   BY MR. DeGIULIO:

10         Q     You mentioned --

11                THE COURT REPORTER:  I didn't understand.

12                MR. DeGIULIO:  I didn't either.

13                Reed --

14                MR. MORGAN:  My objection is it's

15  nonresponsive.

16                MR. DeGIULIO:  Okay.

17                THE WITNESS:  What did he say?

18                MR. DeGIULIO:  He just made an objection,

19  it's okay.

20                THE WITNESS:  Okay.

21  BY MR. DeGIULIO:

22         Q     You mentioned lifting.  Did you have any

23  training from Great Lakes during your employment about

24  lifting, techniques, limits, that sort of thing?

25                A     Yeah.  It's in the SALT book on how, you
```



# EXHIBIT-13

MSJ_0157

Leslie McDermott vs.                                        Cameron Roger Whitmore
Great Lakes Dredge and Dock, Co.                                    July 13, 2018

33

1  updates as to the status of what he planned on

2  doing to resolve the issue.

3       Q.   Okay.  So that helps a lot.  So what

4  you would do is, if somebody other than Rich Smith

5  came to you and related what was talked about here

6  in the first few sentences, you would go to Rich

7  Smith and say, take care of this, find out what's

8  wrong with the winch or boom, is it working

9  properly or not, and if it's not, get with

10 engineering and get something out there that works;

11 right?

12      A.   Well, I wouldn't quite go that direct.

13 I mean, there's still -- you know, I mean, he's

14 still a maintenance manager.  He's above me.  So I

15 would ask him to look into the situation that

16 was -- you know, the men were talking about, ask

17 him to discover if there was an issue or if it was

18 not functioning properly, and also ask him, if he

19 came back and said, yes, there was an issue, I

20 would ask how we plan on correcting it.

21      Q.   Okay.  So now I want to advance to the

22 next step here.  Do you have any understanding of

23 how much the 6-inch fuel hose with the heavy flange

24 fittings weighs?

25      A.   No.



# EXHIBIT-14

Excerpts from the Deposition of William Baumann

MSJ_0159

19

1    So I don't know who made the specs.

2         Q.    Well, let's not talk so much about who

3    made the original specs.  Whose responsibility was

4    it when the barge was operated day in and day out

5    to determine if the equipment was performing

6    suitable for the intended use?

7         A.    In that definition of suitability, I

8    would say it means maintained and ready to operate,

9    and that would have been Rich.  And as far as I

10   know, it is maintained, ready, and working.

11        Q.    And you're saying it was working

12   properly and suitable for its intended use?  Is

13   that what your testimony is?

14        A.    In my opinion, yes.

15        Q.    And your opinion has no foundation in

16   knowing how many turns or how many minutes would

17   expire in trying to lift this hose off the deck of

18   the barge.  Isn't that true?

19        A.    That's true.

20        Q.    Now let's go to document 912.  Do you

21   remember receiving this from Rich Smith on or about

22   9/22/16?

23        A.    I don't remember it, specifically when.

24   I know that I was copied on it.  But I don't recall

25   the date.

Leslie McDermott vs.                                 William Charles Baumann
Great Lakes Dredge and Dock, Co.                              July 12, 2018

20

1        Q.   When you were copied on it, did you

2   read the document, Mr. Baumann?

3        A.   I probably didn't read it immediately.

4   I knew what it was.  I did not read the details of

5   the justification.  I instructed Rich to send it

6   in, so I knew what he was asking for.

7        Q.   Who did you instruct him to send it in

8   to?

9        A.   To Steve Becker, to -- and Audrey Tarr,

10  which is the -- Steve is the vice president of

11  plant and equipment, and Audrey Tarr is the

12  assistant that deals with financial documents.

13       Q.   All right.  When you received this, do

14  you have any recollection of reading what's under

15  Justification at the bottom?

16       A.   I didn't.  I have read it since then,

17  but I don't -- I did not -- I don't recall reading

18  it or what was in it at that point.

19       Q.   As a fleet manager over maintenance and

20  repair, is part of your responsibility to read

21  reports of requests for upgrade of mechanical

22  equipment and to participate in determining if it's

23  needed?

24       A.   I would say that's part of my job, yes.

25       Q.   All right.  So for what reason didn't

21

1   you read what Mr. Smith had written here under

2   Justification?

3       A.   I did not read his justification.  We

4   had discussed the justification, so I didn't feel I

5   needed to read every word.  I get over 100 emails a

6   day, so I don't get to read every one of them.

7       Q.   Okay.  So you're saying you were

8   already aware of what he had reported, that the

9   original boom has a hand crank operation that is

10  geared to a 1 to 1 ratio, parenthesis, worm gear

11  hand powered winch, and is extremely difficult to

12  operate due to the weight of the 30-foot boom, you

13  already knew that without reading it?

14      A.   Well, I think there's mistakes in here,

15  but I knew that he was asking for the $15,000 to

16  put the electric on there, and the reason was

17  because the fuel dock that we were going to was

18  going to charge us less money, and -- or if we

19  could get this winch working where the crew would

20  work -- would use it, we could save money on the

21  fuel, and that would probably be a good way to

22  justify the $15,000.  I didn't know that -- all of

23  this -- I don't agree with all these details in

24  here.  And had I read it, I might have corrected

25  some of that.

Leslie McDermott vs.
Great Lakes Dredge and Dock, Co.

William Charles Baumann
July 12, 2018

23

1          A.    I knew that the tankermen were not

2     using it because they're moving hoses.  Our old

3     fuel barges didn't have a crane at all, and that's

4     the way we always did it.  These were new.  These

5     were an upgrade.  But, you know, a fuel hose is not

6     difficult to manhandle.  It's normally manhandled.

7     But he said they're not using it, and we need to be

8     able to use it at this KMI.  So in order to make

9     them use it, maybe the electric ones would be

10    better.

11          MR. MORGAN:  Well, I'm going to object

12    to your answer as being nonresponsive, Mr. Baumann.

13    BY MR. MORGAN:

14          Q.    The question is real straightforward,

15    and that is, did you know the men were not using

16    this equipment to lift the hose?

17          A.    Yes.

18          Q.    Did you know what the hose weighed with

19    the flange?

20          A.    No.

21          Q.    Did you know what the weightlifting

22    restrictions were at Great Lakes Dredge and Dock

23    Co. at this time?

24          A.    I don't know the exact.  I know that

25    there is recommended practices to not lift more

AWR

40

1   been involved, if they felt they couldn't do this,

2   what's the alternative?  Can we get them more

3   people?  And I never heard the safety part.  I

4   don't think the safety department needed to get

5   involved in this.  It's --

6           Q.   Well, Mr. Baumann -- is it Baumann or

7   Baumann?  I want to pronounce it correctly.

8           A.   Baumann.

9           Q.   Baumann.  Mr. Baumann, you don't know

10  what the hose weighed.  You don't know what the

11  flange weighed.  So you don't know how much the men

12  were lifting.  We've all agreed upon that.  Right?

13          A.   Correct.

14          Q.   So don't you admit that risk

15  assessment, when you're talking about lifting and

16  pulling the hose, would require knowing what the

17  weights are?

18          A.    I think we have methods to -- I mean, I

19  don't know what the hose weighed.  I don't know

20  that Rich didn't, nor that the men didn't.  But we

21  have guidelines about if you don't know what it

22  weighs, don't overexert.  You know if you're

23  picking up 1000 pounds or if you're picking up 20

24  pounds.  Right?  You know that, hey, I can't lift

25  this, I have to do some other means.  And we have

MSJ_0067